## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| TAMMY BABBITT and WILLIAM CARTER, individually and on behalf of other similarly situated individuals, | Case No. 20-cv-00490-DWF-ECW |
| Plaintiffs, | **DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT REGARDING PLAINTIFF TAMMY BABBITT** |
| v. | |
| TARGET CORPORATION, | |
| Defendant. | |

## I.    INTRODUCTION

As an Executive Team Leader ("ETL")-Food, plaintiff Tammy Babbitt ("Babbitt") was an integral part of management at Target's South Rochester, Minnesota store. In that role, Babbitt was the sole executive responsible for the 75-employee Food Department. Babbitt admits that on a daily basis, she managed her department by delegating tasks to her team members to complete.

Babbitt came to Target with 20 years' experience as a manager at Walmart, where she agrees she was properly classified as exempt. Target further trained Babbitt to perform as a leader, and provided her with the requisite autonomy to decide how to manage her department, consistent with leadership objectives and skills. Babbitt coached her employees, administered corrective actions, and assessed her direct reports' performance. Babbitt also made recommendations about hiring and other personnel decisions. In her

entire tenure as an ETL, she recalls only one instance where her recommendation was not *immediately* followed. Even then, her recommendation was ultimately approved.

Babbitt understood she was supposed to perform as a leader, and her contemporaneous comments in her performance reviews reflect that she evaluated herself against these expectations. She credited her leadership and team-building, along with the sales increases she led her team to achieve year-over-year in the Food Department. Furthermore, when she completed a self-audit in 2019 detailing how she spent her time in the ETL role, she reported that she spent 70% of her time on managerial duties.

Now Babbitt makes the claim in this action that she actually no more than an hourly employee. The claim is not only unsupported by the undisputed evidence, but also is absurd. The South Rochester store employed approximately 200 people. The idea that the entire store is run by a single manager, a lone Store Team Leader ("STL")—who is not physically present during half of the hours the store was open, let alone during the time periods employees were working when it was not open—defies logic. Instead, the undisputed evidence shows that Babbitt, along with her fellow ETLs, assisted the STL by running their individual departments and served as exempt managers in that capacity.

Babbitt therefore was correctly classified as exempt, and summary judgment should be granted to Target on her sole claim that she was misclassified under the Fair Labor Standards Act ("FLSA").

## II.    MATERIAL FACTS

### A.    ETLs Are an Integral Part of Store Management

Target is a national discount retailer with approximately 1,900 stores in all 50 states. (Decl. of Michael Brewer in Support of Mot. For Summary Judgment Regarding Plaintiff Tammy Babbitt ("Brewer Decl.") ¶ 3.) Target's largest stores measure over 150,000 square feet, with top annual sales volume around $100 million and workforces of hundreds of employees. (*Id.* ¶ 4.) ETLs occupy an integral position in store management, as along with the STL, they are the only exempt salaried managerial position in the store. (Brewer Decl. ¶ 5; Babbitt 30:5-16.) ETLs are in charge of managing their particular department in the store. (Brewer Decl. ¶ 6.) To qualify for an ETL position, an applicant at a minimum must have a college degree or equivalent work experience. (*Id.* ¶ 7.)

### B.    Target Expects ETLs to Manage

Target's handbook for exempt stores employees makes clear that Target expects management to be an ETL's primary duty:

> As a leader, it's critical to spend substantially more than 50 percent of your time on leadership responsibilities rather than hourly tasks. You will need to jump in and assist with hourly tasks on occasion; however, you cannot forget to jump out at the right time to ensure you are spending the clear majority of your time on leadership.

(Decl. of David James in Support of Mot. For Summary Judgment Regarding Plaintiff Tammy Babbitt ("James Decl.") Ex. A.) Target further explains, "[a]s a leader, you are accountable for task completion, *but you must accomplish this through other people*. Successful leaders demonstrate the skills of owning, managing and driving their business."

(*Id.*, emphasis added.) Babbitt understood these expectations. (James Decl. Ex. B ("Babbitt") 45:1-46:20.)

Target's leadership expectations for an ETL-Food are confirmed in the job description, known as "Core Roles." (James Decl. Ex. C.) For example, the ETL-Food must "lead [her] team to deliver a fresh, full and food safe area during all operating hours." (*Id.*) ETLs must act at a high level, such as by developing strategies, creating plans, managing and overseeing, anticipating changes and needs, and developing and coaching employees. (*Id.*)

To ensure that they are performing primarily as managers, Target periodically requires ETLs to complete a self-audit in which they are asked to report how they spend their time in an average workweek between managerial and non-managerial tasks. (James Decl. Ex. D.) In July 2019, Babbitt reported that she spent 70% of her time on managerial tasks and 30% of her time on non-managerial tasks, and affirmed that representation was accurate. (*Id.*) After filing this lawsuit, at deposition, she revised the split to 60%/40% (still in favor of managerial tasks), and testified that the proportions changed significantly over the course of her time as an ETL. (Babbitt 189:7-190:18.)

