# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| TAMMY BABBITT and WILLIAM CARTER, individually and on behalf of other similarly situated individuals, | Case No. 20-cv-00490-DWF-ECW |
| Plaintiffs, | **DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION** |
| v. | |
| TARGET CORPORATION, | |
| Defendant. | |

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     STATEMENT OF FACTS ..................................................................................... 3

        A.  Each Target Store Is a Multi-Million-Dollar Business. ...................................... 3

        B.  Target Expects ETLs to Lead and Manage Their Teams. ................................. 4

            1.  There Are Several Kinds of ETL Positions. ............................................... 5

            2.  ETLs Receive Tailored Training to Develop Leadership Skills. ................ 8

            3.  Target's Policies Require ETLs to Focus on Managerial Duties. ............... 8

        C.  Evidence Shows Significant Variations Among ETLs, and Among
            Plaintiffs and Opt-ins, on Time Spent on Managerial Duties and Duties
            Performed. ...................................................................................................... 9

            1.  According to Their Self-Audits and Testimony, ETLs Spend Varying
                Amounts of Time on Managerial Duties. ................................................... 9

            2.  The ETL Experience Can Vary Significantly, Depending on the
                SD's Management Style. ......................................................................... 13

            3.  The Testimony of Plaintiffs, Opt-ins and Other ETLs Shows
                Significant Differences in How They Spent Their Time. .......................... 15

III     IN PRIOR ETL MISCLASSIFICATION CASES, COURTS HAVE
        CONSISTENTLY REFUSED TO CERTIFY NATIONAL COLLECTIVES
        OR STATEWIDE CLASSES, AND OTHER PLAINTIFFS HAVE
        ABANDONED THEIR CLAIMS ...................................................................... 21

        A.  *Jibowu.* ......................................................................................................... 21

        B.  Certification Has Been Denied or Dropped in Other Target
            Misclassification Cases. ................................................................................ 22

IV.     THE HEIGHTENED STANDARD FOR CONDITIONAL
        CERTIFICATION APPLIES HERE ................................................................. 23

        A.  Plaintiffs Must Satisfy the Applicable Standard to Win Conditional
            Certification. ................................................................................................. 23

        B.  The Heightened Standard is Appropriate, Given the Extensive Factual
            Record Presented Here ................................................................................. 26

        C.  Even If a Lower Standard Were Used, Target's Evidence Should Be
            Considered. ................................................................................................... 29

V.      THE 11,000+ PUTATIVE COLLECTIVE MEMBERS ARE NOT
        SIMILARLY SITUATED ................................................................................. 30

i

A.  Plaintiffs Identify No Formal Misclassification Policy Applicable to All ETLs..............................................................................30

B.  Just as the Court Found in *Jibowu*, the Evidence Establishes That There Is No Nationwide Misclassification Practice. ................................34

C.  Certification Should Be Denied Because Too Much Variation Exists Between the Actual Job Duties Performed by Plaintiffs and the Putative Collective. ..........................................................................37

VI.    OTHER ETL CASES ARGUE AGAINST, NOT FOR, CERTIFICATION ........39

VII.   PLAINTIFFS CANNOT JUSTIFY CONDITIONAL CERTIFICATION POST-*JIBOWU* ............................................................................41

VIII.  PLAINTIFFS' PROPOSED NOTICE IS DEFICIENT .........................................45

A.  The Cut-Off Date Should Be Three Years from the Issuance of Notice..........45

B.  The Parties Should Meet and Confer About the Proposed Notice. .................46

IX.    CONCLUSION ...................................................................................46

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                 **Page(s)**

*Adair v. Wis. Bell, Inc.*,
  No. 08-cv-280, 2008 WL 4224360 (E.D. Wis. Sept. 11, 2008) ................................. 24

*Ahmed v. T.J. Maxx Corp.*,
  103 F. Supp. 3d 343 (E.D.N.Y. 2015) ........................................................................ 34

*Aros v. United Rentals*,
  269 F.R.D. 176 (D. Conn. 2010)................................................................................ 31

*Benton v. Labels Direct, Inc.*,
  No. 4:14-cv-01293, 2014 WL 4659640 (E.D. Mo. Sept. 17, 2014) ........................... 28

*Bramble v. Wal-Mart Stores, Inc.*,
  No. 09-cv-4932, 2011 WL 1389510 (E.D. Pa. Apr. 12, 2011)............................... 25, 36

*Brown v. Barnes & Noble*,
  252 F. Supp. 3d 255, 263-264 (S.D.N.Y. 2017) ..................................................... 33, 35

*Brown v. Barnes & Noble, Inc.*,
  No. 1:16-cv-07333, 2018 WL 3105068 (S.D.N.Y. June 25, 2018) ...................... 33, 42

*Burch v. Qwest Commc'ns Int'l, Inc.*,
  500 F. Supp. 2d 1181 (D. Minn. 2007) ...................................................................... 29

*Camper v. Home Quality Mgmt. Inc.*,
  200 F.R.D. 516 (D. Md. 2000)................................................................................... 43

*Chand v. Target Corp.*,
  No. BC315688 (Cal. Sup. Ct. Oct. 5, 2006) ........... ................................................ 22

*Chin v. Tile Shop, LLC*,
  57 F. Supp. 3d 1075 (D. Minn. 2014) ........................................................................ 29

*Davis v. Charoen Pokphand (USA), Inc.*,
  303 F. Supp. 2d 1272 (M.D. Ala. 2004) .................................................................... 29

*Deutsch v. My Pillow, Inc.*,
  No. 20-cv-318, 2020 WL 7351556 (D. Minn. Dec. 15, 2020) ...................... 26, 30, 38

*Faraji v. Target Corp.*,
  No. 5:17-cv-00155, 2018 WL 2041380 (C.D. Cal. Apr. 30, 2018)............................ 22

iii

*Gifford v. Target Corp.*,
No. 10-cv-01194 (D. Minn. April 19, 2010)............................................................... 23

*Guillen v. Marshalls of MA, Inc.*,
750 F. Supp. 2d 469 (S.D.N.Y. 2010)................................................................ 34, 35

*Hoffman-LaRoche, Inc. v. Sperling*,
493 U.S. 165 (1989)........................................................................................... 23, 24

*Holt v. Rite Aid Corp.*,
333 F. Supp. 2d 1265 (M.D. Ala. 2004) ..................................................................... 27

*Jibowu v. Target Corp.*,
492 F. Supp. 3d 87 (E.D.N.Y. 2020) .................................................................*passim*

*In re JPMorgan Chase & Co.*,
916 F.3d 494 (5th Cir. 2019) ..................................................................................... 39

*Khan v. Airport Mgmt. Servs., LLC*,
No. 10-cv-7735, 2011 WL 5597371 ........................................................................... 35

*King v. West Corp.*,
No. 8:04-cv-318, 2006 WL 118577 (D. Neb. Jan. 13, 2006) ..................................... 25

*Korenblum v. Citigroup, Inc.*,
195 F. Supp. 3d 475 (S.D.N.Y. 2016)................................................................. 26, 31

*Laroque v. Domino's Pizza, LLC*,
557 F. Supp. 2d 346 (E.D.N.Y. 2008) ....................................................................... 42

*Le v. Regency Corp.*,
957 F. Supp. 2d 1079 (D. Minn. 2013) ...................................................................... 29

*Lloyd v. J.P. Morgan Chase & Co.*,
No. 11-cv-9305, 2013 WL 4828588 (S.D.N.Y. Sept. 9, 2013), *aff'd in part*,
791 F.3d 265 (2d Cir. 2015)................................................................................ 43, 44

*Locicero v. Target Corp.*,
No. 3:16-cv-05592 (D.N.J. July 27, 2017) .......................................................... 27, 28

*Loomis v. CUSA LLC*,
257 F.R.D. 674 (D. Minn. 2009)................................................................................ 45

*Luksza v. TJX Companies, Inc.*,
No. 2:11-CV-01359, 2012 WL 3277049 (D. Nev. Aug. 8, 2012).............................. 27

iv

*Marek v. Chesny*,
    473 U.S. 1 (1985) ................................................................................................ 40

*McEarchen v. Urban Outfitters, Inc.*,
    No. 13-cv-3569, 2014 WL 2506251 (E.D.N.Y. June 3, 2014) .................................... 36

*Mike v. Safeco Ins. Co. of Am.*,
    274 F. Supp. 2d 216 (D. Conn. 2003) ................................................................. 31, 37

*Morisky v. Public Serv. Elec. & Gas Co.*,
    111 F. Supp. 2d 493 (D. N.J. 2000) ............................................................................ 31

*Myers v. Hertz Corp.*,
    624 F.3d 537 (2nd Cir. 2010) ..................................................................................... 31

*Olivo v. GMAC Mortg. Corp.*,
    374 F. Supp. 2d 545 (E.D. Mich. 2004) ..................................................................... 27

*Parker v. Rowland Express, Inc.*,
    492 F. Supp. 2d 1159 (D. Minn. 2007) ................................................................. 23, 24

*Pippins v. KPMG LLP*,
    No. 11-cv-0377, 2012 WL 19379 (S.D.N.Y. Jan. 3, 2012) ......................................... 43

*Ray v. Motel 6 Operating, L.P.*,
    No. 3:95-cv-0828, 1996 WL 938231 (D. Minn. 1996) ............................................... 26

*In re RBC Dain Rauscher Overtime Litig.*,
    703 F. Supp. 2d 910 (D. Minn. 2010) ........................................................................ 29

*Roberts v. TJX Companies, Inc.*,
    No. 13-cv-13142, 2017 WL 1217114 (D. Mass. Mar. 31, 2017) ............................... 44

*Saleen v. Waste Mgmt.*,
    No. 08-cv-4959, 2009 WL 1664451 (D. Minn. June 15, 2009) .............. 25, 26, 30, 37

*Saleen v. Waste Mgmt.*,
    649 F. Supp. 2d 937 (D. Minn. Sept. 1, 2009) .............................................. 25, 30, 41

*Severtson v. Phillips Beverage Co.*,
    137 F.R.D. 264 (D. Minn. 1991) ........................................................................... 24, 25

*Sharma v. Burberry Ltd.*,
    52 F. Supp. 3d 443 (E.D.N.Y. 2014) .......................................................................... 42

4820-6749-3616

*Smithrud v. City of St. Paul,*
   746 F.3d 391 (8th Cir. 2014) ................................................................. 45