### C.    Babbitt's Management Positions

Before she joined Target, Babbitt was a manager at Walmart for almost 20 years, first as an assistant manager, and later as a co-manager. (Babbitt 22:21-23:4, 24:4-6.) Babbitt admits that she was accurately classified as exempt at Walmart. (*Id.* 32:14-18.)

Target hired Babbitt on March 13, 2018, as an Executive in Training ("EIT") in the North Rochester, Minnesota store. (James Decl. Ex. E; Babbitt 26:22-25.) In this role,

4

Target paid her as a non-exempt, hourly employee. (James Decl. Ex. E.) During the training period, Target trained Babbitt about leadership and, among other things, she worked side by side with an existing ETL. (Babbitt 40:16-22; 41:22-25.) On April 22, 2018, after approximately six weeks of EIT courses, Babbitt became an ETL – Food in the South Rochester, Minnesota store. (James Decl. Ex. E; Babbitt 26:23-25.) On June 1, 2019, Babbitt's job title changed to "ETL – Food & Beverage Sales." (James Decl. Ex. E.) She remained in this position through her termination of employment on February 29, 2020. (*Id.*)

Since she left Target, Babbitt has been an Assistant Store Leader at Kwik Trip. (Babbitt 37:1-10.)

### D.  Babbitt Managed Her Department and the Store in a Variety of Ways

Babbitt was one of only eight or nine exempt managers at South Rochester, responsible for "close to 200" employees at the store. (Babbitt 30:5-21.) Store sales were about $128,000.00 or so per weekday, and approximately $200,000.00 per day on weekends, with even greater volume during the holiday season. (Babbitt 31:2-16.)

Babbitt's manager held her accountable for the entire Food Department (i.e., grocery and food service), which is broken down into subareas headed by Team Leads. (James Decl. Ex. F; Babbitt 79:5-12.) When Babbitt managed the Food Department, she oversaw approximately 75 employees, including five Team Leads who reported directly to her. (Babbitt 38:6-14; 78:16-79:8.) These Team Leads managed a number of team members, and Babbitt was responsible for ensuring that Team Leads were accountable for their subareas and for managing their people. (Babbitt 101:16-19.)

Babbitt managed her team in a variety of ways. On a daily basis, Babbitt listed the tasks to be completed by the Food team and assigned particular Team Leads to complete particular tasks. (Babbitt 138:8-17; James Decl. Ex. G.) Babbitt determined whether employees understood their sales expectations, and if not, she directed her Team Leads to train them about sales. (Babbitt 162:24-163:13.) She was also accountable for her department's execution of the weekly sales plan. (James Decl. Ex. H; Babbitt 167:20-168:21.) Babbitt's STL expected her to have a staffing plan and to ensure that hourly employees were cross-trained. (James Decl. Ex. I; Babbitt 173:6-174:2.)

The STL's communications with Babbitt demonstrate that he expected her to lead the completion of hourly tasks, rather than tackle them herself. For example, the STL would identify various tasks within the Food Department with the understanding that Babbitt, on a daily basis, would delegate them to the Team Leads for completion:

> Q:   Okay. And in the email you're directing particular Team Leads to do particular tasks, right?
>
> A:   Yes.
>
> Q:   So you took the tasks that had to be done and you divided them up among the Team Leads so that the Team Leads would do the tasks, right?
>
> A:   Yes.
>
> A:   Correct, I took the tasks that were given to me and I gave them down to them.
>
> Q:   Okay. And you did that every day?
>
> A:   Yes.

(Babbitt 138:8-17, discussing James Decl. Ex. G.)

6

Babbitt played a key role in preparing her team and the Food Department for Target executive and regulatory visits to the store. In preparation for these visits, Babbitt sent her team a staffing plan, identifying which employees were responsible for stocking which items. (James Decl. Ex. J; Babbitt 141:22-142:6.) When an auditor visited to ensure Babbitt's Food Department was complying with food sanitation regulatory requirements, Babbitt accompanied the auditor during the inspection, received the audit report on Target's behalf, and managed her team to rectify any deficiencies identified. (Babbitt 146:4-15, 147:5-10, 147:24-148:16.)

Babbitt was responsible for compliance with wage-and-hour requirements, including that her team took their legally required meal and rest breaks. (Babbitt 47:3-20.) She also ensured that her team did not work off the clock and were paid for all hours worked. (Babbitt 47:21-48:9.) Babbitt coached her team if they failed to comply with these legal requirements. (Babbitt 102:10-103:6; James Decl. Ex. K.)