*Stroud v. Target Corp.,*
   No. 10-cv-01583 (D. Minn. Sept. 1, 2011) ................................. 23, 25, 31, 32

*Tahir v. Avis Budget Grp., Inc.,*
   No. 9-cv-3495, 2011 WL 1327861 (D.N.J. Apr. 6, 2011) ........................... 36

*Thompson v. Speedway SuperAmerica LLC,*
   No. 08-cv-1107, 2009 WL 130069 (D. Minn. Jan. 20, 2009) ...................... 24

*Till v. Saks Inc.,*
   No. 11-cv-00504, 2013 WL 5755671 (N.D. Cal. Sept. 30, 2013) ............... 27

*Vasquez v. Vitamin Shoppe Indus. Inc.,*
   No. 10-cv-8820, 2011 WL 2693712 (S.D.N.Y. July 11, 2011) .................... 42

*Wal-Mart Stores, Inc. v. Dukes,*
   564 U.S. 338 (2011) ................................................................................. 39

*West v. Border Foods, Inc.,*
   No. 05-cv-2525, 2006 WL 1892527 (D. Minn. July 10, 2006) ....... 24, 25, 30

*White v. 14051 Manchester Inc.,*
   301 F.R.D. 368 (E.D. Mo. 2014) ............................................................. 24

*Wollman v. Gross,*
   637 F.2d 544 (8th Cir. 1980) ................................................................... 45

**Statutes**

29 U.S.C. § 213(a)(1) ............................................................................... 31

29 U.S.C. § 216(b) ............................................................................ *passim*

29 U.S.C. § 256(b) ................................................................................... 45

**Other Authorities**

29 C.F.R. § 541 ...........................................................................31, 32, 37

Fed. R. Civ. P. 23 ..................................................................................... 40

Fed. R. Civ. P. 30(b)(6) ............................................................................. 1

Fed. R. Civ. P. 68 ..................................................................................... 40

4820-6749-3616

## I.    INTRODUCTION

Last year, in a nearly identical case brought by the same plaintiffs' counsel, the U.S. District Court for the Eastern District of New York denied the same request Tammy Babbitt and William Carter ("Plaintiffs") now make: it declined to conditionally certify a nationwide collective consisting of Target Executive Team Leaders ("ETLs") who were purportedly misclassified as exempt under the FLSA. *See Jibowu v. Target Corp.*, 492 F. Supp. 3d 87 (E.D.N.Y. 2020). After considering the declarations and deposition testimony of eight opt-in plaintiffs and Target's Rule 30(b)(6) witness, various policy documents and job descriptions, and over 9,000 self-audits completed by ETLs over two years, the court in *Jibowu* denied conditional certification because "declarations of eight opt-in Plaintiffs are insufficient to show that they are, in fact, similarly situated to the potential members of the proposed nationwide collective of more than 14,000 Target ETLs." *Id.* at 125. Recognizing its potential impact here, the parties twice stipulated to stay this case pending the *Jibowu* decision.

Undeterred by their decisive loss in *Jibowu*, Plaintiffs' counsel are at it again with new plaintiffs, but the same anemic proof and misplaced arguments for conditional certification of a national collective of more than 11,000 ETLs. Making matters worse, they also make the dubious claim that conditional certification should be granted because Target has drawn ETL exempt misclassification claims in the past. In so doing, they ask the Court to grant conditional certification based on reasons improper under the law, contradict their own argument that the merits should not be considered at this stage, and

ignore that in each of those cases conditional certification of an FLSA collective or certification of a state law class was denied, or the plaintiffs gave up after Target showed that ETLs are properly classified as exempt and certification was unlikely.

As the prior cases demonstrate, this case does not warrant conditional certification under the applicable standard. Even apart from the fact that the same national request was denied in *Jibowu*, the evidence before the Court shows countless individualized differences among the thousands of current and former ETLs at issue with respect to the duties they perform and how they perform those duties; that makes certification inappropriate. ETLs in the various roles at issue here perform different tasks and have responsibility for different aspects of store management. Some ETLs manage two employees, others manage teams of over 100 employees. Target's self-audit program reveals that the way ETLs manage their departments and the duties on which they spend their time vary from store to store, position by position, and even within the same ETL position itself. Plaintiffs concede that the style and preferences of local Store Directors ("SDs") influence how they perform their role and the amount of time spent on non-managerial tasks. Indeed, Plaintiffs' argument regarding a corporate-wide labor budget policy ignores the reality that budgets are determined on a store-by-store basis. Nothing here suggests this action can be efficiently tried through representative proof.

Instead of making the required showing, Plaintiffs rely on individual experiences of less than 0.09%[1] of the proposed 11,000+ person collective and cherry-pick from a handful

---

[1] Plaintiffs reference Kris Gresswell and filed her declaration as a supposed opt-in; however, she has not filed a consent or opt-in notice. (*See* Lesser Decl., ¶12 (ECF 86).)

2

of Target's corporate documents, none of which show that the primary duties of ETLs are non-managerial. But the evidence shows ETLs are an integral part of Target's store management, have a wide range of responsibilities in managing the hourly employees who perform the day-to-day work of their teams, and vary significantly in what duties they perform and how they perform those duties. Some ETLs oversee their team's interactions with Target guests in the front end of the store. Others rarely interact with guests and instead oversee the employees responsible for incoming merchandise on the overnight shift when the store is closed. Significantly, even among ETLs holding the same position, the multitude of differences in job duties depends on, among other factors, local store management, store type and location, the size of their teams, and reporting structure.

Because the evidence convincingly demonstrates that Plaintiffs' alleged experiences were attributable to their own decisions, the decisions of their local SDs, and other local factors, Plaintiffs do not show, even preliminarily, that the putative collective members were subject to a common policy or practice to perform primarily non-managerial duties. Accordingly, conditional certification should be denied.

## II.   STATEMENT OF FACTS[2]

### A.   Each Target Store Is a Multi-Million-Dollar Business.

Target is a national discount retailer with more than 1,900 stores in all fifty states. (Brewer Decl., ¶3.) The variation from one Target store to another is significant.

---

[2] With the exception of the declarations submitted by Michael Brewer ("Brewer Decl."), Jeffrey Wohl ("Wohl Decl."), and Joseph Schmitt ("Schmitt Decl."), which were submitted independently, all the declarations cited herein are attached as exhibits to Schmitt's

A store's annual sales may range from less than $30 million to more than $100 million, and its size from 12,800 to 150,000 square feet. (*Id.*) The building may stand alone, connect to a mall, or be nestled in an urban neighborhood. (*Id.*) It may include one or more checkout lanes, entrances, levels, or backrooms. (*Id.*) The number of employees ranges from less than 50 to hundreds, and the number of payroll hours available for employees varies by each store, based on the store's prior year's performance and scheduling practices, as well as forecasts that account for planned and anticipated sales. (*Id.*, ¶¶3-4.)

These variations have a significant impact on how ETLs perform their roles. For example, Target stores attached to malls require ETLs to run the business differently due to the significantly higher volume of guests. (Mazzone Decl., ¶5.) Moreover, which ETL positions exist at any given store depend on that store's size and sales volume. While a store's payroll budget may not be in an ETL's control, the ETL can earn more payroll hours by increasing sales in the ETL's area, moving hours among ETL teams, or recommending a boost to the store's overall payroll hours. (Brewer Decl., ¶4.)

**B.    Target Expects ETLs to Lead and Manage Their Teams.**

ETLs are an integral part of Target's store management, overseeing an entire department ("workcenter"). (*Id.*, ¶5.) In June 2019, Target implemented a Store Modernization, which changed ETL and other position titles and areas of responsibility. (*Id.*, ¶6.) After these changes, ETLs have been responsible for overseeing foundational

---

declaration and cited by the declarant's last name and applicable paragraph number. Similarly, all deposition excerpts cited are attached to the Schmitt declaration and cited by the deponent's last name and applicable page:line number.

teams, including specialty sales, service and engagement, and general merchandise and food sales, which replaced the workcenters. (*Id.*) ETLs typically report to the SD,[3] who reports to the District Store Director ("DSD"). The DSD oversees, on average, five stores and is based out of a regional office. (*Id.*, ¶7.)

ETLs are, first and foremost, responsible for managing team members in their department. (*Id.*, ¶5.) Target communicates this expectation in several ways: through their varied job descriptions, its handbook for exempt store employees, leadership training, an extensive self-audit program, and other corporate policies. Not one of these items—nor any corporate document—reflects that ETLs are subject to an **unlawful** common policy, which Plaintiffs must show to warrant conditional certification. Rather, all Target policies demonstrate that the expectations and requirements of ETL positions are consistent with an ETL's classification as a *bona fide* exempt executive.

### 1.   There Are Several Kinds of ETL Positions.

ETL positions vary depending on their area of store responsibility.[4]

#### a.   Food and Food Service.

The ETL-General Merchandise and Food Sales, ETL-Food and Beverage Sales and ETL-Inbound Food and Beverage Sales lead the Food and Food Service areas, including grocery, produce, deli, and bakery sections. (*Id.*, ¶8.) These ETLs are responsible for driving a food safety culture, including training and coaching their team to deliver on food

---

[3] Prior to Store Modernization, the Store Director position was titled Store Team Leader ("STL").
[4] Plaintiffs have excluded from their motion the following ETL roles: Human Resources, Asset Protection, Remodel, and Logistics (in stores that have ETL-Replenishment).

safety and cleaning routines, ensuring compliance with applicable regulatory requirements, and proactively building relationships with vendors. (*Id.*) Food ETLs also act as Food Leader on Duty ("FLOD") – the person in charge of all food operations. In Babbitt's case, her STL thought the FLOD "was imperative for the store to run correctly" so "there was always someone leading throughout." (Babbitt 115:4-22.)