Babbitt frequently opened the store, at which point she was the most senior person in the building, often referred to as the "Leader on Duty" or "LOD." (Babbitt 81:17-25.) As the LOD, she would tour the entire store to identify areas for improvement. (Babbitt 82:1-9.) She also led a store meeting, known as a "huddle," to discuss sales with the entire staff on site that day. (Babbitt 83:9-84:3.)

### E.     Babbitt's Performance Reviews Emphasized Her Management Accomplishments

Babbitt's 2018 annual review, delivered in March 2019, reflects her work as a manager. (James Decl. Ex. L.) For example, Babbitt was responsible for leading the

7

implementation of new processes in her department, referred to as "modernization." (James Decl. Ex. L; Babbitt 176:17-177:15, 183:6-8.) She was recognized for promoting teamwork and ensuring that her entire food staff was productive. (James Decl. Ex. L; Babbitt 178:25-179:15.) Babbitt's STL praised her for providing clear goals for her Team Leads and "further empowering them to feel like business owners." (James Decl. Ex. L; Babbitt 180:2-18.) Ultimately, Babbitt's manager credited her with being "a very global leader and set[ting] the bar for teamwork." (James Decl. Ex. L; Babbitt 180:24-181:2.) By contrast, Babbitt's manager did not mention any work performed by hourly team members, such as stocking shelves and running the register, in the annual review. (James Decl. Ex. L.)

In the self-assessment part of her 2018 review, Babbitt credited herself with being a great problem solver, great at team building, and offering a "total store leadership with her team." (James Decl. Ex. L; Babbitt 182:18-21.) Babbitt felt that she needed to tour the department with her Team Leads "more frequently to ensure there [sic] development as leaders" and "have more team lead and team member status visits to ensure development." (James Decl. Ex. L; Babbitt 184:9-12.) Babbitt did not highlight any work stocking shelves, running the register, or other work performed by hourly team members as important in her self-review. (James Decl. Ex. L.)

Babbitt's STL detailed the Food Department's (and Babbitt's) financial results for the year: "[y]our sales were up .26% in food, which lagged the store and company results. Markdowns were improved in food by .2%. Margin followed suit by improving in food by .42%." (James Decl. Ex. L.)

Babbitt's 2019 annual review similarly highlighted her accomplishments as a manager. (James Decl. Ex. M.) In particular, Babbitt called out the following key achievements in her self-review:

- Yearly sales increase in all of food 1.33%

- Good and gather was the largest brand launch in history of the company. We planned and executed a great launch. YTD driven $615,000

- Hired new leadership talent to my area (… both ETL potential), New TL Rebecca also shows strong promise

- Helped out in multiple areas during 4th quarter - especially through GM areas and checklanes

- I did a lot [sic] for the team in planning and executing for food and activities in the break room.

- Assisted in hiring for all areas of the store through Q4

(*Id*.; Babbitt 185:8-18.) Again, Babbitt did not highlight any work typically performed by hourly team members, such as stocking shelves and running the register, that she may have performed. (James Decl. Ex. M.)

**F.    Babbitt Made Personnel Decisions and Recommendations**

Babbitt played a key role in hiring hourly employees to work on her team. She interviewed candidates, and recommended which to hire and which to decline based on her assessment of how the candidate answered various questions. (Babbitt 57:8-13; 61:19-62:5.) She does not recall a single instance in which her hiring recommendations were not followed. (Babbitt 59:12-19.)

As a manager, Babbitt also drafted performance reviews. (Babbitt 111:17-21.) She identified the employee's strengths, opportunities, and future goals. (Babbitt 119:21-

120:1.) The employee's overall rating was the product of her input, as well as that of other ETLs and the STL. (Babbitt 120:8-21.) Babbitt does not recall any instance in which she advocated for a rating that the employee did not ultimately receive. (Babbitt 120:22-25.)

Babbitt also reviewed performance reviews of team members that her Team Leads drafted. (Babbitt 123:19-124:7.) As the executive ultimately responsible for the Food Department, she maintained the authority to overrule her Team Leads' recommendations. (Babbitt 124:16-125:2.)

Babbitt also administered coaching and discipline to her team members. Target's progressive discipline practice is known as "coaching and corrective action." (Babbitt 63:24-64:10; Decl. James Ex. N.) Target's process requires an employee's leader to prepare written corrective action, and another leader to approve it. (Babbitt 66:6-15; Decl. James Ex. N.), Babbitt was involved in both steps. (Babbitt 67:5-10; 68:13-15; 72:20-23.) For example, in partnership with the STL, Babbitt drafted and delivered to a team member a Corrective Action – Counseling that addressed the employee's poor attendance and sales performance. (Decl. James Ex. O; Babbitt 104:1-18, 165:22-166:2.) She also followed up with team members weekly after administering corrective action to ensure they were meeting expectations. (Babbitt 73:2-16; Decl. James Ex. N.)