### b.   Service and Engagement.

Prior to Store Modernization, the "Guest Experience" workcenter involved the "front end" of the store, including cash registers and the Guest Service desk, but also encompassed Target Café and Starbucks, which are now the responsibility of the ETL-Food. (Brewer Decl., ¶9.) ETLs-Service and Engagement ensure their team appropriately resolves guest disputes, use guest surveys to drive change in guest experience, own schedules and anticipate staffing needs to support peak traffic times, and manage Team Leaders ("TLs") (non-exempt employees who help lead teams) to drive proficiencies for front-of-store experiences. (*Id.*)

### c.   General Merchandise Sales and Specialty Sales.

These ETL positions lead the salesfloor. Before Store Modernization, the salesfloor workcenter was divided into Hardlines (electronics, automotive, and home) and Softlines (apparel and accessories). (*Id.*, ¶10.) Now, the ETL-Specialty Sales leads teams in Apparel and Accessories and Beauty and Electronics. These ETLs are tasked with building teams knowledgeable about their departments, leveraging guest insights and feedback to drive the business, and managing their teams to plan merchandising and pricing workload. (*Id.*) An ETL-General Merchandise Sales manages their team in executing inbound, outbound,

6

replenishment, inventory accuracy, presentation, and pricing and signing processes for General Merchandise areas; the ETL also may lead Food & Beverage and Food Service areas, depending on the store. (*Id.*)

### d.    Inbound Operations.

Prior to Store Modernization, Logistics and Replenishment teams made up the Backroom workcenter, which received merchandise and ensured it was properly stored and the shelves were stocked. (*Id.*, ¶11.) ETLs leading Replenishment and Logistics planned staffing to handle incoming goods, develop efficient backroom processes, and collaborate with other ETLs to prioritize the workload to increase sales. (*Id.*) Depending on various factors, including the size and sales volume of a particular store, an ETL may have led multiple workcenters in a hybrid role. (*Id.*, ¶14.) Today, ETLs still manage logistics and replenishment processes, but high-volume stores also have a designated ETL-Inbound Operations who leverages their TLs and expertise in operations, process, and efficiency to manage teams sorting and stocking merchandise. (*Id.*, ¶12.)

### e.    Closing.

Before Store Modernization, an ETL served as Leader-on-Duty ("LOD") during designated shifts. (*Id.*, ¶13.) As the highest-ranking manager in the building when the STL was not present, the LOD managed the entire store, supervised all team members, handled all personnel and guest issues, and responded to emergencies. (*Id.*) After Store Modernization, the LOD role was replaced by ETL-Closing. The ETL Closing's priorities mirror those of the SD; she oversees total store operations through closing during designated shifts. (*Id.*, ¶13; Awel Decl., ¶5; Gebhardt Decl., ¶5.)

7

Given these differences, Target evaluates each ETL position separately to determine whether its expectations for the role support an exempt executive classification. (Brewer Decl., ¶14.) Plaintiffs themselves acknowledged ETL positions vary from role to role.

### 2.      ETLs Receive Tailored Training to Develop Leadership Skills.

All ETLs attend Target's Business College, a management-training program focusing on leadership and business skills. (*Id.*, ¶15.) The training outlines leadership functions, including hiring, recruiting, and promoting team members; performance management; scheduling to ensure proper staffing levels; monitoring compliance measures; providing for employee and guest safety; directing team members and evaluating performance; and driving store profitability. (*Id.*) For up to six weeks, ETLs engage in classroom and online learning. (*Id.*) After Business College, ETLs continue on to role-specific training for twelve weeks, receiving individualized coaching, mentoring, and on-the-job training. (*Id.*)

### 3.      Target's Policies Require ETLs to Focus on Managerial Duties.

To emphasize its expectations that ETLs perform as leaders, Target's Exempt Team Member Handbook further explains Target's expectations of ETLs. Target states:

> As a leader, it's critical to continually spend substantially more than 50 percent of your time on leadership responsibilities rather than hourly tasks. You will need to jump in and assist with hourly tasks on occasion; however, you cannot forget to jump out at the right time to ensure you are spending the clear majority of your time on leadership.

> As a leader, you are accountable for task completion, but you must accomplish this through other people. Successful leaders demonstrate the skills of owning, managing, and driving their business." (Schmitt Decl., Ex. 5.)

These guiding principles are reinforced in Target's Leadership Expectations document. (Schmitt Decl., Ex. 6.) No Target policy or document directs ETLs to spend most of their time on non-managerial duties.

Indeed, many opt-ins admit they understood Target expected them to perform primarily managerial duties. Babbitt testified that was her understanding (Babbitt 45:1-46:20), but her "STL gave [her] different directions once [she] began working at the South Rochester store." (*Id.* at 46:21-25.) Babbitt's testimony was mirrored by other ETLs. (Carter 51:20-52:1; Young 47:15-48:2.) Perhaps Cobb explained it best: "I understand that is Corporate's expectation. That was not my STL's expectation." (Cobb 58:23-59:1.)

Target's expectation that ETLs act as leaders was also a focus throughout Store Modernization as roles and processes changed and Target launched the "Journey of Business Ownership." Store Modernization's impact on ETL roles varied; for some, such as Cobb, she recalled she was "getting a lot more responsibility and no more team members." (*Id.* at 131:14-132:6.) Carter agreed many processes were changed in Modernization, and testified that he implemented those process changes alongside his SD. (Carter 202:3-20.) In contrast, Young testified that Modernization had only a "small impact" on his duties. (Young 159:16-159:24.)

    **C.**    **Evidence Shows Significant Variations Among ETLs, and Among Plaintiffs and Opt-ins, on Time Spent on Managerial Duties and Duties Performed.**

        **1.**    **According to Their Self-Audits and Testimony, ETLs Spend**

**Varying Amounts of Time on Managerial Duties.**

Target administers a self-audit to monitor whether ETLs spend most of their time on managerial duties. (Brewer Decl., ¶16.) In the self-audit, the ETL reports the percentage of time spent on specific managerial and non-managerial duties, including any the ETL may add to the form. (*Id.*) The instructions make clear complete honesty is expected, and no retaliation or reward will result from an ETL's answers. (*Id.*) If an ETL reports spending 50% or less of the time on managerial duties, Target offers resources and training to restore their proper balance of work; the ETL is not subject to any adverse action. (*Id.*)

The self-audits show that the extent to which ETLs were performing managerial duties widely varied. In 2019, 83.3% of ETLs-Closing reported performing managerial duties over 50% of the time; for ETLs-Inbound Food & Beverage Sales, that number was 100%. (*Id.*, ¶18.) Such variation is even more significant within any given ETL role. For example, 92.3% of ETLs-Inbound Operations reported performing managerial duties more than 50% of the time, but the percentage of managerial tasks varied between 9 and 95%. (*Id.*) The following graphs more comprehensively show the wide variation in the results:

10





11

(Brewer Decl., ¶17.)

There also is significant variation among Plaintiffs and opt-ins' self-audit results. Babbitt represented to Target that she spent 70% of her time on managerial tasks and 30% on non-managerial tasks, and vouched for the accuracy of that breakdown. (Babbitt 187:22-189:20; Schmitt Decl. Ex. 30.) In deposition, she revised the breakdown to 60/40%, still in favor of managerial tasks, and testified the proportions changed significantly depending upon the season and over the course of time. (Babbitt 189:7-190:18.) Babbitt's testimony differed dramatically from Carter's, who testified that although he reported spending the majority of his time on exempt tasks in his self-audits, in fact he spent most of his time performing nonexempt work. (Carter 183:12-185:24.) And these accounts in turn differed from those of numerous other ETLs, who testified that they accurately stated in their self-audits they spent the majority of their time on exempt work. (*See, e.g.*, Gebhardt Decl., ¶16; Sletten Decl., ¶16; Wood Decl., ¶16; Aloi Decl., ¶16.)

Babbitt's testimony that her managerial time changed significantly over time demonstrates that how ETLs perform their roles depends on a variety of factors. (Babbitt 189:7-190:18.) Another ETL reported changes in the time spent performing managerial duties based on the specific ETL role, even within the same store. (Wood Decl., ¶18.) Store assignment is also a factor. Carter, who held a similar role to Babbitt but at a different store, reported spending a majority of time performing non-exempt work (Carter 183:12-185:24.), while Babbitt did not. (Babbitt 189:7-190:18.) Another ETL recognized that length of time in the role affected the percentage of time spent on managerial duties.

12

Shortly after being promoted to ETL, she reported spending 55% of her time on managerial duties, but over time that percentage significantly increased. (Gedi Decl., ¶ 18.)

There also are vast disparities in how much time ETLs spend on specific managerial duties. Some ETLs reported spending 60% of their time developing and training team members and delegating workflow, while others reported spending little time on these duties. (Brewer Decl., ¶19.) These wide gaps exist for other managerial duties, such as managing safety and security (0% to over 40%), and planning and scheduling (0% to 25%). (*Id.*) The opt-ins reported similar disparities in their own self-audits. (*Id.*, Exs. 1,6) (instructing and directing team members – Young 5%, Babbitt 20%); (*Id.*, Exs. 5-6) (training and developing team members – Schulze 20%, Young 5%); (*Id.*, Exs. 2,5) (hiring team members – Carter 7%, Schulze 2%); (*Id.*, Exs. 6-8) (evaluating and addressing team member performance – Gonzalez/Zenszer 15%, Young 5%). These disparities illustrate that how one ETL performs her role cannot possibly represent how all ETLs perform their roles.

### 2. The ETL Experience Can Vary Significantly, Depending on the SD's Management Style.

SDs, ETLs, and Plaintiffs acknowledge the SD's impact on ETL duties. (*See, e.g.*, Aloi Decl., ¶18; Alexander Decl., ¶5; Kennedy Decl., ¶5; Langlois Decl., ¶5; Miller Decl., ¶5; Skelding Decl., ¶11); Cobb 58:23-59:1; Babbitt 46:21-25; Carter 51:20-52:1; Young 47:15-48:2.) For many ETLs, their SD's attitude or working style affected how many hours they worked. (Aloi Decl., ¶5; Conrad Decl., ¶5; Sletten Decl., ¶5.) ETL Rebecca Miller, who worked as an ETL at four stores, explained the SD "really sets the tone for the store,"

13

and expectations "vary between [SDs] and how they operate and how cohesively they work with ETLs." (Miller Decl., ¶5.) One SD states she tries to balance giving ETLs independence with maintaining a "uniform vision." (Tenorio Decl., ¶8.) Relatedly, ETLs who have worked with many different SDs note the SD's prior work experience, especially in the ETL's current role, has a significant impact on how the work is actually performed. (Nienhaus Decl., ¶5.)

Christianna Saenz, an SD and former ETL, states she would often engage in leadership tasks with little oversight as an ETL because she had complete authority over her workcenter; however, she recalls "a period of time during which I had a store leader who managed me very closely," and that "was just that leader's management style." (Saenz Decl., ¶6.) Camille Groark, an SD, acknowledged there can be variation in the amount of autonomy and authority each ETL may exercise at any given time, but expects ETLs to inspect their workcenters and identify opportunities for improvement, and "generally do[es] not expect the ETLs to seek [her] permission before jumping into action." (Groark Decl., ¶6.)