Babbitt also regularly reviewed and approved corrective actions recommended by her Team Leaders. (Babbitt 79:17-80:9.) Babbitt cannot recall a single instance where her approval of others' proposed corrective action was not followed. (Babbitt 68:16-18.) Likewise, she can recall only one instance when her own proposed corrective action was

not immediately approved; in that case, it ultimately was approved after a delay. (Babbitt 68:19-69:11.)

Babbitt regularly engaged in coaching conversations with her team. For example, Babbitt coached one of her Team Leads about his attendance, urging him to take ownership over his business (including directing employees how to improve sales), train his team, and ensure they were working productively on the right tasks. (Babbitt 76:3-78:17; James Decl. Ex. P.) Babbitt also coached another Team Lead and directed him to improve the condition of the delicatessen sales floor, pointing out what needed to be done and explaining that if he did not improve, there would be disciplinary action. (Babbitt 89:15-92:9; James Decl. Ex. Q.) Babbitt also addressed with him complaints from his team regarding his lack of leadership. (Babbitt 93:9-20; James Decl. Ex. Q.) Babbitt coached Team Leads in other departments as well. (Babbitt 80:18-81:9.)

### G. Babbitt's Pay Was Commensurate with Management

Babbitt's initial salary was $70,000.00, and grew to $74,460.00 during her tenure. (James Decl. Ex. E.) Unlike team members and Team Leads, Babbitt was eligible for a bonus based on her department's productivity. (Brewer Decl. ¶ 8.)

From December 30, 2018 through January 4, 2020, which includes the entire pay periods surrounding the 2019 calendar year, the median Team Leader wage was $19.00/hour following merit increases in approximately May 2019. (Brewer Decl. ¶ 9.) The median Team Leader total income during this period was $32,174.01. (*Id.*) Only three (out of nineteen) Team Leaders reached $50,000.00, and the highest earner received

$56,008.30 over this year-plus. (*Id.*) The median Team Member wage during this period was $13.00/hr. following merit increases. (*Id.*)

## III.   LEGAL ANALYSIS

### A.   Summary Judgment Standard

A court shall grant summary judgment if the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Lenzen v. Workers Comp. Reinsurance Ass'n*, 843 F. Supp. 2d 981, 990 (D. Minn. 2011), *aff'd*, 705 F.3d 816 (8th Cir. 2013). The moving party bears the initial burden of demonstrating there are no genuine issues of material fact. *Gilkerson v. Nebraska Colocation Centers, LLC*, 859 F.3d 1115, 1118 (8th Cir. 2017), *reh'g denied* (Aug. 1, 2017). "If the movant does so, the non-moving party must then present evidence showing a genuine issue of material fact." *Id.*

To survive summary judgment, "[a] plaintiff may not merely point to unsupported self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor." *Davidson & Assocs. v. Jung*, 422 F.3d 630, 638 (8th Cir. 2005). A plaintiff's opposition must be based on "more than mere speculation, conjecture, or fantasy," and a plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011). "A mere scintilla of evidence is insufficient to defeat summary judgment." *Brunsting v. Lutsen Mountains Corp.*, 601 F.3d 813, 820 (8th Cir. 2010) (quotation marks omitted).

While all facts must be viewed in the light most favorable to the nonmoving party, *Gilkerson*, 859 F.3d at 1118, the court "is not required to accept unreasonable inferences or sheer speculation as fact." *Reed v. City of St. Charles, Mo.*, 561 F.3d 788, 791 (8th Cir. 2009) (quotation makes omitted). "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the applicable law." *Hammer v. City of Osage Beach, MO*, 318 F.3d 832, 837 (8th Cir. 2003). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Torgerson*, 643 F.3d at 1042.

In FLSA misclassification cases, courts previously interpreted the exemptions narrowly, but that is no longer the rule. Overtime exemptions must be given a "fair reading," as they are "are as much a part of the FLSA's purpose as the overtime-pay requirement" itself. *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018); *Coates v. Dassault Falcon Jet Corp.*, 961 F.3d 1039, 1047 n. 7 (8th Cir. 2020) (noting the Supreme Court's rejection of the narrow construction of exemptions). "[W]hether [employees'] particular activities excluded them from the overtime benefits of the FLSA is a question of law." *Grage v. Northern States Power Co.-Minn.*, 813 F.3d 1051, 1054 (8th Cir. 2015).