The opt-ins themselves blame the amount of time spent performing non-exempt work on **_local_** management, not on any company-wide policy or practice. One of Gerard's SDs was "very, very in control of absolutely everything that [she] did," and Gerard admits spending more time unloading freight and zoning because those tasks were more important to her SD. (Gerard 62:21-63:11, 176:2-23.) Young similarly testified that he was "a little parakeet that my [SD] would call out routes in the morning and then we were told, hey, tell

14

this person to do this and they need to do it at this time, they need to have it done by this time." (Young 50:1-5.)

> ### 3.   The Testimony of Plaintiffs, Opt-ins and Other ETLs Shows Significant Differences in How They Spent Their Time.

The testimony of Plaintiffs, opt-ins, and other ETLs shows profound differences in how they performed ETL jobs.

**Core roles.** Plaintiffs and opt-ins concede differences between the roles, including which managerial tasks were assigned and how they spent their time. For instance, Cobb agreed her job duties as an ETL-Logistics were different from her ETL-General Merchandise & Food Sales duties, because she became accountable for the Food and Food Services departments and had more direct reports. (Cobb 82:23-84:25.)

Other ETLs stated that some ETL positions spend a lot more time on the salesfloor while others spend more time "off stage" in their office. ETLs on the salesfloor and others who managed guest services had substantial interactions with Target guests, while those "off stage" interacted with guests infrequently. (*See* Shelton Decl., ¶5; Aloi Decl., ¶5.) For example, an ETL-GM helps plan the store's layout and determines the best way to ensure their team members can actually implement that vision, which results in spending more time on the salesfloor. (Skelding Decl., ¶4.) On the other hand, ETL-Logistics work in the backroom without guests present. (Alexander Decl., ¶5.)

**Variations in ETL-specific training.** Because an ETL's training is tailored to their role and store, the process is different for every ETL. (Brewer Decl., ¶15.) Further, Plaintiffs and opt-ins admit to variations in their training experiences. Carter's training

15

consisted of working closely with another ETL over eight weeks (Carter 40:6-40:18); Gerard did not undergo as much training as other ETLs, only training for "two or three weeks," although the training was "usually six weeks." (Gerard 43:30-44:24.) Cobb's training was only one week, although when she talked to other ETLs, they had gone through a "Target Business College" and had "at least two weeks or a month, two to four weeks." (Cobb 152:13-153:2.)

On the other hand, Babbitt attended the Business College for eight weeks, which was both computer-based and hands-on, on-the-floor training, and included leadership training. (Babbitt 41:22-25.) Young recalled a much different experience; he stated his training lasted for "four to six weeks potentially," and consisted of learning Target policies through online modules. (Young 40:3-41:2.)

**Participation in personnel decisions.** Plaintiffs and opt-ins participated in personnel decisions with varying frequency and there are many differences in how often they say their supervisors accepted their recommendations.

**Interviewing and hiring**. Gerard testified that when she was an ETL-Guest Experience, the TLs would do first-round interviews, the Senior TL would conduct the second round and then would usually make the final decision, unless it was a tougher decision, in which case they would ask Gerard for input. Even though Gerard often delegated interviewing and hiring, she made periodic hiring decisions. (Gerard 57:1-58:16.) Babbitt, Cobb, and Schulze would conduct first and second-round interviews; Babbitt's STL/HR always followed her recommendations, Cobb's STL/HR generally followed her recommendations, while Schulze testified he didn't give recommendations

16

and simply passed information along to HR to "make the determination." (Babbitt 59:12-22; Cobb 41:13-42:18; Schulze 110:8-25.) Other ETLs stated they were able to improve their store's hiring process overall by looking for more outgoing and diverse employees to meet guests' needs. (Aloi Decl., ¶14.)

**Discipline**. Plaintiffs' and opt-ins' experiences with issuing discipline also vary considerably. While Cobb testified that discipline, including verbal coachings, always needed to be run by the ETL-HR and STL, she also stated the outcome was generally approved. (Cobb 123:1-25.) Schulze testified he did not have authority to independently discipline employees. (Schulze 182:5-7.) In contrast, Gerard said any ETL would have the authority to issue discipline. (Gerard 136:21-137:2.)

Additionally, Cobb's STL did not think it was appropriate for TLs to handle drafting corrective actions; Cobb was unable to delegate this task and completed all team member corrective actions on her own. (Cobb 110:10-111:2.) In contrast, Babbitt testified that her TLs drafted corrective actions, after which she reviewed and approved those draft documents. (Babbitt 79:17-80:9.) Further, Schulze testified that the store's HR team member usually drafted discipline and then gave it to him to administer. (Schulze 114:11-115:23.)

Carter and Babbitt both testified they made recommendations regarding discipline; Carter's store sometimes ignored his recommendations, but Babbitt's store always followed her recommendations. (Cobb 34:16-35:3; Babbitt 68:16-18.) Carter and Cobb also testified that their STLs overruled their opinions based on the STL's like or dislike of

17

specific employees – a perfect illustration of STL variation. (Carter 59:10-61:3; Cobb 114: 23-117:25.)

**Other personnel actions**. Significant variation exists as to promotions and performance evaluations as well. (*See* Awel Decl., ¶8) (stating three team members were promoted based upon her recommendation); *but see* Schulze 90:7-20 (no role whatsoever in performance evaluations); 158:14-159:8, 182:3-4 (stating he had no authority to promote, although in his performance review he noted "promoted 1 TM to TL.").) Young and Babbitt participated in performance evaluations; Young stopped giving input because his SD was "going to override them anyway," while Babbitt's recommendations were always followed. (Young 126:3-21; Babbitt 120:19-25.) Similarly, ETLs differ regarding their authority to terminate team members. (*See* Mazzone Decl., ¶8 (stating that she recently recommended termination of a team member, and that her recommendation was followed); Sletten Decl., ¶8 (stating that she terminated a team member, and then informed HR about her decision); *but see* Schulze 181:25-182:2 (stating he did not have authority to fire employees).)

**Supervising staff and delegating tasks.** ETLs are responsible for leading and directing their entire department, or when an LOD or an ETL-Closing, the entire store. (Brewer Decl., ¶¶5,13; Gebhardt Decl., ¶5.) The size of the department or store therefore impacts how many individuals are under the supervision of a particular ETL and varies widely. For instance, Babbitt was responsible for the Food department, which is broken down into sub-areas managed by TLs. (Babbitt 79:5-12.) Babbitt's SD held her accountable for the entire department, totaling 75 employees. (Babbitt 38:6-14.) Young supervised

18

approximately 30-40 team members as an ETL-Logistics and 50 team members as an ETL-Salesfloor/Guest Experience (Young 120:6-121:19.) However, Gerard's ETL-Guest Experience role involved supervising a team of approximately 100 team members. (Gerard 136:1-4.) Gerard further explained that the shift from a small store to a large store means that there were "just not enough people to complete the tasks, hence why the ETLs had to work long hours" in the store. (Gerard 22:4-17.)

In addition, Plaintiffs and the opt-ins managed or directed the work of other employees in varying degrees. Babbitt stated her TLs were expected to manage their team members, but she was responsible for ensuring they did that appropriately, as opposed to doing the team members' work for them. (Babbitt 121:1-122:21.) She was also required to ensure team members were complying with meal break requirements, and for holding TLs accountable for brand standards. (Babbitt 102:10-24; 119:7-10.) In contrast, Gerard testified she was not responsible for meal and rest break compliance, and Cobb stated she was responsible for task completion, which sometimes meant having to complete the tasks on her own. (Gerard 66:11-18; Cobb 61:9-25.)

**Reporting structure.** ETLs typically report directly to the SD, but some ETL positions also report and interact with other business partners, while others more routinely step into the SD role themselves. (Brewer Decl., ¶7.) Carter is one example – he actually operated without an STL for a period of time, during which he and another ETL were the senior-most people in the store. (Carter 49:14-50:9.)

For some ETLs, their store volume and size mean they are one of only a few ETLs, and they routinely "own" the store due to staffing considerations, including its processes

19

and people, which does not occur when working at higher volume locations. (Siseman Decl., ¶5.)

ETLs who had the same reporting structure had different experiences. Babbitt explained there were various tasks she wanted to complete, but her SD would give her other directions that prevented her from doing tasks of her choosing. (Babbitt 149:14-151:9.) Cobb stated that although she directed team members, "it was all given to [her] from [her] STL" and she could not do anything on her own. (Cobb 62:18-63:9.) Notably, she also admitted she believed STLs other than her own approached things differently. (Cobb 79:8-80:9.) As an illustration of another approach, various ETLs have stated they are empowered to make important decisions regarding the business and feel responsible for everything in the store. (*See, e.g.,* Shelton Decl., ¶¶10,14,19; Nienhaus Decl., ¶¶14,19; Siseman Decl., ¶¶6,8.)

**Training other employees.** Some opt-ins say they spent very little to no time training or coaching team members or leaders. For example, Gerard stated she cannot recall any time she was one-on-one in training a team member, and never trained TLs. (Gerard 100:22-102:1; 149:2-22.) Young said all training in his store was done online. (Young 51:18-52:18.) Cobb testified she assisted in training a newly promoted "TL-Inbound and Receiver," and would train team members if necessary due to staffing shortages, but they had trainers on staff who more regularly engaged in training. (Cobb 89:3-18; 63:10-64:6.) Babbitt testified that she trained her TLs (Babbitt 153:24-154:13) and that her TLs "[are] supposed to manage their area" and "are all supposed to train the members of their team, direct them to do tasks, and follow up to make sure they do the tasks." (Babbitt 79:9-16.)

20

Conversely, another ETL stated that after a team member completed any required training, she was very involved in continually training them and had discretion in how to go about doing so. (Sletten Decl., ¶19.)

## III.   IN PRIOR ETL MISCLASSIFICATION CASES, COURTS HAVE CONSISTENTLY REFUSED TO CERTIFY NATIONAL COLLECTIVES OR STATEWIDE CLASSES, AND OTHER PLAINTIFFS HAVE ABANDONED THEIR CLAIMS

### A.   *Jibowu*.

On June 28, 2017, Priscilla Jibowu, represented by the same counsel as here, filed an FLSA collective action lawsuit against Target in the U.S. District Court for the Eastern District of New York. Jibowu alleged misclassification of ETLs in violation of the FLSA and various state laws.