### B.     Babbitt Qualified as a *Bona Fide* Executive

Babbitt asserts a single claim: failure to pay overtime due to misclassification as exempt under the FLSA. (Cmplt. ¶¶ 40-44.) The FLSA excludes from statutory overtime requirements employees who are properly classified as *bona fide* executives. 29 U.S.C. § 213(a)(1). An employee falls within this exemption if (1) she is compensated on a salary

basis at a rate of more than $684 per week; (2) her primary duty is the management of the enterprise or a customarily recognized department thereof; (3) she customarily and regularly directs the work of two or more employees; and (4) she has the authority to hire and fire other employees or their suggestions or recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particularly weight. 29 C.F.R. § 541.100(a); *see Fife v. Bosley*, 100 F.3d 87, 89 (8th Cir. 1996) ("to determine whether an employee is an exempt executive … employee, a court must apply Department of Labor regulations").

There is no dispute that Babbitt satisfies the first and third requirements. Babbitt's salary – ranging from $70,000.00 to $74,460.00 – far exceeds the threshold requirement of $684.00 per week, or $35,568.00 annually. Similarly, there is no dispute that Babbitt directed the work of at least two employees: she supervised five Team Leads and approximately 75 employees total within the Food Department. Therefore, the only remaining questions are whether Babbitt's primary duty was management, and whether she had the authority to make personnel decisions, and/or her recommendations regarding such decisions was given particular weight. As shown below, the evidence overwhelming demonstrates there is no genuine dispute of material fact on these issues, either.

        1.       Babbitt's Primary Duty Was the Management of the Food Department

To meet the executive exemption, an employee's "primary duty" must be the "management of the enterprise … or a customarily recognized department thereof." 29 C.F.R. § 541.100(a). Babbitt was the sole ETL responsible for the Food Department at the

South Rochester store; thus, there is no dispute she was responsible for a "customarily recognized department."

"The term 'primary duty' means the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). Courts may consider "the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." 29 C.F.R. § 541.700(a). Ultimately, there can be no doubt that Babbitt managed the Food Department. The sole question is whether her primary duty was management. Indeed, it was.

> a.   There is No Question That Babbitt Performed Managerial Duties While Leading the Food Department

The U.S. Department of Labor ("DOL") explains that management:

> includes, but is not limited to, activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102. There is no question that Babbitt engaged in many of these sorts of activities. She directed the work of the Team Leads, and managed their supervision of team

members. She ensured that the Food Department executed the weekly sales plan. Babbitt's STL expected her to have a staffing plan and ensure that hourly employees were cross-trained. On a daily basis, she communicated a list of tasks for the Food Team and delegated responsibilities to the various Team Leads. Babbitt ensured that the Food Team members understood their sales expectations, and when they did not, she directed her Team Leads to train the Food Team members regarding those expectations. Babbitt was responsible for wage-and-hour compliance, including ensuring that meal and rest breaks were taken and preventing off-the-clock work. She was actively involved with hiring, coaching and corrective action when her team (as well as hourly employees outside of her Food Department) did not meet expectations.

As the ETL-Food, Babbitt had special responsibility for ensuring food sanitation, partnering with Target's auditor, Ecolab. Babbitt participated in inspections, received the resulting reports, and was expected to lead the resolution of any deficiencies.

Finally, Babbitt frequently had responsibility for the entire store when it opened and the STL was not present. In this capacity, she toured the entire store to identify tasks and led "huddles" to discuss sales with the entire staff.

> b. Babbitt's Management Duties Were the Most Important to Target

Under this factor, courts must compare the <u>importance</u> of Babbitt's managerial and non-managerial duties, while "keeping in mind the end goal of achieving the overall success of the company," as well as the impact on the employer's business if the manager failed to perform her managerial, versus non-managerial, duties. *Thomas v. Speedway*

*SuperAmerica, LLC*, 506 F.3d 496, 505 (6th Cir. 2007). Ultimately, the question is whether Babbitt's managerial tasks were the most important <u>to Target</u>. *See generally Auer v. Robbins*, 65 F.3d 702, 713 (8th Cir. 1995) (holding that "precinct sergeants' duties, as delineated in the police manual, clearly establish that managing subordinate patrol officers constitutes their primary duty").

Here, there is no question that Babbitt's managerial duties were most important to Target. Target communicated their importance to Babbitt in a number of ways, starting with the Core Roles. The Core Roles is replete with important managerial tasks, and contain little to no reference to manual labor.

In addition, Target invested in Babbitt's six-week paid leadership training program as an EIT, whereas new hourly employees jumped right into their job. *Anderson v. Dolgencorp of N.Y., Inc.*, Nos. 1:09-cv-360, 1:09-cv-363, 2011 WL 1770301, at *11 (N.D.N.Y. May 9, 2011) (citing *In re Dollar General Stores FLSA Litig.*, Nos. 5:09-MD-1500-JG et al., at *10 (E.D.N.C. Jan. 19, 2011)) (determining that plaintiff's "value to [employer was] shown by the fact that, unlike the other employees in the store, she went through four weeks of training before she was assigned her own store.")).