After two years of protracted litigation, Jibowu moved for conditional certification. Because the parties here believed the ruling on conditional certification in *Jibowu* could affect this case, they twice stipulated to a stay of this case until the court ruled in *Jibowu*. (ECF 16, 21.)

The *Jibowu* court issued its ruling on September 30, 2020. 492 F. Supp. 3d 87 (E.D.N.Y. 2020). The court denied Jibowu's request for conditional certification of a national collective, finding that the evidence was insufficient to show a *de facto* nationwide policy of misclassification in violation of the FLSA. *Id.* at 124. The court held that, at most, misclassification sometimes may have occurred at the local level due to unofficial, *de facto* policies implemented at individual stores. *Id.* at 125-126. On that basis, and under the

liberal Second Circuit standard for conditional certification, the court granted conditional certification only as to the stores where Jibowu and her opt-ins worked. *Id.* at 129.

## B. Certification Has Been Denied or Dropped in Other Target Misclassification Cases.

Besides *Jibowu*, Target has faced other ETL misclassification cases brought as putative collective actions under the FLSA or putative class actions under state law, including three by Plaintiffs' counsel. (Wohl Decl., ¶¶2,8.) Each time, either the court denied certification, or the plaintiffs abandoned their collective or class claims.

In *Chand*, the court denied certification of a proposed class of California ETLs claiming misclassification under California law. *Chand v. Target Corp.,* No. BC315688 (Cal. Sup. Ct. Oct. 5, 2006). The court noted: "[T]he variance among the percentages of time for every task listed by all ETLs in the self-audits, the variances among the store volumes and personnel, the variances among the duties and responsibilities of each ETL, the fact that some of the ETLs were properly classified as exempt, suggests that [the] question of how much time an ETL spent on exempt versus non-exempt tasks is an individual one and these individual questions predominate." (Wohl Decl., Ex. A at 7-8.)

Later, in *Faraji*, the court denied certification of a proposed class of California ETL-APs. *Faraji v. Target Corp.*, No. 5:17-cv-00155, 2018 WL 2041380 (C.D. Cal. Apr. 30, 2018). Plaintiff failed to show that "the question of whether Target misclassified the ETL-APs as exempt is subject to common proof," as the record evidence showed substantial variation in the amount of time putative class members allegedly spent performing managerial versus non-managerial tasks. *Id.* at *4. (Wohl Decl., Ex. B.)

In *Stroud*, the plaintiffs sought conditional certification under the FLSA of Target Group Leaders (managers in Target Distribution Centers who hold positions analogous to the ETL positions). *Stroud v. Target Corp.*, No. 10-cv-01583 (D. Minn. Sept. 1, 2011). Judge Montgomery denied conditional certification, finding that "[w]hile a broad view of the declarants' duties may show them to be 'roughly the same,' their own testimony reflects their day-to-day duties vary by department, location and other issues." *Id*. at 13. (Wohl Decl., Ex. C.)

In *Gifford*, represented by the same counsel in *Stroud*, plaintiffs filed a putative collective on behalf of all ETLs nationwide alleging exempt misclassification under the FLSA. *Gifford v. Target Corp.*, No. 10-cv-01194 (D. Minn. April 19, 2010). Shortly after the *Stroud* plaintiffs lost their motion for conditional certification, the *Gifford* plaintiffs dropped the collective claims. (*Id.*, ¶6.)

In seven other ETL cases, after counsel for Target explained how ETLs are properly classified as exempt and why collective or class certification would not be granted, the plaintiffs dropped the collective or class claims. (*Id.*, ¶7.)

## IV.   THE HEIGHTENED STANDARD FOR CONDITIONAL CERTIFICATION APPLIES HERE

### A.   Plaintiffs Must Satisfy the Applicable Standard to Win Conditional Certification.

Conditional certification is neither automatic nor required; it is reserved only for appropriate cases. *Hoffman-LaRoche, Inc. v. Sperling,* 493 U.S. 165, 179 (1989). The relevant inquiry is not whether a court has discretion to facilitate notice, but whether it is appropriate to exercise that discretion. *Parker v. Rowland Express, Inc.*, 492 F. Supp. 2d

23

4820-6749-3616

1159, 1163 (D. Minn. 2007) ("The power to authorize notice, however, is to be exercised only in appropriate cases, and remains within the discretion of the district court"). Notably, in exercising its discretion, a court has the "responsibility to avoid the 'stirring up' of litigation through unwarranted solicitation" in a collective FLSA action. *Severtson v. Phillips Beverage Co.*, 137 F.R.D. 264, 266-67 (D. Minn. 1991).

A plaintiff's burden in seeking conditional certification is neither invisible nor a mere formality; a plaintiff therefore cannot rely on mere allegations or conclusory statements. *See Parker*, 492 F. Supp. 2d at 1164-65; *Adair v. Wis. Bell, Inc.*, No. 08-cv-280, 2008 WL 4224360, at *3 (E.D. Wis. Sept. 11, 2008) (citation omitted); *see also Thompson v. Speedway SuperAmerica LLC*, No. 08-cv-1107, 2009 WL 130069, at *1 (D. Minn. Jan. 20, 2009) (holding that "a colorable basis" means that plaintiff must come forward with "some factual basis" beyond allegations in complaint) (citation omitted). Notably, judges in this District long have recognized that averments in support of conditional certification **must** be based on personal knowledge; "unsupported assertions of widespread violations are not sufficient to meet the Plaintiff's burden." *West v. Border Foods, Inc.*, No. 05-cv-2525, 2006 WL 1892527, at *6 (D. Minn. July 10, 2006).

The decision to grant conditional certification should be true to the purpose of a collective action: to facilitate the "efficient resolution in one proceeding of common issues of law and fact." *Hoffman-LaRoche, Inc.*, 493 U.S. at 170. As such, collective treatment is appropriate only when a small number of witnesses competently can testify and provide representative proof on behalf of a larger group of employees. *White v. 14051 Manchester Inc.*, 301 F.R.D. 368, 379 (E.D. Mo. 2014) ("given that there does not appear to be a single

uniform policy, it is unclear how such evidence could proceed in a fair and representative proceeding."). If the relevant circumstances of those in the putative collective are different, the "collective action" model is unsustainable. *See King v. West Corp.*, No. 8:04-cv-318, 2006 WL 118577, at *14 (D. Neb. Jan. 13, 2006) ("[E]mployees with the same job title are not 'similarly situated' for the purposes of an 'opt-in' FLSA class if their day-to-day job duties vary substantially."); *Bramble v. Wal-Mart Stores, Inc.*, No. 09-cv-4932, 2011 WL 1389510, at *4 (E.D. Pa. Apr. 12, 2011) ("The right to proceed collectively may be foreclosed where an action relates to specific circumstances personal to the plaintiff rather than any generally applicable policy or practice.") (citation omitted).

In addition to showing there are common questions of law or fact, and that the plaintiffs and the proposed group are similarly situated, judges in this District also require a showing that the case will ultimately be manageable as a collective action. *Stroud*, 10-cv-01583, at 13 (*citing Saleen v. Waste Mgmt.,* No. 08-cv-4959, 2009 WL 1664451, at *8 (D. Minn. June 15, 2009) *aff'd*, 649 F. Supp. 2d 937); *Severtson,* 137 F.R.D. at 266 (finding the court should "make a preliminary inquiry as to whether a manageable class exists" before approving notice). Manageability is of paramount importance because "it is incumbent on a court at the conditional-certification stage to review all of the evidence before it to determine whether it should facilitate notice and thereby expand the scope of litigation." *Saleen*, 2009 WL 1664451, at *8. Neither "the remedial purposes of the FLSA, nor the interests of judicial economy" are served should courts overlook facts showing that a proposed collective is unmanageable. *West*, 2006 WL 1892527, at *6. In fact, should a

25

court overlook manageability, it would "abandon its duty to determine whether the matter before it is an appropriate case for collective treatment." *Saleen*, 2009 WL 1664451, at *8.

In *Deutsch v. My Pillow, Inc.*, No. 20-cv-318 (SRN/ECW), 2020 WL 7351556, at *12 (D. Minn. Dec. 15, 2020), the court remarked that it was unclear whether it needed to consider manageability during the conditional certification phase. Nonetheless, the court extensively discussed manageability and recognized the case law from this District that has found manageability to be an essential element in the conditional certification inquiry. *Id.* Although the plaintiffs satisfied the manageability requirement there, the court in *Deutsch* also clarified that evidence presented by both the plaintiffs and My Pillow painted a unique picture, as the potential collective members worked in one location; there was no variation caused by individual managers; the policies in question were allegedly unlawful on their face; and the parties **_agreed_** that plaintiffs' job responsibilities were essentially the same. *Id*. at *7-8. That made *Deutsch* materially different from cases where the proposed collectives involve expansive groups with thousands of potential members and facially lawful policies. *Id.* at *12. In short, manageability must play an even greater and more vital role in this case.

### B.     The Heightened Standard is Appropriate, Given the Extensive Factual Record Presented Here.

Significantly, where a plaintiff moves for conditional certification after substantial discovery, courts consistently apply a heightened evidentiary standard. *Ray v. Motel 6 Operating, L.P.,* No. 3:95-cv-0828, 1996 WL 938231, at *4 (D. Minn. 1996) (declining to apply lenient standard because facts before court were extensive); *see also Korenblum v.*

*Citigroup, Inc.*, 195 F. Supp. 3d 475, 479, 482 (S.D.N.Y. 2016) (applying heightened standard where parties had taken depositions)*; Till v. Saks Inc.*, No. 11-cv-00504, 2013 WL 5755671, at *9 (N.D. Cal. Sept. 30, 2013) (applying more rigorous inquiry where court has thicker record to make more informed determination on similarity); *Luksza v. TJX Companies, Inc.*, No. 2:11-CV-01359, 2012 WL 3277049, at *8 (D. Nev. Aug. 8, 2012) (after four months of discovery, court reviewed "Plaintiffs' allegations and affidavits in conjunction with the evidence obtained through discovery and apply a heightened standard" and denied motion for conditional certification); *Olivo v. GMAC Mortg. Corp.*, 374 F. Supp. 2d 545, 548, n.1 (E.D. Mich. 2004) (applying higher evidentiary standard after period of discovery); *Holt v. Rite Aid Corp.*, 333 F. Supp. 2d 1265, 1274 (M.D. Ala. 2004) (applying higher evidentiary standard). Though there is variation among courts regarding what the heightened standard requires, the overwhelming consensus is that courts "look beyond the pleadings and affidavits submitted by plaintiffs and will consider the evidence submitted by both parties." *Jibowu*, 492 F. Supp. 3d at 119 (collecting cases).