Target's handbook for exempt store leaders further underscored the primacy of Babbitt's managerial responsibilities. The handbook explained, and Babbitt understood:

- It's "critical" for ETLs to "spend substantially more than 50 of [their] time on leadership responsibilities;"

- ETLs may assist "with hourly tasks on occasion," but must ensure they "are spending the clear majority of [their] time on leadership, and;"

17

- "Successful leaders demonstrate the skills of owning, managing and driving their business."

(James Decl. Ex. A; Babbitt 45:1-46:20.) *Auer*, 65 F.3d at 713 (relying on policy manual to conclude that management was most important duty). Moreover, Target invested in its self-audit program, designed to ensure that ETLs are spending at least half of their time performing managerial duties.

Babbitt's STL considered her managerial work to be most important as well. Babbitt was the sole executive leader of the Food Department. She directly managed all of the Food Team Leads, and indirectly managed the entire team of approximately 75 team members. Babbitt's STL identified priorities for her, and it was her job to assign Team Leads and direct the team to accomplish them. The STL's communications with Babbitt demonstrate that he expected her to lead the completion of hourly tasks, rather than tackle them herself. For example, as noted above, the STL would identify various tasks within the Food Department with the understanding that Babbitt, on a daily basis, would delegate them to the Team Leads for completion:

Q:   So you took the tasks that had to be done and you divided them up among the Team Leads so that the Team Leads would do the tasks, right?

A:   Yes.

A:   Correct, I took the tasks that were given to me and I gave them down to them.

Q:   Okay. And you did that every day?

A:   Yes.

(Babbitt 138:11-17, discussing James Decl. Ex. G.)

Moreover, Babbitt's performance reviews emphasized her managerial work, and do not address any hourly work. For example, Babbitt's STL highlighted her department's sales metrics year over year, praised her implementation of new department processes, and credited her for being a "very global leader." Babbitt herself mirrors this approach, highlighting her management in her personal accomplishments. Among other things, she was proud of providing a "total store leadership with her team," her problem solving and team building, and hiring new leadership (*i.e.*, Team Leads) in Food. She never mentioned performance of hourly tasks in her self-reviews.

Given that Babbitt was the sole executive leader of the Food Department, it is hardly surprising that Target—both corporate and Babbitt's supervisor—deemed her managerial duties to be the most critical component of her job. Unsurprisingly, courts repeatedly have emphasized the importance of an assistant manager's role in the success of the business. *See Donovan v. Burger King Corp.*, 675 F.2d 516, 520-21 (2d Cir. 1982) (establishment could not successfully function unless assistant managers performed their critical roles of overseeing employees and assigning employees to particular jobs); *Yesmin v. Rite Aid of New York, Inc.*, No. CV 10-4157, 2012 WL 3871735, at *6 (E.D.N.Y. Sept. 6, 2012) (plaintiff's non-exempt tasks were "minor" compared to primary duty of managing store and hourly employees; responsibilities "paramount to the success and profitability of her stores" included monitoring employees to ensure they performed tasks properly, and hiring, reviewing and disciplining employees); *Guinup v. Petr-All Petroleum Consulting Corp.*, No. 07-CV-1120, 2010 WL 3338800, at *8 (N.D.N.Y Aug. 23, 2010) ("In other words, while [the store] could have operated—albeit poorly—if Plaintiff did not perform her non-

managerial duties, [it] could not have operated successfully unless Plaintiff performed her managerial functions").

           c.       Babbitt Spent the Majority of Her Time on Management Duties

"[E]mployees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement." 29 C.F.R. § 541.700(b). Babbitt represented to Target in her self-audit that that she spent 70% of her time doing management work. Now that she is suing Target, she has reduced this figure, but when asked what needed to be adjusted, still was left with a majority of her time (60%) on managerial duties. Either way, Babbitt's admissions strongly support her exempt status.

Babbitt will no doubt downplay her self-audit results and related sworn testimony, shifting to a new story that she spent less than half her time on managerial duties. But even if she does change her position, it should not change the analysis.