Plaintiffs concede that a heightened standard is appropriate after "substantial discovery." (Pls.' Mem. 15, n.18, ECF 85.) They nonetheless argue that this Court should apply the more lenient standard because they "have not taken any formal discovery in this case." (*Id.*) This argument is wholly disingenuous. In this case alone, the parties have exchanged voluminous discovery and taken six depositions. Moreover, because their counsel also handled *Jibowu* and its predecessor, *Locicero v. Target Corp.*, No. 3:16-cv-05592 (D.N.J. July 27, 2017) (in which case plaintiffs' counsel accepted an individual offer

of judgment and dropped the collective claim)[5], Plaintiffs have had access to copious additional information, including testimony from six depositions taken by both sides, responses to 48 sets of written discovery served by both sides, and over 135,000 documents produced by Target, including Target's relevant policies and procedures.

On this very motion, Plaintiffs rely on declarations, deposition testimony, documents and briefing from *Jibowu*. (Lesser Decl., ¶¶23-29, Exs. 21-27.) Plaintiffs' reliance on *Jibowu* materials is particularly notable because affidavits and testimony form an important evidentiary component for certification. *See Benton v. Labels Direct, Inc.*, No. 4:14-cv-01293, 2014 WL 4659640, at *8 (E.D. Mo. Sept. 17, 2014) ("plaintiffs may meet [their evidentiary] burden by presenting detailed allegations supported by affidavits."). Notably, the *Jibowu* court itself applied a heightened "modest plus" certification standard. There, the court held that application of the heightened "modest plus" standard was appropriate given the "significant scope" of discovery that had been taken, which allowed the court to look beyond the pleadings and evidence submitted by the plaintiffs and consider evidence submitted by Target as well. *Jibowu*, 492 F. Supp. 3d at 119. There is no reason for this Court to take a different approach here.

Plaintiffs also argue that the lower conditional certification standard should be used because discovery remains open. But application of the heightened standard is not so

---

[5] Notably, Plaintiffs' counsel agreed to resolve *Locicero*, then filed *Jibowu* three months later. With the exception of those three months, Plaintiffs' counsel have been asserting the same claim against Target since September 14, 2016, and have been seeking and obtaining discovery from Target for most of that time. The notion that Plaintiffs' counsel have not obtained extensive discovery is insupportable – and their motion here confirms that fact.

limited; the authorities Plaintiffs cite do not say otherwise. *See In re RBC Dain Rauscher Overtime Litig.*, 703 F. Supp. 2d 910, 964 (D. Minn. 2010) (applying lower certification standard because (a) parties had yet to conduct "extensive discovery" and (b) court was concerned higher standard would unduly prevent putative collective members from getting notice). In contrast, the parties have conducted more discovery here, and Plaintiffs have made extensive use of the discovery in *Jibowu*.

Other cases Plaintiffs cite also are inapposite because they rely on common proof absent here. *See Chin v. Tile Shop, LLC*, 57 F. Supp. 3d 1075, 1083 (D. Minn. 2014) (relying on nearly identical job postings); *Le v. Regency Corp.*, 957 F. Supp. 2d 1079, 1092 (D. Minn. 2013) (relying on proof that all employees performed same or similar job duties at same location, and each was subject to unlawful policy requiring unpaid work); *Burch v. Qwest Commc'ns Int'l, Inc.*, 500 F. Supp. 2d 1181, 1188 (D. Minn. 2007) (relying on proof that all call center employees were required to perform unpaid work).

This case is not at the early stages of litigation, and Plaintiffs have had years to marshal their best evidence. *See Davis v. Charoen Pokphand (USA), Inc.*, 303 F. Supp. 2d 1272, 1276 (M.D. Ala. 2004). On the contrary, examining Plaintiffs' request for conditional certification based on the lower standard would result in manifest injustice and reward procedural gamesmanship.

## C.    Even If a Lower Standard Were Used, Target's Evidence Should Be Considered.

Judges in this District also have held that although they should not make credibility determinations or reject the plaintiff's evidence, evidence from the defendant that does not

contradict the plaintiff's evidence should be considered, even under the more lenient standard. *Saleen*, 2009 WL 1664451, at *7-8 ("[I]t is incumbent on a court at the conditional-certification stage to review all the evidence before it to determine whether it should facilitate notice and thereby expand the scope of litigation. Were such a complete review avoided, as Plaintiffs suggest it must be, a court would abandon its duty to determine whether the matter before it is an appropriate case for collective treatment."); *West*, 2006 WL 1892527, at *6. Further, while it declined to make credibility determinations, the court in *Deutsch* considered and partially relied on the defendant's evidence, even though little discovery had been conducted prior to the motion for conditional certification. *Deutsch*, 2020 WL 7351556.

## V. THE 11,000+ PUTATIVE COLLECTIVE MEMBERS ARE NOT SIMILARLY SITUATED

Under either standard, Plaintiffs fall short of showing conditional certification is proper because they cannot show that over 11,000 putative collective members are similarly situated.

### A. Plaintiffs Identify No Formal Misclassification Policy Applicable to All ETLs.

Plaintiffs assert that in order to win conditional certification, they need to show only that Target had a corporate policy of not paying overtime to ETLs. The case law says otherwise. *See Saleen*, 649 F. Supp. 2d at 940 ("What the case law of this District requires is that the putative class members be the 'victims of a single decision, policy, or plan'" ... "In other words, the putative class members must be harmed by an *unlawful* companywide policy.") (emphasis in original).

30

For purposes of conditionally certifying a collective, it is not enough merely to show that an employer has classified a group of employees as exempt. *Stroud*, No. 10-cv-01583 at 11, *citing Morisky v. Public Serv. Elec. & Gas Co.*, 111 F. Supp. 2d 493, 498 (D. N.J. 2000); *cf. Aros v. United Rentals*, 269 F.R.D. 176, 183-84 (D. Conn. 2010). Exempt status "must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations in this part." 29 C.F.R. § 541.2.

Plaintiffs must show not just that all ETLs were subject to a common policy, but that the "common policy or plan…**violated the law**." *Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2nd Cir. 2010) (emphasis added). "[L]iability as to each putative plaintiff depends upon whether that plaintiff was correctly classified as exempt." *Id.* at 544. "[W]hether a compensation policy is unlawful frequently turns on the duties, pay rates, and working schedules of the employees it covers," therefore, "the elements of, and defenses to, the [exemption] claim inform the analysis of whether employees are similarly situated." *Korenblum*, 195 F. Supp. 3d at 480. Where the evidence reflects employees with the same job description actually perform different job duties on a day-to-day basis, determining whether any given employee is exempt requires a "fact-intensive" inquiry into the "full range of the employee's job duties and responsibilities" including "a detailed analysis of the time spent" performing exempt duties. *Mike v. Safeco Ins. Co. of Am.,* 274 F. Supp. 2d 216, 220 (D. Conn. 2003) (quotation omitted); *Morisky,* 111 F. Supp. 2d at 498 (citations omitted).

The FLSA excludes from overtime employees who are classified as *bona fide* executives. 29 U.S.C. § 213(a)(1). The inquiry focuses on whether an employee's primary

duties are managerial. 29 C.F.R. § 541.100(a). As a result, to win conditional certification, plaintiffs must "demonstrate a nationwide policy pursuant to which [ETL]s are assigned duties that render [Target's] exempt classification inappropriate." *Jibowu*, 492 F. Supp. 3d at 121; *see also Stroud*, No. 10-cv-01583 at 13.

Plaintiffs identify no policy applicable to all ETLs that requires them to perform non-exempt duties as their primary duties. Instead, they point to job descriptions, training, and guidance; in fact, many of these policies differ with respect to different classes of ETLs, as discussed in section II, *supra.* Regardless, all of these documents require ETLs primarily to perform exempt work: ETLs are expected to act as leaders and accomplish goals through their teams.

For example, consistent with the regulatory decree that "employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement," 29 C.F.R. § 541.700(b), Target's Exempt Team Member Handbook instructs ETLs that "it's critical to continually spend substantially more than 50 percent of your time on leadership responsibilities rather than hourly tasks. You will need to jump in and assist with hourly tasks on occasion; however, you cannot forget to jump out at the right time to ensure you are spending the clear majority of your time on leadership." (Schmitt Decl., Ex. 5.)

Target's pre-Store Modernization Core Roles also established Target's leadership expectations, including but not limited to "[s]erve as a leader by strategically thinking about how to develop and accomplish goals, and properly delegate to team members the tasks necessary to implement those goals," "[a]ssess and select top talent at the hourly team

CASE 0:20-cv-00490-DWF-ECW   Doc. 101   Filed 08/13/21   Page 40 of 54

member and team leader level by interviewing new candidates for hire and current team members for promotion, and make decisions about whom to hire," and "[e]valuate performance results, and develop and implement action plans to achieve performance goals; hold team leaders accountable to do the same." (Lesser Decl., Ex. 30 (ECF 89).)

While Target expects each ETL to perform significant managerial duties, an ETL's daily responsibilities vary by role, as evidenced by the job descriptions for each ETL position. (Brewer Decl., ¶14.) Nothing in any ETL job description requires that ETLs perform non-managerial work as their primary duty.[6]

Similarly, the Business College training documents Plaintiffs cite focus on leadership responsibilities. For example, they instruct that ETLs are to "[r]un a profitable business" and "be a business leader," "[m]otivate [their] team to improve performance," "[a]ssist with recruiting and hiring of your team," and generally focus on an ETL's development as a leader. (Schmitt Decl., Ex. 28.) Nothing in ETL training suggests a policy of requiring ETLs to perform nonexempt work as their primary duty.[7]

Finally, Target's portal Workbench, food display procedure, and implementation guide, which provide guidance and direct work processes and emphasize leadership

---

[6] Plaintiffs contend that the core roles and job descriptions do not reflect how they performed their jobs. But, as the court noted in *Brown v. Barnes & Noble*, "[it] is not enough for Plaintiffs to point to the job description as evidence that all CMs perform similar duties when, under Plaintiffs' own theory of the case, the job description did not accurately reflect the duties." 252 F. Supp. 3d 255, 263-264 (S.D.N.Y. 2017) ("*Brown I*").