The DOL is clear: "[t]ime alone, however, is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work." 29 C.F.R. § 541.700(b). This is particularly true in the retail context. *Id*. §541.700(c) ("assistant managers in a retail establishment who perform exempt executive work … may have management as their primary duty even if the assistant managers spend more than 50 percent of the time performing nonexempt work such as running the cash register"),

The Eighth Circuit also rejects the notion that the amount of time spent managing is dispositive, particularly in retail. *Murray v. Stuckey's Inc.*, 939 F.2d 614, 618 (8th Cir. 1991) (quoting *Donovan v. Burger King Corp.*, 672 F.2d 221 (1st Cir. 1982)) ("the person

'in charge' of a store has management as his primary duty, even though he spends the majority of his time on non-exempt work and makes few significant decisions"); *Spinden v. GS Roofing Prod. Co.*, 94 F.3d 421, 428 (8th Cir. 1996) (noting that "the fact that an employee spent 65 to 90 percent of his time on nonexempt tasks is not a controlling factor under the regulations for determining whether the employee was exempt"); *Auer*, 65 F.3d at 712 ("As a general rule, the regulations provide that if an employee spends over 50% of his time on managerial duties, his primary duty is management. However, if an employee spends less than 50% of his time on managerial duties, he is not presumed to have a primary duty of nonmanagement").

The DOL also recognizes that "[c]oncurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption…" 29 C.F.R. § 541.106(a). "Generally, exempt executives make the decision regarding when to perform nonexempt duties and remain responsible for the success or failure of business operations under their management while performing the nonexempt work." *Id*. Again, the DOL finds these principles particularly attributable to the retail setting:

> For example, an assistant manager in a retail establishment may perform work such as serving customers, cooking food, stocking shelves and cleaning the establishment, but performance of such nonexempt work does not preclude the exemption if the assistant manager's primary duty is management. An assistant manager can supervise employees and serve customers at the same time without losing the exemption. An exempt employee can also simultaneously direct the work of other employees and stock shelves.

*Id*. § 541.106(b).

Even if Babbitt sometimes jumped in to help finish hourly employee tasks, she did so as a manager, and was performing exempt and non-exempt tasks concurrently. Thus, no matter how Babbitt's time is sliced, the outcome is the same: Babbitt's management work constituted her primary duty. *Yesmin*, 2012 3871735, at *5 (assistant store manager's position qualified for executive exemption, despite being assigned various manual labor duties, because, unlike non-exempt employee, assistant store manager decided when to perform nonexempt duties, while still remaining responsible for success or failure of business operations).

### d.    Babbitt Was Relatively Free from Direct Supervision

Target and her STL expected Babbitt to lead her team without material supervision. The STL identified priorities for the Food Department, and left it to Babbitt to determine how to execute them. On a daily basis, Babbitt delegated responsibilities to the Food Team Leads, who, in turn, delegated to the Team Members in their subareas. Similarly, Babbitt was responsible for deciding how to execute the weekly sales plan received from corporate.

Not surprisingly, Babbitt's STL frequently was not even in the building during Babbitt's shifts. As LOD, Babbitt opened the store at the beginning of the day and often was the most senior person in the store.  She toured the entire building to identify projects and led all-employee sales meetings. Her STL hardly could have offered direct supervision during these periods.

Babbitt no doubt will argue that her freedom and independence was circumscribed by corporate standards or instructions from her STL. This argument is immaterial. A national retail chain like Target naturally requires some degree of consistency store

appearance and product placement so that consumers know what to expect and can navigate the store. The existence of corporate standards does negate Babbitt's responsibility to manage her team to ensure her department was compliant with these standards, nor do they suggest <u>how</u> Babbitt should manage her team to that goal. *Murray v. Stuckey's Inc.*, 939 F.2d 614, 619 (8th Cir. 1991) (employee's primary duty was management even though national office, "like most modern retail chains, prescribed and standardized many aspects of store operations" and "the discretion usually associated with management may be limited by the company's desire for standardization and uniformity").

Moreover, the law does not demand <u>complete</u> freedom from supervision. The fact that Babbitt received some instruction from her supervisor—as do all managers—does not diminish Babbitt's <u>relative</u> freedom to exercise her managerial discretion. *See Scott v. SSP Am. Inc.*, No. 09-CV-4399, 2011 WL 1204406, at *11 (E.D.N.Y. Mar. 29, 2011) (plaintiff was relatively free from direct supervision when she, *inter alia*, decided how to delegate work, disciplined hourly employees, came up with action plans to address store issues, moved employees to different units, and coached subordinates); *Yesmin*, 2012 WL 381735, at *6 ("The fact that plaintiff was also supervised by the store manager, who was the highest ranked employee in the store, does not diminish [plaintiff's] management of the other employees and the operation of the store."); *Amash v. Home Depot U.S.A., Inc.*, No. 1:12-cv-837, 2014 WL 2616839, at *6 (N.D.N.Y. June 12, 2014) ("even where a manager's discretion is limited by upper management, the manager may still be considered an exempt employee."). Ultimately, Target and Babbitt's STL identified objectives, but left the execution of those objectives to her.

e.      Babbitt's Salary Dwarfed Hourly Employees' Wages

Babbitt's salary ranged from $70,000.00 to $74,460.00 across her tenure as a Target ETL. Meanwhile, the median Team Leader in her store earned $19.00/hour in 2019[1], and $32,174.01 in a little over a year. Even the highest paid Team Leader earned only $56,008.30 in a year-plus, almost $20,000.00 short of Babbitt's salary. Further, Babbitt was eligible for a bonus, while hourly team members were not. Babbitt's compensation was on a different level, which further confirms her exempt status. Indeed, if Target wanted to merely hire someone to stock shelves or perform other nonexempt work, it could have hired at least two, and perhaps even more, hourly employees to do that work instead of Babbitt.