[7] Furthermore, as noted earlier, Business College is only one piece of an ETL's training. ETLs typically receive further tailored training for 12 weeks, which varies by store and position. Indeed, Plaintiffs and opt-ins described meaningful differences, ranging from no classroom training to attending Business College for varying lengths of time. (Schmitt Decl., Ex. 28.)

4820-6749-3616

responsibilities, in no way even suggest that ETLs should be performing primarily nonexempt tasks. (*See* Schmitt Decl., Ex. 29; Lesser Decl., Exs. 32-34 (ECF 89-2,3,4).) *See also Ahmed v. T.J. Maxx Corp.*, 103 F. Supp. 3d 343, 352 (E.D.N.Y. 2015) (documents encouraging assistant managers to "be willing to perform all tasks" did not actually "require them to do so").

As these policies do not require ETLs to perform primarily nonexempt work, they do not support conditional certification.

### B.    Just as the Court Found in *Jibowu*, the Evidence Establishes That There Is No Nationwide Misclassification Practice.

Unable to identify a formal, common policy requiring ETLs to perform primarily nonmanagerial duties, plaintiffs must show that there is a *de facto* nationwide misclassification practice. The court squarely rejected that notion in *Jibowu*, 492 F. Supp. 3d at 125, and so should the Court here.

When a plaintiff alleges that how they performed the job was at odds with the job description, the plaintiff also must show that "he and the other [employees] were similarly situated with respect to the claim that they were required to perform non-managerial job duties in contravention of the formal job description." *Guillen v. Marshalls of MA, Inc.*, 750 F. Supp. 2d 469, 476 (S.D.N.Y. 2010). Instead, here, Plaintiffs concede there is no nationwide practice regarding how ETLs must use their time. Plaintiffs and the opt-ins testified that ETLs' allocation of work time and duties was largely dependent on the SD/STL. For example, Gerard stated one of her SDs was "very, very in control of absolutely everything that [they] did." (Gerard 176:2-23.) Unloading freight and zoning

34

were important to that particular SD, so Gerard spent more time on those tasks than leading her team. (*Id.* at 62:21-63:11.) Thus, even by Plaintiffs' own account—which, Target disputes—this Court cannot meaningfully and fairly adjudicate the entire putative collective based on evidence from a handful of ETLs.

Other arguments advanced by Plaintiffs suffer from the same flaw. For instance, Plaintiffs argue shrinking labor budgets required ETLs to deviate from their job descriptions to focus on nonmanagerial tasks. But labor budgets were unique to each store because they were set with reference to specific store circumstances. Plaintiffs' "labor budget" theory of liability—which, again, Target disputes—actually corroborates that it is impossible to determine an ETL's exempt status without analyzing individualized factors, such as financial and personnel metrics of each store.

Where Plaintiffs fail to present evidence of a common policy requiring such work, this Court cannot infer the existence of a nationwide practice requiring over 11,000 ETLs to perform nonexempt work based merely on a few alleged personal experiences of Plaintiffs and opt-ins. *See Brown I*, 252 F. Supp. 3d at 266 ("This Court cannot infer that Defendant had a *de facto* policy of requiring all 1,100 [managers] to perform non-exempt work based only on the personal experiences of the nine people who have joined this suit."); *Guillen*, 750 F. Supp. 2d at 478 (denying conditional certification to class of assistant store managers at 820 Marshall's stores nationwide based on five affidavits); *Khan v. Airport Mgmt. Servs., LLC*, No. 10-cv-7735, 2011 WL 5597371, at *4-5 (declarations from

35

plaintiff and handful of former employees were insufficient to certify a class of managers in 600 stores).[8]

Plaintiffs' cases do not, as here, involve job policies expressly requiring employees spend more than 50% of their time on exempt leadership duties, or direct employees concurrently performing exempt and nonexempt duties to "jump out at the right time to ensure you are spending the clear majority of your time on leadership." (Schmitt Decl., Ex. 5.) Those cases also do not involve, as here, a broad self-audit program proving the overwhelming majority of potential collective members are not similarly situated to the plaintiff, nor allegations that any nonexempt work was caused by decisions of local management.[9]

Contrary to supporting a nationwide practice requiring mostly nonexempt work, the evidence shows Plaintiffs and their opt-ins are distinct outliers among ETLs, as the vast majority of ETLs perform mostly exempt work. In 2019, the overwhelming majority of ETLs reported spending more than 50% of their work time on managerial duties, consistent with Target's expectations. (*See, e.g.*, Sletten Decl., ¶5; Wood Decl., ¶5; Aloi Decl., ¶5.) The self-audit does not direct an ETL to assign time to an exclusive list of job duties;

---

[8] *See also Bramble*, 2011 WL 1389510, at *2, 8 (denying certification to 5,588 employees because "plaintiffs have produced little evidence to substantiate their assertions that their responsibilities, as performed, were similar to those actually performed by other[s]"); *Tahir v. Avis Budget Grp., Inc.*, No. 9-cv-3495, 2011 WL 1327861, at *4 (D.N.J. Apr. 6, 2011) (plaintiff's testimony and four declarations from proposed collective of 119 individuals did not establish that "proposed class are similarly situated with respect to the performance of allegedly non-exempt work").
[9] In *McEarchen v. Urban Outfitters, Inc.*, No. 13-cv-3569, 2014 WL 2506251, at *3 (E.D.N.Y. June 3, 2014), the court's reasoning relied on the fact that the defendant did not argue, as Target does, that any FLSA violations were due to local management.

4820-6749-3616

instead, it provides space for open-ended responses and feedback. (Brewer Decl., ¶16.) Therefore, the responses offer a holistic view of how ETLs view their own breakdown of job duties, and are unlike the isolated, personal experiences of Plaintiffs and opt-ins.

The self-audits are compelling evidence that Plaintiffs are not victims of a nationwide practice, but instead a handful of non-representative outliers. Plaintiffs lack proof of a nationwide practice of misclassification.

### C. Certification Should Be Denied Because Too Much Variation Exists Between the Actual Job Duties Performed by Plaintiffs and the Putative Collective.

Whether an employee is exempt from the FLSA's overtime requirements is an inherently fact-intensive inquiry "based on all the facts in a particular case." 29 C.F.R. § 541.700(a). Where, as here, the proof submitted is "specific to the individual," and there is no "common thread binding [the] proposed class of employees," then conditional certification must be denied. *Mike*, 274 F. Supp. 2d at 216.

Moreover, even without making credibility determinations or finding facts at this stage, an examination of the individualized evidence demonstrates significant variation even among Plaintiffs and opt-ins, suggesting these issues lend themselves to a case-by-case evaluation. *See Saleen,* 2009 WL 1664451, at *7-8 ("…it is incumbent on a court at the conditional-certification stage to review **all the evidence before it** to determine whether it should facilitate notice and thereby expand the scope of litigation. Were such a complete review avoided, as Plaintiffs suggest it must be, a court would abandon its duty to determine whether the matter before it is an appropriate case for collective treatment.") (emphasis added). If, because of differences in how Plaintiffs perform their jobs,

applicability of an exemption requires detailed individual fact-finding on an employee-by-employee or job-by-job basis, the economy of a collective action is missing, and certification should be denied.

The evidentiary record, including the annual self-audits and Plaintiffs' and opt-ins' testimony specific to their personal experiences at Target, demonstrates wide variations in how they perform their roles. This is especially true given Target's Store Modernization, which took place within the proposed collective timeframe. Since then, the ETL role has and may continue to change in material ways. (Brewer Decl., ¶6.) There is not enough similarity between Plaintiffs and the collective they seek to represent to warrant conditional certification.

Based on the factors this Court evaluated in discussing manageability in *Deutsch*,[10] coupled with the evidentiary record showing significant variation between Plaintiffs and those they seek to represent, this Court should evaluate manageability as a requirement separate and apart from the "substantial similarity" analysis. *See Deutsch*, 2020 WL 7351556, at *12. Plaintiffs show no formal policy or nationwide practice of misclassification. Instead, the evidence reveals wide variation among the thousands of ETLs Plaintiffs seek to represent, and even among themselves and their opt-ins. Thus, Plaintiffs' allegations have no common thread and necessarily require individualized inquiries, rending this unmanageable as a collective action. Conditional certification therefore should be denied.

---

[10] Generally discussing: variation in location of the work, local manager impact, common policy or process, variations in the nature of the asserted violation.

## VI.    OTHER ETL CASES ARGUE AGAINST, NOT FOR, CERTIFICATION

Plaintiffs make much of the fact that Target has defended against other ETL misclassification lawsuits (several of which have been brought by Plaintiffs' counsel). But as discussed in section III, *supra*, if those lawsuits hold any meaning here, they argue against conditional certification, because the same individualized variations in how ETLs perform their jobs that led the courts in those cases to deny certification or the plaintiffs to abandon their allegations apply in equal force here.

Moreover, it is nothing less than an invitation for the Court to commit reversible error for Plaintiffs to argue that those cases show "Target's continued violation of the FLSA at the expense of its workers." (Pls.' Mem. 2, ECF 85.) Conditional certification **never** may be premised on the supposed merits of the action. *In re JPMorgan Chase & Co.*, 916 F.3d 494, 503 (5th Cir. 2019) ("The district court's error was compounded by its transgression of the Supreme Court's explicit warning 'to avoid even the appearance of judicial endorsement on the merits of the action.' ... During the hearing on the plaintiffs' motion for conditional certification, the court suggested that not providing notice to putative opt-in plaintiffs would 'further disenfranchise' the employees even beyond the 'huge compromise of the individual's [*sic*] rights.'"). Conditional certification is a procedural vehicle only, and every Target ETL already has the ability to file suit under the FLSA. Plaintiffs attack individual cases as inadequate, but representative litigation "is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (addressing

39

Rule 23 class cases). Endorsing representative litigation as the norm would turn this rule on its head.

Nor can Plaintiffs rely on Rule 68 offers of judgment that some ETLs have accepted in their cases. The offers make clear that "neither this offer, nor any resulting judgment, may be deemed or offered or received in evidence as a presumption, concession or admission by Target of any fault, liability, or wrongdoing." It is well established an offer of judgment is meant to incentivize parties to settle and avoid protracted litigation, not represent a concession of liability. *Marek v. Chesny*, 473 U.S. 1, 5 (1985). Holding otherwise would punish settlements and violate the very purpose of Rule 68.

Moreover, even if an inference were appropriate, it would be against certification. As discussed in section III, *supra,* representative litigation against Target has not proceeded to trial because courts have repeatedly found nationwide representative litigation to be improper, and/or plaintiffs' counsel elected not to proceed after Target's counsel met with plaintiffs' counsel and demonstrated that any litigation would be unsuccessful.