## C.      Babbitt's Recommendations with Respect to Hiring, Promotion, and Other Personnel Changes Were Given Particular Weight

The final requirement for the executive exemption is the "authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." 29 C.F.R. § 541.100(a)(4). Factors that determine whether suggestions or recommendation are given particular weight may include "whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon." *Id.* § 541.105.

---

[1] The median Team Member earned $13.00/hour.

*Maddon v. Lumber One Home Center, Inc.*, 745 F.3d 899 (8th Cir. 2014), is instructive on the low threshold for this requirement. There, the Eighth Circuit reviewed "the different factors [various] courts used to find the fourth element satisfied, including the offering of personnel recommendations that were acted upon by managers, involvement in screening applicants for interviews, and participation in interviews, among others." *Id*. at 904. It concluded that "many different employee duties and levels of involvement can work to satisfy this fourth element." *Id*. Applying this test, the employee at issue met the requirement by making a recommendation regarding a single applicant. *Id*. at 908. The Eighth Circuit has reaffirmed this low bar. *Garrison v. ConAgra Foods Packaged Foods, LLC*, 833 F.3d 881, 886 (8th Cir. 2016) ("involvement in at least one personnel decision, if not more, [is sufficient to establish] an executive capacity"). The DOL agrees. Final Rule Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, Federal Register Vol. 69, No. 79, p. 22131 (Apr. 23, 2004) (noting disjunctive "or" and determining that "[a]n employee who provides guidance on any one of the specified changes in employment status may meet the section 541.100(a)(4) requirement").

Babbitt routinely made personnel decisions and recommendations as an ETL. She interviewed candidates for her team, and made hiring recommendations based on how those candidates answered interview questions. She approved corrective actions proposed by her Team Leads, and drafted corrective actions herself. She was actively involved in annual performance reviews: she participated in a collaborative process with the STL and her ETL peers to determine her subordinates' overall ratings, and she reviewed and

25

approved her Team Leads' recommendations. Any of these personnel actions in isolation is sufficient to satisfy this prong of the executive exemption. Collectively, they firmly establish that Babbitt was properly classified as a manager as a matter of law.

Of course, Babbitt did not have unlimited authority to make certain personnel decisions, such as terminations of employment, but that is not necessary to establish her exempt status. Indeed, any organization large or sophisticated enough to have a human resources, employee relations, or similar function expects some level of review for certain personnel decisions. But Babbitt had the authority to suggest or recommend personnel actions, and her input was afforded substantial deference. <u>Tellingly, across her entire tenure with Target, Babbitt can recall only a single instance in which her recommendation was not immediately followed, and even then it was eventually approved after a delay</u>. She could not recall <u>any</u> instance in which her recommendation was not ultimately followed. This is more than sufficient to establish this requirement of the executive exemption. *Nerland v. Caribou Coffee Co., Inc.*, No. 05-CV-1847, 2007 WL 1170770 at *1 n. 3 (D. Minn. Apr. 19, 2007) (recommendations can be given particular weight even if they are not conclusive); 29 C.F.R. § 541.105 ("An employee's suggestions and recommendations may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status").

## **CONCLUSION**

The undisputed evidence shows that Target correctly classified Babbitt as an exempt executive. Target expected Babbitt to perform as a leader, not an hourly employee.

Babbitt's most important duties were managerial, not rank-and-file. Babbitt regularly performed managerial duties and made personnel decisions and recommendations. The Court should therefore grant summary judgment in favor of Target.

NILAN JOHNSON LEWIS PA

Dated: August 6, 2021

By:  s/ Joseph G. Schmitt
    Joseph G. Schmitt (Reg. No. 231447)
    David A. James (Reg. No. 337389)
    Pablo Orozco (Reg. No. 0396811)
    250 Marquette Avenue South, Suite 800
    Minneapolis, Minnesota 55401
    Telephone: (612) 305-7500
    Fax: (612) 305-7501
    jschmitt@nilanjohnson.com
    djames@nilanjohnson.com
    porozco@nilanjohnson.com

ATTORNEYS FOR DEFENDANT
TARGET CORPORATION

4825-4443-9795