Finally, three of the seven lawsuits[11] Plaintiffs identify were filed and litigated by Plaintiffs' own counsel. The fact that counsel has sought to litigate this case time and again does not therefore mean there are scores of Target team members across the country who believe they have been misclassified.

---

[11] The fact that there have been several cases is hardly surprising. Target is a desirable defendant because it is one of the nation's largest and most visible retailers.

## VII.   PLAINTIFFS CANNOT JUSTIFY CONDITIONAL CERTIFICATION POST-*JIBOWU*

Plaintiffs argue Judge Chen's decision in *Jibowu* was wrongly decided and demonstrates the need for nationwide notice. Plaintiffs are wrong on both counts.

First, Plaintiffs argue *Jibowu* wrongly held that "for national FLSA misclassification cases[] notice should only to go locations at which the named or opt-in plaintiffs had worked." (Pls.' Mem. 24, ECF 85.) But this is categorically **not** what Judge Chen held. Rather, the ruling states that "the declarations of eight opt-in [p]laintiffs are insufficient to show that they are, in fact, similarly situated to the potential members of the proposed nationwide collective of more than 14,000 ETLs." *Jibowu*, 492 F. Supp. 3d at 125. This conclusion is correct and in accord with law and common sense. Plaintiffs cannot identify any unlawful policy. Based on a limited number of ETL accounts, they argue instead that Target's **practices** are unlawful. But this means Plaintiffs must show that these practices exist for a large portion of the purported collective. Judge Chen's reasoning is just that the experiences of eight opt-ins cannot give rise to a reasonable inference about the experience of more than 14,000 individuals who worked in different stores, in different Districts, under different SDs, and at different times (now including post-Store Modernization). This rationale is unremarkable. Where plaintiffs argue based on practices, and the proposed collective is expansive, they are required to submit more evidence than otherwise necessary.

This court in *Saleen*, 649 F. Supp. 2d at 941, articulated this very principle eloquently, noting that "the mere fact that a small fraction of employees allege they did not

receive the compensation to which they were entitled provides almost no evidence that the *reason* that these employees were underpaid was because of an unlawful companywide policy. At the same time, as the fraction of employees who allege that they were shortchanged grows, it becomes less likely that the employees are the victims of innocent mistakes or local managers…" At some point, "the percentage of employees who complain of being improperly compensated grows large enough to establish a 'colorable basis'…" *Id.* Judge Chen's point is that the plaintiffs before her—much like Plaintiffs here—failed to provide enough evidence to warrant conditional certification of a nationwide class more than 14,000 strong.

In such a case, some courts deny conditional certification outright, as did Judge Montgomery; that is the correct result here. *See Brown v. Barnes & Noble, Inc.*, No. 1:16-cv-07333, 2018 WL 3105068, at *1, 19 (S.D.N.Y. June 25, 2018) (denying conditional certification of proposed collective of approximately 1,100 employees in 583 stores across 49 states; "The size and scope of the proposed collective also contributes to this Court's conclusion that solicitation of additional opt-ins would undermine rather than promote efficiency.") ("*Brown II*"). Others, however, follow Judge Chen's approach and limit the proposed collective to the specific locations with testimony of alleged unlawful policies. *See, e.g.*, *Sharma v. Burberry Ltd.*, 52 F. Supp. 3d 443, 459 (E.D.N.Y. 2014) (denying nationwide certification, limiting collective to three stores); *Vasquez v. Vitamin Shoppe Indus. Inc.*, No. 10-cv-8820, 2011 WL 2693712, at *4 (S.D.N.Y. July 11, 2011) (limiting proposed nationwide collective to seven stores where plaintiffs worked) (collecting cases); *Laroque v. Domino's Pizza, LLC*, 557 F. Supp. 2d 346, 356 (E.D.N.Y.

42

2008) (collective of employees at single store); *Camper v. Home Quality Mgmt. Inc.*, 200 F.R.D. 516, 520 (D. Md. 2000) (limiting collective to single location). As an alternative to outright denial, such a limitation would be prudent here, where Plaintiffs offer the "representative" testimony of less than 0.09% of the proposed collective, and any testimony about other ETLs is limited to generalized statements that they performed non-managerial work and often not based on personal knowledge.

Second, Plaintiffs argue *Jibowu* is wrong because it "requires, essentially, store-by-store proof of a *de facto* unlawful policy of misclassifying these ETLs." (Pls.' Mem. 23, ECF 85.) According to Plaintiffs, the Second Circuit has criticized "the 'de facto' line of cases" as conflating the conditional certification analysis with a merits determination. (*Id.* at 24.) As noted, Judge Chen did not require the *Jibowu* plaintiffs to prove anything on a "store-by-store" basis – instead, the evidence there, as here, showed that key decisions were store-based. Moreover, the citations they provide do not criticize anything remotely resembling a "de facto" line of cases. Rather, those cases reject the view that plaintiffs need to prove uniform practices where they have alleged uniform and unlawful **policies**.

For instance, in *Pippins v. KPMG LLP*, No. 11-cv-0377, 2012 WL 19379 (S.D.N.Y. Jan. 3, 2012), the court noted that where "there is evidence that the duties of the job are largely defined by comprehensive corporate procedures and policies, district courts have routinely certified classes of employees challenging their classification as exempt, despite arguments about 'individualized' differences in job responsibilities." *Id.* at *8. Similarly, in *Lloyd v. J.P. Morgan Chase & Co.*, No. 11-cv-9305, 2013 WL 4828588 (S.D.N.Y. Sept. 9, 2013), *aff'd in part*, 791 F.3d 265 (2d Cir. 2015), plaintiffs asserted they were

43

subject to an "identical" job description and their day-to-day duties were also largely the same. *Id.* at *2. There is no indication that plaintiffs alleged that a departure from lawful policies gave rise to liability. But this is precisely what Plaintiffs argue here. Plaintiffs acknowledge that Target's policies support exemption and argue they were misclassified because local practices were inconsistent with those policies. Plaintiffs' citations are thus inapposite.

Third, Plaintiffs argue this Court should disregard *Jibowu* using the same rationale in *Roberts v. TJX Companies, Inc.*, No. 13-cv-13142, 2017 WL 1217114 (D. Mass. Mar. 31, 2017), a case involving different plaintiffs, different facts, and a different defendant, in a different circuit. Plaintiffs argue *Roberts* is instructive because the court there conditionally certified a nationwide class even though federal courts in other districts had previously declined to do so. (Pls.' Mem. 25, ECF 85.) But Plaintiffs do not—and cannot—explain why *Roberts* is at all similar to this case. Even a cursory examination of *Roberts* reveals material dissimilarities. For instance, in *Roberts*, the putative collective comprised of a single role, all of whom "share nearly the same major areas of responsibility." *Roberts*, 2017 WL 1217114, at *4. By contrast, ETL includes a broad category of distinct roles which have very different responsibilities. Moreover, the size of the putative collective in *Roberts* was much smaller than here; the testimony of the collective members here shows key decisions were made at the store level, and *Roberts* was decided based on a different standard in a different circuit.

Finally, Plaintiffs challenge *Jibowu* on the tired argument that piecemeal litigation is flawed. As explained above, this misses the mark. That some *Jibowu* opt-ins fall outside

44

of the order and were thus required to join this lawsuit is insufficient to depart from *Jibowu*. Plaintiffs are correct that individual ETLs must file suit, but that is no different from any other sort of claim. All ETLs are just not sufficiently similarly situated to allow efficient or fair adjudication of their claims on a collective basis.

## VIII.   PLAINTIFFS' PROPOSED NOTICE IS DEFICIENT

### A.     The Cut-Off Date Should Be Three Years from the Issuance of Notice.

The FLSA's statute of limitations runs from the date an individual files their written consent with the court. *See* 29 U.S.C. § 256(b). Courts in this District have used a class period extending back "three years from the date notice was issued…" *See Loomis v. CUSA LLC*, 257 F.R.D. 674, 678 (D. Minn. 2009). Plaintiffs suggest the statute should be tolled, as they request notice be issued to ETLs dating back to July 20, 2018. But any FLSA claim a prospective plaintiff might have had stemming from employment earlier than three years prior to the eventual opt-in would be time-barred.

Moreover, "[e]quitable tolling of a statute of limitations is a 'limited and infrequent form of relief.'" *Smithrud v. City of St. Paul*, 746 F.3d 391, 396 (8th Cir. 2014). "The party who is claiming the benefit of an exception to the operation of a statute of limitations bears the burden of showing that he is entitled to it." *Wollman v. Gross*, 637 F.2d 544, 549 (8th Cir. 1980). It is appropriate only where the party seeking equitable tolling can establish "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Id.* (quotation omitted). Although Plaintiffs' basis for tolling is unclear, they cannot meet this high bar.

45

**B.     The Parties Should Meet and Confer About the Proposed Notice.**

Plaintiffs' proposed notice is deficient because it: (1) is initially, and randomly throughout, directed toward **all** ETLs, without reference to ETL positions Plaintiffs proposed be excluded; (2) inappropriately requests Target post a copy of the notice in a conspicuous location in the "break room" or "similar office space" at all Target stores; (3) is misleading because it omits sufficient language expressing Target's position; (4) intrudes upon the privacy of potential collective members by requesting Social Security numbers; (5) uses inappropriate text message and/or email notifications, along with vaguely described electronic click-to-sign options; (6) includes an excessive opt-in period; and (7) requires reminder notices. If the Court grants conditional certification, the parties should meet and confer about the notice.

## IX.   CONCLUSION

Plaintiffs have not met their burden for conditional certification under either the lenient or heightened standard, and their motion should be denied.

4820-6749-3616

Respectfully submitted,

NILAN JOHNSON LEWIS PA

Dated: August 13, 2021        By:  s/ Joseph G. Schmitt
                                  Joseph G. Schmitt (Reg. No. 231447)
                                  David A. James (Reg. No. 337389)
                                  Pablo Orozco (Reg. No. 0396811)
                                  250 Marquette Avenue South, Suite 800
                                  Minneapolis, Minnesota 55401
                                  Telephone: (612) 305-7500
                                  Fax: (612) 305-7501
                                  jschmitt@nilanjohnson.com
                                  djames@nilanjohnson.com
                                  porozco@nilanjohnson.com

                                  **ATTORNEYS FOR DEFENDANT
                                  TARGET CORPORATION**

47

4820-6749-3616