UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| TAMMY BABBIT and WILLIAM CARTER, individually and on behalf of other similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>TARGET CORPORATION,<br><br>Defendant. | : : : : : : : : : : : : | CIVIL ACTION NO.:<br>0:20-CV-00490-DWF-ECW |

**PLAINTIFF TAMMY BABBITT'S OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Seth R. Lesser
Christopher M. Timmel
**KLAFTER LESSER, LLP**
Two International Drive, Suite 350
Rye Brook, NY 10573
Tel: (914) 934-9200

David A. Roth
Marc S. Hepworth
Charles Gershbaum
Rebecca S. Predovan
**HEPWORTH GERSHBAUM &
ROTH, PLLC**
192 Lexington Avenue, Suite 802
New York, NY 10016
Tel: (212)545-1199

Richard E. Hayber
**HAYBER, MCKENNA & DINSMORE, LLC**
750 Main Street, Suite 904
Hartford, CT  06103
Tel: (860) 920-5362

Rachhana T. Srey, MN Bar # 340133
**NICHOLS KASTER, PLLP**
4600 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 256-3200

*Attorneys for Plaintiffs and Opt-Ins*

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................. 1

II.     STATEMENT OF FACTS ................................................................... 3

        a.    Plaintiff's Employment at Target ................................................... 3

        b.    Plaintiff's Job Duties and Responsibilities as an ETL ................... 3

III.    ARGUMENT ........................................................................................ 9

        a.    Legal Standard ............................................................................... 9

        b.    The FLSA and It's Exemptions ................................................... 10

        c.    A Genuine Dispute of Material Fact Preludes Summary Judgment on
              Target's Executive Exemption Defense ....................................... 11

              1.    The Primary Duty Test ...................................................... 12

              2.    Babbitt's Most Important Duty, And the Duty Which Took Up the
                    Majority of Her Workday, Was the Performance of Non-Exempt
                    Work ................................................................................... 13

              3.    The Frequency With Which Babbitt Exercised Discretionary
                    Responsibility and the Manner In Which She was Not Free From
                    Direct Supervision ............................................................. 27

              4.    Target paid Babbitt barely more than the hourly positions beneath
                    her ....................................................................................... 38

IV.     CONCLUSION ................................................................................... 40

# TABLE OF AUTHORITIES

**Cases**                                                                                **Page(s)**

*Ale v. TVA,*
    269 F.3d 680 (6th Cir. 2001) ................................................................. 26

*Amash v. Home Depot U.S.A,*
    2014 U.S. Dist. LEXIS 79761 (N.D.N.Y. June 12, 2014) ........................... 36

*Anderson v. Liberty Lobby, Inc.*
    477 U.S. 242 (1986) .................................................................................. 9

*Auer v. Robbins,*
    65 F.3d 702 (8th Cir. 1995) ..................................................................... 23

*Bilyou v. Dutchess Beer Distributors, Inc.,*
    300 F.3d 217 (2d Cir. 2002) ..................................................................... 11

*Brooks v. Tri–Systems, Inc.,*
    425 F.3d 1109 (8th Cir.2005) .................................................................... 6

*Cameron v. Abercrombie & Fitch Co.,*
    2012 U.S. Dist. LEXIS 131557 (S.D. Ohio Sept. 24, 2012) ....................... 15

*Carhuapoma v. New York- Presbyterian Healthcare Sys.,*
    2013 U.S. Dist. LEXIS 45886 (S.D.N.Y. Mar. 29, 2013) ..................... 10, 38

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) .................................................................................. 9

*Clougher v. Home Depot USA,*
    696 F. Supp. 2d 285 (E.D.N.Y. 2010) ..................................................... 30

*Corning Glass Works v. Brennan,*
    417 U.S. 188 (1974) ................................................................................ 10

*Costello v. Home Depot USA, Inc.,*
    928 F. Supp. 2d 473 (D. Conn. 2013) ................................................ 20, 23

*Costello v. Home Depot, USA, Inc.,*
    2013 U.S. Dist. LEXIS 39006 (D. Conn. Mar. 5, 2013) ........................ 31, 33

*Davis v. Wal-Mart Stores, Inc.,*
    2010 U.S. Dist. LEXIS 95172, (D. Or., July 12, 2011).............................. 39

*Deweese v. Git-N-Go Convenience Stores, Inc.,*
    2013 U.S. Dist. LEXIS 189719 (S.D. Iowa Feb. 1, 2013) ..................... *passim*

*Donovan v. Burger King Corp.,*
  675 F.2d 516 (1st Cir. 1982) ........................................................................... *26*

*Ely v. Dolgencorp, LLC,*
  827 F. Supp. 2d 872 (E.D. Ark. 2011) .......................................................... 40

*Foster v. Nationwide Mut. Ins. Co.,*
  695 F. Supp. 2d 748 (S.D. Ohio 2010) ......................................................... 13

*Hale v. Dolgencorp, Inc.,*
  2010 U.S. Dist. LEXIS 62584 (W.D. Va. June 23, 2010) ............................ 39

*Smith v. Heartland Auto. Servs., Inc.,*
  418 F. Supp.2d 1129 (D. Minn. 2006) ....................................................... *passim*

*Hill v. Tangherlini,*
  724 F.3d 965 (7th Cir. 2013) ........................................................................... 6

*Icicle Seafoods, Inc. v. Worthington,*
  475 U.S. 709 (1986) ...................................................................................... 14

*Indergit v. Rite Aid Corp.,*
  2010 U.S. Dist. LEXIS 32322 (S.D.N.Y. Mar. 31, 2010) ............................ 15

*Jibowu v. Target Corp.,*
  492 F. Supp. 3d 87 (E.D.N.Y. 2020) ....................................................... 2, 20

*Johnson v. Big Lots Stores, Inc.,*
  604 F. Supp. 2d 903 (E.D. La. 2009) ........................................................... 39

*Johnson v. Derhaag Motor Sports, Inc.,*
  2014 U.S. Dist. LEXIS 158845 (D. Minn. Nov. 10, 2014) ....................... *passim*

*Jones v. Dolgencorp, Inc.,*
  789 F. Supp. 2d 1090 (N.D. Iowa 2011) .................................................. *passim*

*Jones v. Virginia Oil Co.,*
  69 Fed. Appx. 633 (4th Cir. 2003) ............................................................... 38

*Kanatzer v. Dolgencorp, Inc.,*
  2010 U.S. Dist. LEXIS 67798 (E.D. Mo. July 8, 2010) ................................ 23, 26, 30

*Kostelec v. State farm Fire and Cas. Co.,*
  64 F.3d 1220 (8th Cir. 1995) ........................................................................ 24

*Martinez v. Hilton Hotels Corp.*,
930 F. Supp. 2d 508 (S.D.N.Y. 2013) .......................................................... 26

*MCI Worldcom Network Servs. v. Clearwater Drilling Inc.*,
2002 U.S. Dist. LEXIS 21150 (S.D.N.Y. Oct. 31, 2002) ............................ 19

*Morgan v. Family Dollar*,
551 F.3d 1233 (11th Cir. 2008) ........................................................... *passim*

*O'Brien v. Ed Donnelly Enters., Inc.*,
575 F. 3d 567 (6th Cir. 2009) ...................................................................... 19

*Plaunt v. Dolgencorp, Inc.*,
2010 U.S. Dist. LEXIS 132135 (M.D. Pa. Dec. 14. 2010) .......................... 39

*Reiseck v. Universal Comm's of Miami. Inc.*,
591 F.3d 101 (2d Cir. 2010) ........................................................................ 11

*Rubery v. Buth-Na-Bodhaige, Inc.*,
470 F. Supp. 2d 273 (W.D.N.Y. 2007) ........................................................ 15

*Scott v. SSP*,
2011 U.S. Dist. LEXIS 32819 (E.D.N.Y. Mar. 29, 2011) ..................... 34, 35

*Smalley v. Home Depot U.S.A., Inc.*,
2013 WL 1402348 (N.D. Cal. Apr. 15, 2013) ............................................. 31

*Soderberg v. Naturescape, Inc.*,
2011 U.S. Dist. LEXIS 156235 (D. Minn Nov. 3, 2011) ....................... *passim*

*Spinden v. GS Roofing Prods. Co.*,
94 F.3d 421 (8th Cir. 1996) ................................................................. *passim*

*Stevens v. HMS Host Corp.*,
2015 U.S. Dist. LEXIS 102924(E.D.N.Y. Aug. 5, 2015) ........................... 13

*Tamas v. Family Video Movie Club, Inc.*,
2013 U.S. Dist. LEXIS 44313 (N.D. Ill. Mar. 28, 2013) ........................... 15

*Thomas v. Speedway SuperAmerica, L.L.C.*,
506 F.3d 496 (6th Cir.2007) ....................................................................... 23

*Tolan v. Cotton*,
134 S. Ct. 1861 (2014) ................................................................................. 9

*Torgerson v. City of Rochester*,
643 F.3d 1031(8th Cir.2011) ....................................................................... 10

*Williams v. Hooah Sec. Servs. LLC,*
   2011 U.S. Dist. LEXIS 133412 (W.D. Tenn. Nov. 18, 2011) ..................................... 15

*Yesmin v. Rite Aid of New York, Inc.,*
   2012 U.S. Dist. LEXIS 127655 (E.D.N.Y. Sept. 6, 2012) ..................................... 35, 36

## Codes, Statutes and Other Rules

29 U.S.C. § 202 .............................................................................................. 1

29 U.S.C. § 207 .............................................................................................. 11

29 U.S.C. § 213 .............................................................................................. 11

29 C.F.R. § 541.100 ................................................................................. 12, 27

29 C.F.R. § 541.103 ........................................................................................ 14

29 C.F.R. § 541.700 ........................................................................... 12, 13, 38

Fed. R. Civ. P. 56 ................................................................................. *passim*

## I.     INTRODUCTION

Defendant Target Corporation's ("Target" or "Defendant") memorandum in support of its motion for summary judgment ("Def. Mem.") as to Plaintiff Tammy Babbitt's Fair Labor Standards Act claims is a model of distortion and misdirection. In an attempt to demonstrate that no genuine disputes exist concerning material facts, Defendant credits only the deposition testimony it likes, disregards that which it doesn't and makes conclusory assertions without any factual support. When all else fails, Target simply misrepresents Plaintiff Tammy Babbitt's testimony. *See, e.g.,* p. 5 n.4, below.[1]

Despite these efforts, the record is clear that there remain hotly disputed material facts regarding Ms. Babbitt's "primary duty," meaning the tasks she actually performed on a daily basis, and the propriety of her classification as an exempt employee by Defendant. Indeed, a reader of Target's motion would not know that Ms. Babbitt directly testified that she spent 80-90% of her time doing manual, non-exempt tasks: testimony that, without more, would warrant denial of Target's motion.[2]

In short, Ms. Babbitt's testimony as a whole, despite being either ignored or misrepresented by Defendant, unambiguously conflicts with Defendant's assertions on the central issues. Inasmuch as the standard at summary judgment requires all inferences to be

---

[1] In addition to misrepresenting the record, Defendant's motion is premature. *See* Plaintiff's Plaintiffs' Motion for Discovery Pursuant to Fed. R. Civ. P. 56(d), filed concurrently herewith.

[2] See Deposition of Tammy Babbitt at pages 202:25-203:5, attached as Exhibit A to the Declaration of Seth R. Lesser ("Lesser Decl."), filed concurrently herewith; all exhibits cited in this motion are attached to the Lesser Decl. As used hereinafter, all citations to the Babbitt deposition will be in the form of "Babbitt at [relevant pages]".

1

construed in the light most favorable to the non-moving party (Ms. Babbitt, and not to Target, much as it might wish), summary judgment is inappropriate. Ultimately, these are issues that a fact-finder, not the Court, must resolve. Indeed, even though Target (as is its wont) tries to ignore it, Target fails to mention or to even distinguish its failed summary judgment attempt on these exact issues, with a far fuller record in *Jibowu v. Target Corp.*, 492 F. Supp. 3d 87 (E.D.N.Y. 2020) (denying summary judgment on a ETL plaintiff's misclassification claims due to questions of fact that could not be resolved via summary judgment).

But that is not all. Target predicates substantial portions of its motion on such items as, first, arguing that because it "expected" Ms. Babbitt to do management, it wins the day, and, second, that because Ms. Babbitt admitted doing various managerial tasks, it also wins the day. But the executive exemption rises or falls based on what an employee *actually* did, not on how an employer "expects" the person to do. *See* page 26, below. And the issue for the Court is not whether Ms. Babbitt did some managerial tasks, but rather, taken as a totality, whether management was her "primary duty." Ms. Babbitt admits that she performed some management tasks – indeed, as just noted, she spent 10-20% of her time doing work that Target would term as managerial. But that work paled in importance when compared to the extent and depth and context of all her work, which was, primarily non-managerial. That is why summary judgment cannot be granted here: a reasonable jury could rule in her favor.

In the alternative, if the Court is not prepared to deny summary judgment based on the existing record, the Court should deny the motion without prejudice so that Ms.

Babbitt can take merits discovery as to her individual claims, which has not occurred because Plaintiffs in this case have not taken any discovery (as to her claims, or otherwise). *See* Plaintiff's Motion For Discovery Pursuant to Federal Rule of Civil Procedure 56(d) (filed concurrently herewith).

## II.   STATEMENT OF FACTS

### a.   Plaintiff's Employment at Target

Plaintiff Tammy Babbitt worked as an ETL for Target from March 2018 through February 2020. During that time, Ms. Babbitt testified that she worked 60-70 hours a week. Ex. A (Babbitt at. 35:1-10). It is undisputed that she was classified as exempt by Target and did not receive premium overtime pay.

### b.   Plaintiff's Job Duties and Responsibilities as an ETL[3]

Target begins its brief by arguing at length about its alleged expectations for the ETL position and by pointing to a few purported managerial tasks it claims Plaintiff performed to establish supposed uncontested facts with respect to its exemption (Def. Mem. 3-12). Its analysis is misleading and flawed. Target's self-serving "expectations" for the ETL position are not relevant to what, in real life, Ms. Babbitt did as an ETL – and what an employee does is the test. *See* page 26, below. Moreover, as discussed below, even the few cherry-picked management tasks Target alleges Ms. Babbitt performed were rote, took little time, were performed under close supervision, and rarely, if ever, took priority over the manual labor that took the vast majority of Ms. Babbitt's time. Indeed, as shown below, virtually

---

[3] Additional facts are also brought out and addressed in the Argument section, below.

3

every single "managerial" task that Target alleges was performed by Ms. Babbitt, was *also* done by hourly, non-exempt Team Leads (which of Course begs the question of how "managerial" the tasks could have been). The standard to be considered is the "primary duty" of Plaintiff (*see* pp. 11-13, below); examples of (purported) management activities over nearly two years of employment hardly constitute Plaintiff's primary duty. In all events, the record as a whole shows that management was decidedly not Plaintiff's primary duty.

There is no doubt that the ETL job demands the performance of substantial non-exempt work, as is captured by Target's own description of the ETL position. In fact, Target identifies, *inter alia*, these job requirements as common to all ETLs:

- Able to move merchandise with appropriate equipment (e.g., tubs, carts, flats, etc.) to and from stockroom and sales floor.
- Able to place and arrange items on all shelves and racks on the sales floor.
- Able to climb and descend ladders.
- Able to lift 40 pounds.
- Able to continuously move around all areas of the store on a daily basis.
- Able to read instructions, reports, and information on computer screens and to key information on computer and PDA keyboards.
- Able to handle all products sold by Target. [ . . .]
- Flexible work schedule (e.g., nights, weekends, holidays and long hours) and regular attendance necessary.

Executive Team Leader Core Roles at TGT-Babbitt000704 (Exhibit B).

And, most significantly, although ignored entirely by Target in its motion, Plaintiff Tammy Babbitt testified at her deposition that she spent *80-90% of her time* not doing exempt work. Her testimony was forthright:

4

Q:      What percentage of your time would you spend performing
        these types of duties?

A:      I would say 80, 90 percent.

Babbitt 202:25-203:5.

And when she said "these types of duties," she was referring to a raft of manual,

non-exempt tasks that she testified doing, including:

- stocking shelves,
- working the cash register,
- placing newly received merchandise in its proper location,
- unpacking merchandise,
- setting up displays,
- cleaning the store,
- folding clothing,
- unloading trucks,
- assisting customers,
- filling internet orders,
- boxing them up for shipping,
- zoning (pulling all the product forward to face the store),
- putting up and taking down signs,
- using a crown,
- using a wave,
- using a walkie stacker,
- using an electronic pallet jack.

Ex. A (Babbitt at. at 198:21-202:19).[1]

---

[1] On page 2 of its motion, Defendant asserts that Plaintiff, in a 2019 self-audit, wrote that
she performed 70% of her time on "managerial duties." This is an egregiously misleading
statement. As discussed below, Target ignores Plaintiff's additional testimony that the non-
testimonial self-audit she completed was *not* accurate, that she was coached on how to
complete the audit by her store director, and that, in reality, contrary to the audit, she spent
80-90% of her time performing non-exempt, manual work. *See* Exhibit A (Babbitt at. at
198:21-202:19; 209:20-211:4).

On page 4 of its motion, Target also claims that Ms. Babbitt testified to doing
management/non-management work 60/40% of her time but that is an egregious
misstatement of her testimony, as is discussed at n.9, below.

Furthermore, Plaintiff not only testified that she spent the majority of her time performing manual work, but she identifies this manual work as the most important part of her job. *See* Exhibit C (Declaration of Tammy Babbitt ("Babbitt Decl.")) ¶¶ 3, 7.[5] To the extent that Ms. Babbitt performed any management work – such as early-round interviews, or preparation of performance reviews for hourly employees – this work was infrequent, took little time, was subject to unilateral review and revision by her supervisors, was rote, did not require independent judgment, and was always secondary to the work of keeping the store clean, neat, and well-stocked. *See* pages 13-25, below. Again, nearly every "managerial" task to which Target points was a task that non-exempt hourly Team Leads *also* performed, including, for example, being "Leader on Duty" ("LOD"), conducting hiring interviews, having team "huddles", and relaying tasks from the STL to other hourly workers, etc. *See* Babbitt Decl. ¶ 8; Babbitt at. 114:24-115:5.

Furthermore, Ms. Babbitt was highly micromanaged and Target provided detailed directions and processes to follow for completing the work she performed. Babbitt Decl. ¶¶ 5-6; *see also* pages 26-38, below. Target assigns work to its ETLs like Babbitt through

---

[5] Although the testimony Target ignores and fair inferences from Ms. Babbitt's deposition alone would preclude granting summary judgment, Plaintiff submits her declaration to address matters as to which Target did not question her at her deposition (most likely because it suspected it would not like the response). *See Hill v. Tangherlini*, 724 F.3d 965, 967-68 & n.1 (7th Cir. 2013) (party may present its side of the story at summary judgment through declarations, which should not be denigrated as "self- serving"; all cases holding otherwise overruled); *see also, e.g., Brooks v. Tri–Systems, Inc.*, 425 F.3d 1109, 1111–12 (8th Cir.2005) (discussing Rule 56 and noting that both affidavits and deposition testimony can be used at summary judgment).

each store's Store Team Leader (now termed "Store Director") and District Team Leader who were required to implement the assigned materials from the regional office through corporate layouts, manuals, and guides. Babbitt at 196:20-197:16. These directives controlled what tasks ETLs like Babbitt performed, when they were performed, and exactly how they were performed. Target pushes this information out to its stores using its workbench portal. *See, e.g.,* Target's "New F&B Standards Overview", TGT- Babbitt at 11394, 11406 (Exhibit D) (presentation detailing how these materials look when accessed through Target's portal Workbench).

Babbitt's daily work was directed by comprehensive formal corporate procedures and policies with which ETLs must comply, including merchandizing guidelines with detailed layouts and schematics, standards, workflow and processes, assignment sheets, and direction on even basic processes such as how to sort and stock and where to place signs. *See* Target's "Merchandising Guidelines" at TGT-Babbitt 009387-009399  (Exhibit E) (guide describing food display procedures provided by Defendant to all Target stores); Target's "Implementation Guide" at TGT-Babbitt at 011146-150 (Exhibit F) (exemplar "implementation guide" detailing the proper mode for sorting and stocking in an extensive 54-page manual that lists the ETL position as required to ensure completion); Target's "Signing Checklist" at TGT-Babbitt 013668 (Exhibit G) (detailing the type of checklists provided by corporate to Target's stores, listing out all sign placement requirements

throughout the store for an exemplar period of time).[6]  These policies mandated, in

practice, that Babbitt perform primarily hourly work to meet Defendant's standards and

she has testified that is what occurred. Babbitt Decl. ¶¶ 5-6; *see also* citations in footnote 5,

above.

In addition, Target sets "labor budgets" for its stores that determine the payroll and

number of hours allotted to each store each week. Target discourages overtime and

encourages its stores to operate with as lean a labor budget as possible. Ms. Babbitt had no

responsibility for setting store budgets or determining how many hours were allocated to

each area of the store. Ex. A, Babbitt at 204:22-205:14. The labor budgets were so lean,

and the pressure to suppress labor costs so constant, that this led, consistently, to

understaffing; and this understaffing, in turn, caused Ms. Babbitt to have to perform the

work of hourly associates. *Id.* at 204:22-205:3, 208:5-15.

Furthermore, Target has its STLs closely supervise all of the work in the store,

including the work performed by ETLs like Babbitt. Babbitt's store manager met with her

on a daily basis and gave her notes listing the things he wanted her to do that day, and she

would pass them along to her people. Babbitt at 150:4-151:19, 196:17-198:2. Further, her

STL would routinely walk through the store with her and direct her as what work should or

---

[6] *See also, e.g.,* Target's "Operations Guide", TGT-Babbitt 020410-20429 (Exhibit H)
(detailing operation routines including for tasks as innocuous as "in stock scanning"
complete with pictures); Target's "New F&B Standards Overview", at TGT-Babbitt
011392-11393, 11410, 11412-18 (Exhibit D) (detailing types of foundational standards,
uniform cleaning policies, sales floor priorities and assignment sheets provided to Target
stores, listing items such as zoning, stocking/filling and executing routines);  Target's
"Business Ownership I" at TGT-Babbitt 00001-00003, 00005 (Exhibit I) (teaching
Business Ownership Onboarding I: ETL Training, a uniform guide to ETL instruction).

should not be performed. Babbitt Decl. ¶¶ 3-4. Babbitt was required to carry a walkie talkie to keep him in direct contact with her throughout the day. Exhibit C, Babbitt Decl. ¶ 4. *See also* discussion at pages 26-38, below.

## III.   ARGUMENT

### a.   Legal Standard

Target seeks summary judgment pursuant to Federal Rule of Civil Procedure 56. Under Rule 56, summary judgment is appropriate only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden is on the moving party to demonstrate the absence of a material factual question, and the court must view all facts "in the light most favorable" to the nonmoving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The Supreme Court has reiterated the "importance of drawing inferences in favor of the nonmovant" when considering a motion for summary judgment and emphasized that "courts must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014). That is because "[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Thus, in determining a motion for summary judgment, the court is required to believe the evidence tendered by the non-movant and draw "all justifiable inferences ... in his favor." *Id.*; *accord Grage v. N. States Power Co.*, 813 F.3d 1051, 1054 (8th Cir. 2015) ("Summary judgment is only proper

where the evidence, viewed in the light most favorable to the nonmovant, shows that no genuine issue of material fact exists, such that the movant is entitled to judgment as a matter of law.").

The "application of an exemption under the Fair Labor Standards Act is a matter of an affirmative defense on which the employer has the burden of proof." *Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97 (1974). In this Circuit, this standard of proof is only met where an employer "prove[s] that [an] exemption applies by demonstrating that their employees fit plainly and unmistakably within the exemption's terms and spirit." *Spinden v. GS Roofing Prods. Co.*, 94 F.3d 421, 426 (8th Cir. 1996).

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts" should be left to the jury. *Grage*, 813 F.3d at 1056 (citing *Torgerson*, 643 F.3d at 1042, and holding that "the jury needs to weigh the evidence and determine the primary duties Grage performed as a Supervisor I before the court can decide the legal question of whether those duties exclude her from overtime pay under the FLSA."). Indeed, it is often recognized that "[b]ecause whether an employee is exempt from the overtime pay provisions is a fact intensive inquiry, even where there has been full discovery, courts are often reluctant to grant summary judgment based on an exemption." *Carhuapoma v. New York- Presbyterian Healthcare Sys.*, 2013 U.S. Dist. LEXIS 45886, at *19 (S.D.N.Y. Mar. 29, 2013); *see also* cases cited at pages 12-15, below.

### b. The FLSA and It's Exemptions

The FLSA was enacted in 1938 to combat "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and

general well-being of workers." 29 U.S.C. § 202(a). It provides that "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1).

The FLSA provides several exemptions to this general rule, including the executive exemption, which is at issue here, 29 U.S.C. § 213(a)(1), this being the only exemption pursuant to which Target tries to justify its classification of Ms. Babbitt and its ETLs. Not only is the exemption question a mixed question of fact and law, but, as noted, exemptions are "narrowly construed against the employers seeking to assert them and their application [is] limited to those establishments plainly and unmistakably within their terms and spirit." *Bilyou v. Dutchess Beer Distributors, Inc.*, 300 F.3d 217, 222 (2d Cir. 2002) (quotation omitted); *Spinden*, 94 F.3d at 426 (same); *see also Reiseck v. Universal Comm's of Miami. Inc.*, 591 F.3d 101, 104 (2d Cir. 2010). For this reason, as noted, the burden of proof on exemptions *lies with Defendants. Corning Glass*, 417 U.S. at 196-97; *Bilyou*, 300 F.3d at 222. Against this backdrop, Defendant moves for summary judgment. Because a jury could readily find that Target has failed to carry its burden, Defendant's motion should be denied.

c. **Genuine Disputes of Material Fact Precludes Summary Judgment on Target's Executive Exemption Defense**

The executive exemption, the only exemption pursuant to which Target claims its classification was appropriate, applies when an employee is (1) compensated no less than

11

$455 per week; (2) the employee's "primary duty" is management; (3) the employee "customarily and regularly directs the work of two or more employees"; and (4) the employee has the authority to hire or fire, or her suggestions and recommendations regarding the same are given "particular weight." 29 C.F.R. § 541.100. Summary judgment is only appropriate when a Defendant meets its burden of proof on *all* four prongs of this test. As discussed below, Defendant's motion should be denied because Target has failed to meet its burden on the second prong of the test – the management as primary duty prong.[7]

### 1.    The Primary Duty Test

"Primary duty" means "the principal, main, major, or most important duty that the employer performs." 29 C.F.R. § 541.700(a). Factors that help determine an employee's primary duty include: (1) the "relative importance" and "amount of time spent performing exempt work"; (2) the frequency with which the employee exercises discretionary powers; (3) "the employee's relative freedom from direct supervision"; and (4) "the relationship between the employee's salary and the wages paid to the other employees for the kind of

---

[7] Ms. Babbitt does not dispute that she was paid more than $455 per week and supervised two or more employees. Ms. Babbitt could challenge the fourth prong as well here, but the failure to meet the third prong is patent, particularly given the extent to which Target relies on hiring/firing in its argumentation. As to hiring and firing, we would simply point out that – among the things that Target ignores— Ms. Babbitt could not independently fire, promote, or discipline employees. Babbitt at 203:7-20. She was not involved at all in the hiring of Team Leads. Babbitt at 57:14–58:11 She was only involved in hiring lower-ranking Team Members, and even then only conducted the second of three interviews. Babbitt at 58:8–59:11. Moreover, Babbitt could not unilaterally discipline employees and always needed explicit permission from her Store Managers to do so. Babbitt at 66:1-68:3, 203:17-20, 206:9-12. *See also* pages 26-38, below (more on these points).

non-exempt work performed by the employee." *Id.*; *Auer,* 65 F.3d at 71. "The evaluation of an employee's primary duty is a fact-intensive inquiry that is to be based on the 'character of the employee's job as a whole." *Foster v. Nationwide Mut. Ins. Co.,* 695 F. Supp. 2d 748, 755 (S.D. Ohio 2010) (quoting 29 C.F.R. § 541.700(a)). As one well-respected judge wrote in an analogous situation where, without individual discovery a defendant moved for summary judgment on the executive exemption based on a deposition:

> Ordinarily, courts consider a developed trial record to determine an employee's primary duty. Where, as here, however, defendants rely almost exclusively on bits and pieces of [plaintiff's] employment history [gleaned] from his deposition[,] . . . [t]he material disputes of fact resulting from the undeveloped summary judgment record become manifest in even the most cursory primary duty analysis.

*Stevens,* 2015 U.S. Dist. LEXIS 102924, at *11 (internal quotations and citations omitted). Here, genuine issues of material fact concerning Plaintiff's primary duties make summary judgment inappropriate.

### 2.  Babbitt's Most Important Duty, And the Duty Which Took Up the Majority of Her Workday, Was the Performance of Non-Exempt Work

The amount of time an employee spends performing non-exempt work "can be a useful guide" in determining his or her exempt status, and an employee spending "more than 50 percent of their time performing exempt work" generally satisfies the primary duty test. 29 C.F.R. § 541.700(b). The number of hours spent performing non-exempt tasks is not dispositive (as Target, seeking to avoid Ms. Babbitt's testimony stresses), 29 C.F.R. § 541.700(b), but, while not determinative, in "the ordinary case it may be taken as a good rule of thumb that primary duty means the major part, or over 50 percent, of

the employee's time." 29 C.F.R. § 541.103.[8] As set forth at pages 3-6, above, Babbitt

testified that she spent the vast majority of her workday—80-90%—performing non-

exempt tasks such as – among others –stocking shelves, working the cash register,

placing newly received merchandise in its proper location, unpacking merchandise,

setting up displays, cleaning the store, folding clothing, unloading trucks, assisting

customers, filling internet orders, boxing them up for shipping, etc. – not managing.

Babbitt at. 198-203; *see also* Babbitt 193:9-12 (she was made to do "everything, stocking,

cashiering, orders from the pickup orders, everything."). Ignoring Ms. Babbitt's

testimony as to the many manual tasks she did and how they comprised 80-90% of her

time, Target's brief claims that at her deposition she testified she did 60/40%

management/non-management work (Def. Mem. 4) but that is simply wrong: the 40%

was her time doing, specifically, "cashiering, stocking" and not *all* her non-management

tasks, as to which her testimony was the 80-90%. Babbitt 189: 7-25. The Court should

not be misled by this flat-out miscitation.[9]

  Courts throughout the country deny motions for summary judgment in chain store

managerial misclassification cases where employees devote the better part of their workday

to non-managerial tasks, as Ms. Babbitt did. *See, e.g., Jibowu, supra; see also, e.g.,*

---

[8] The amount of time an employee spends working, either on exempt or non-exempt
duties, is a question of fact. *See Icicle Seafoods, Inc. v. Worthington,* 475 U.S. 709, 714
(1986); *Spinden,* 94 F.3d at 426.

[9] Specifically, Ms. Babbitt was explaining at Babbitt 189 an entry on her self-audit asking
about those tasks. The self-audit as a whole is discussed at pages 18-19, below. Even if she
had testified contradictorily (which she did not), the Court would be bound to resolve any
discrepancy in her favor on this motion. *See* citations at page 19, below.

*Schaefer v. Ind. Mich. Power Co.*, 358 F.3d 394 (6th Cir. 2004) (plaintiff testified he spent 80% of time doing non-exempt worked); *Tamas v. Family Video Movie Club, Inc.*, 2013 U.S. Dist. LEXIS 44313, at *24 (N.D. Ill. Mar. 28, 2013)(denying summary judgment where plaintiff performed 50% non-exempt work); *Cameron v. Abercrombie & Fitch Co.*, 2012 U.S. Dist. LEXIS 131557 (S.D. Ohio Sept. 24, 2012); *Indergit v. Rite Aid Corp.*, 2010 U.S. Dist. LEXIS 32322, at *7 (S.D.N.Y. Mar. 31, 2010) (denying summary judgment where plaintiff performed 90% non-exempt work); *Williams v. Hooah Sec. Servs. LLC*, 2011 U.S. Dist. LEXIS 133412, at *35 (W.D. Tenn. Nov. 18, 2011) (denying summary judgment where 80% non-exempt work); *Rubery v. Buth-Na-Bodhaige, Inc.*, 470 F. Supp. 2d 273, 277 (W.D.N.Y. 2007) (denying summary judgment where plaintiff performed 90% non-exempt work). Indeed, in this Circuit alone, at least two courts have even denied summary judgment in cases involving chain store *managers*, whereas, as an ETL Ms. Babbitt was only an *assistant* store manager. *See, e.g., Smith v. Heartland Automotive services*, Inc., 418 F. Supp. 2d 1129 (D. Minn. 2006); *Jones v. Dolgencorp, Inc.*, 789 F. Supp. 2d 1090 (N.D. Iowa).

Thus, although Target begins its brief (Def. Mem. 2) by insinuating it to be "absurd" that an assistant store manager could have a claim for misclassification and that it "defies logic" that a large chain retail store could be run by a single individual (Def. Mem. 2), as these cases show such claims are hardly "absurd"; rather, of course, the relevant question is what the FLSA requires for an employer to prove to permit it to classify an employee as exempt. In fact far from absurd, as discussed above, Target has lost summary judgment on this exact issue. *Id.* Indeed, in *Morgan v. Family Dollar*, 551 F.3d 1233 (11th Cir. 2008),

which is probably the country's single leading decision on FLSA misclassification claims, the Eleventh Circuit upheld a misclassification jury verdict on behalf of a collective of store managers at Family Dollar stores, which are also large chain stores (albeit not quite as large as Target stores), and, as to assistant managers, who are obviously a level lower, one of the undersigned counsel successfully obtained a jury verdict on behalf of a collective of assistant store managers at Staples stores (in which there were just two assistant managers, as opposed to the seven or eight ETLs each Target store has). *See Stillman v. Staples, Inc.,* No. 07-849 (D.N.J. May 15, 2009). The issue is not breezy characterizations of what employees do but what the law requires and what the evidence is in any given case.[10]

Babbitt explained why she spent most of her time on these manual tasks – substantially because her store was understaffed. *See* page 8, above (*quoting* Babbitt at 208-209). She repeatedly made it clear at her deposition how the understaffing impacted the store:

Q:      Okay, up at the top here, Mr. Rehnelt follows up with you and says, 'What's the plan to have TMs certified and can cover?"  Do you see that?  A:  Uh-huh.  Q:  Yes?  A. I do, yes.  Q:  Do you now what is he referring to there?  A:  One second.  Q:  Sure.

A:      Yeah, so again coverage was very scarce, we were very understaffed. You would have to be a certified barista to be able to be in that area; so if you are not, then that would be an emergency where

---

[10] Although beyond the scope of the motion and a matter to be addressed more fully when this case progresses to the merits phase, one of the reasons plaintiffs can prevail in these cases is because large American retail chain stores substantially operate through a comprehensive set of corporate instructions that circumscribe and limit both the number of managerial issues that might arise and also the discretion involved in addressing them. *See Morgan,* 551 F.3d at 1248 ("No matter the size of the store or the district, every detail of how the store is run is fixed and mandated through Family Dollar's comprehensive manuals."). Such directives exist with Target, *see* pages 7-8, above, and 26-38, below.

we would ask a member from another area. Whether it was a callout
that day or because she had to go on an emergency leave of absence, I
really can't make a plan if I don't have the bodies, so that is my – what
I let him know." Babbitt, at 173:6-23.

Similarly, she explained why as to a performance review, she was unable to direct

her Team Leaders:

> Q· · The next sentence says, "To be successful this upcoming year, you
> will be challenged to lead differently by ensuring your Team Leaders
> are business owners and improving their level of execution and detailed
> work."· Do you see that?
> A· · Yes.
> Q· · Were you able to do that?
> A· · No.
> Q· · Why not?
> A· · Just the staffing, like having to come in and be more of a stocker
> or cashier or running the orders from home, I can't even remember
> what it's called, I am sorry, the ship to store caused me to not always --
> I wasn't able to be in those areas to do that.

Babbitt, p. 181:7-21. Taken in conjunction with her testimony as to labor budgets and how

they caused her to do manual, non-exempt work, as this Court has concluded in a decision

by Judge Kyle, "a fact-finder could conclude from the evidence that [the defendant] used

[the] [p]laintiffs, and their ability to put in hours doing non-exempt tasks without charging

the company overtime, as a mechanism through which to control labor costs." *Smith*, 418

F. Supp. 2d at 1135 (D. Minn. 2006) (Kyle, *J.*); *accord Deweese v. Git-N-Go Convenience*

*Stores, Inc.*, 2013 U.S. Dist. LEXIS 189719, at \*22 (S.D. Iowa Feb. 1, 2013) (quoting and

following *id.*).

Faced with her testimony as to how she primarily spent her time doing non-exempt

manual-type work, Target resorts to an attempted sleight of hand by pointing to the "self-

audit" that Target compels all ETLs to complete, claiming that it proves Babbitt spent most

17

of her time managing. Def. Mem. 2, 4, 20-21. In fact, at Def. Mem. pages 20-21, Target

*only* cites the self-audit and then provides more than two pages of argumentation that time

alone is not a criteria and that relative importance of managerial time is what matters – a

discussion that the Court will see is essentially bereft of evidentiary application to this case

and consisting of general citation to other cases for general principles. All these words are

undoubtedly designed to hope the Court overlooks the fact that Ms. Babbitt answered the

questions on that self-evaluation the way she was told (and she did so, of course, since she

wished to retain her job), and that it was, as she testified, not accurate:

> Q:     And were you ever instructed as to how to fill that out?
> A:     Yes.
> Q:     Tell me what happened.
> A:     Yes, our Store Team Leader did sit down and let me
> know what percentages of each were allocated and what was the
> typical to do in that position as we filled out the document.
> Q:     And did you follow it and fill it out as the Store Director
> told you to do?
>        Mr. Schmitt:  Objection leading.
> A:     Yes, I did.
> Q:     Even if it wasn't correct when you filled it out, it was
> filled out the way they wanted it filled out?
>        Mr. Schmitt: Objection, leading.
> Q:     Is that fair to say?
> A:     Yes.

Babbitt at 210:2-211:6. Patently, a triable issue of fact exists here:  what is to be believed?

Is it her sworn testimony or a non-testimonial form she was told how to fill out and in

which she (not surprisingly) tried to make herself look good?  Only a jury can reach such

18

an answer.[11]  For now, however, any inconsistencies and inferences must be resolved in Plaintiffs' favor. *See O'Brien v. Ed Donnelly Enters., Inc.*, 575 F. 3d 567, 592 (6th Cir. 2009); *MCI Worldcom Network Servs. v. Clearwater Drilling Inc.*, 2002 U.S. Dist. LEXIS 21150, at *6-7 (S.D.N.Y. Oct. 31, 2002) (citing *Arnstein v. Porter,* 154 F.2d 464, 469 (2d Cir. 1946)) ("Although Rowland's deposition testimony is internally inconsistent with regard to why he ignored the markout, for purposes of ECS's summary judgment motion, the portions of Rowland's testimony to which Clearwater and ECS point must be credited.").

Target cannot gainsay on this motion Ms. Babbitt's deposition testimony – indeed, aside from the self-evaluation form, Target offers no evidence as to what Ms. Babbitt primarily did in terms of her time – or, indeed, in terms of its relative importance (*see* pages 22-26, below). It does, of course, point to the managerial tasks that Ms. Babbitt did admit she did and ways in which she did manage, and it also points to generalizations about how large was the store at which she worked and how many individuals (titularly) she might have managed, but all of this ignores the critical point that, of course, Plaintiff does not

---

[11] Plaintiffs' counsel believes that Target's purpose of the self-evaluations was in large measure designed to discourage claims because the self-evaluation form, as a whole, is written in such a way as to compel answers that would bespeak "management." Nearly every question is about "management" activities and when they are not asking about those activities, for example, as on page 6 it asks about "merchandise handling," the question is written in a crafted and confusing manner that actually did not ask about how much time she spent performing that task but about how much time she spent performing those tasks *if [its] primary purpose is not training, development, leading or directing the team,* a qualification and instruction that can only either have confused or produced a "management" response that Target likes. Defendants' Sealed Exhibit D re Declaration in Support, Docket No.: 96 p. 7 of 9 (emphasis added).

deny that Ms. Babbitt did *some* management, but that, as a whole, such work paled into

insignificance compared to what she primarily did and how important it was. This is in part

because, to the extent she had managerial responsibility, it was constrained, limited, and

low-level, and she was closely supervised in how she operated (as shown at pages 26-38,

below). Moreover, completely ignored by Target is the fact that *nearly every single*

*management task* that its brief asserts Ms. Babbitt did was *also* a task handled by the hourly

and non-exempt Team Leads below, demonstrating that far from having her "managing"

being integral to the store, its importance was limited because the exact same tasks were

done by hourly non-exempt Team Leads. Babbitt Decl. ¶ 8 (tasks that were also done by

Team Leads). *See Costello v. Home Depot USA, Inc.*, 928 F. Supp. 2d 473, 493 (D.

Conn. 2013) (identifying the "the degree to which [plaintiff's alleged managerial] functions

were replicated by lower-level employees" as a factor as to which a material issue of fact

existed, precluding summary judgment); *accord Jibowu v. Target Corp.*, 492 F. Supp. 3d

106 (same; citing *id.*).

      Thus, while Target points to some aspects of her managing, it neglects to recognize

how limited where those managerial aspects or that the same work was done by non-

exempt hourly employees, and yet, obviously those points matter.[12] Indeed, as her

---

[12] Target also over-characterizes the record. For example, at page 6, it includes a block
quote from Ms. Babbitt's testimony to make it appear as though she was actively managing
and directing those who worked below her, but, in actuality, that is not what Ms. Babbitt
stated — rather an equally fair reading of the testimony is that she was acting merely as a
pass-through to hourly workers of tasks that the STL had decided needing doing and there
is no indication how, if at all, she "le[d] the completion of [those] hourly tasks aside from
passing them on.

supplemental affidavit underscores, she testifies that in terms of relative importance, her

non-management tasks, taken as a whole, represented her "primary duty." Babbitt Decl. ¶

7. And while Target points to some of the accomplishments she had in her reviews, it

ignores the manner in which she testified that she was not able to more fully manage due to

the chronic endemic understaffing, as is set forth at pages 8, 16-17, above. *See Johnson v.*

*Derhaag Motor Sports, Inc.*, 2014 U.S. Dist. LEXIS 158845, at *40 (D. Minn. Nov. 10,

2014) (where "Defendants argue[d] that while Plaintiff completed some mechanical work,

Johnson's 'job duties were managerial in nature,'" and Plaintiff, in turn, asserted that his

primary duty "was to complete maintenance work for the racing cars" which meant he had

to do "'whatever' it took for the race car to run," the Court had to deny summary judgment

in light of the parties' contrary positions). In short, where the two sides in a FLSA

exemption case present countering testimony and analysis as to what an employee did and

its relative importance, summary judgment is inappropriate. *See id.*; *Heartland Auto.*

*Servs., Inc.*, 418 F. Supp. at 1135-39.[13]

---

[13] This is also captured by t *Deweese v. Git-N-Go Convenience Stores, Inc.*, 2013 U.S. Dist.
LEXIS 189719, at *20-21 (S.D. Iowa Feb. 1, 2013), which was a store manager claim and
is worth citing more fully. There, the defendant argued (on a record stronger than that
here) that the plaintiff bore

> the ultimate responsibility for "the proper and efficient operation of . . . her store . .
> . in such a manner as to ensure . . . its profitability," and "to live up to this
> responsibility, a store manager must perform a number of exempt, managerial
> functions, such as "completing . . . cash deposits, daily reports and gas reports,"
> "screening and referring job applicants," "[d]elegating tasks to store staff," "[i]ssuing
> employee consultations and completing employee evaluations," and

Target also claims, and does so repeatedly, that even if Ms. Babbitt testified she primarily did non-management work, her management duties "Were the Most Important to Target". Def. Mem. 16-20. But in this regard, Target's argumentation reduces to a great many words about what it "expected" of ETLs and what it "considered" them to be doing, and also pointing out that she "understood" those expectations and that she was evaluated on them. Def. Mem. 17-19; *see also* Def. Mem. 3-4, 7-8. But the burden lies with Target and aside from a passing reference that Ms. Babbitt understood what Target expected and a single general testimonial statement that she split up work among Team Leads, the entirety of its support at pages 17 through 20 for this proposition consists of references to

---

"[p]rotecting company assets." Briefly stated, the store manager is the person "in charge" of the store.

*Id.* at *19-21 (record citations omitted). "At the same time, however," the Court wrote:

> the record contains ample evidence that Plaintiff performs a great deal of manual tasks. In fact, her job description itself requires the completion of the following non-exempt duties: serving customers, working the cash register, keeping the coolers and shelves fully stocked, and cleaning equipment, windows, floors, shelving, counters, and gas pumps. Store managers also put away the truck order, stock the ice machines and coolers and make coffee in preparation for store opening, and engage in minor maintenance activities, such as changing light bulbs. Additionally, the Court notes that while on shift as a store manager, Plaintiff works the majority of the time by herself and that at various times she has been assigned to work as a cashier in other stores even though she holds a store manager title.

*Id.* at *22. Aside from having some slightly differing manual tasks, these words no less describe the record here, down to the job description point. Suffice it to say, the *Deweese* Court concluded, "Based on this conflicting information, the Court concludes that a reasonable fact-finder viewing the record in the light most favorable to Plaintiff could conclude that Plaintiff's performance of non-exempt duties was more important to Defendant than her performance of managerial duties." *Id.*

the Core Roles (job description), Target's training program, and policy manuals. All of this does not avail Target, and does not do so for at least three reasons.

*First*, Target gets the operative test wrong. The relevant inquiry is not, as Target would have it, whether Target perceived Babbitt's managerial duties to be the most important "<u>to Target</u>." Def. Mem. 17 (emphasis in original; citing as "see generally" *Auer v. Robbins*, 65 F.3d 702, 713 (8th Cir. 1995)). It is not simply a matter of what Target deemed to be the most important. The relevant inquiry is an analysis of the evidence and an objective determination of which set of duties has a greater impact:

> Courts have held that "the relative importance of an employee's exempt and non-exempt duties—is determined by comparing how valuable the employee's exempt activities are to the employer versus how valuable the employee's non-exempt activities are to the employer." *Kanatzer,* 2010 WL 2720788 at \*3; *see Thomas v. Speedway SuperAmerica, L.L.C.,* 506 F.3d 496, 505–6 (6th Cir.2007). In other words, a question to be asked is: how long would Joyner's Dollar General store successfully last if she only performed managerial duties versus manual labor?

*Jones*, 789 F. Supp. 2d at 1106. Yet, Target – who has the burden of proof on this analysis – fails to offer any evidence whatsoever that Ms. Babbitt's management work had a greater impact on store performance than her manual labor. It does not attach any testimony to support itself, or financial reports or time studies or expert analysis or indeed even a declaration from an employee attesting to this point.[14] Its conclusion is not evidence-based,

---

[14] Although it would merely have set up a "he said/she said" dispute that could not be resolved on summary judgment, Target offered *no* testimony from anyone with personal knowledge as to what Ms. Babbitt did or how important it might have been, although it certainly could have obtained declarations from her Store Team Lead or co-workers. The absence of such evidence can be used to infer that such witnesses would not have helped

it is just Target's counsel's *ipse dixit*. Certainly, none of the materials Target submits disprove or even challenge Babbitt's position, and the fair inference to be drawn from her testimony, namely, that without her 20 hours of free labor a week, which she attests was predominantly non-management, the store could not have met its staffing requirements and labor budget. In such an instance, as discussed above, summary judgment cannot be granted. *See* pages 25-26, above (citing *Johnson v. Derhaag Motor Sports, Inc.*). This point is by the fact, as discussed, that nearly all of (if not all of) the "management" tasks that Target's memorandum identifies that Ms. Babbitt did – and which it asserts were so substantial and all-important – were also tasks done by non-exempt hourly Team Leads. *See Jones*, 789 F.Supp.2d at 1106 (even where an employee, as a store manager, was responsible for "ensuring the store's profitability, she was also responsible for performing a

---

Target's motion. *See Kostelec v. State farm Fire and Cas. Co.*, 64 F.3d 1220, 1229 (8th Cir. 1995) ("Thus, it has long been 'settled that if a party fails to produce the testimony of an available witness on a material issue in the case, it may be inferred that his testimony, if presented, would be adverse to the party who fails to call the witness.'" (citations omitted)). The failure to provide such testimony can be a factor in denying summary judgment. *E.g.*, *Costello*, 928 F. Supp. 2d at 493 (identifying "the absence of corroborating testimony from Home Depot officials or other employees regarding the importance of Costello's various tasks," as a factor as to why "a material issue of fact remains as to the relative importance of Costello's managerial functions.")

Target makes its various contentions at Def. Mem. 16-17 to claim that "[u]nsurprisingly, courts repeatedly have emphasized the importance of an assistant manager's role in the success of the business" (Def. Mem. 19), but while Target cites cases for this proposition, it fails–completely– to show how Ms. Babbitt's activities played any role, at all, "in the success of the business." For all one knows the business operations in which she was involved could have been a complete failure, irrespective of whatever Ms. Babbitt did or did not do. To repeat: Target has the burden of proof and lawyer *ipse dixit* is not evidence and does not constitute meeting a burden of proof.

substantial amount of the manual labor necessary to ensure its profitability — the same manual labor performed by a store clerk"; and  "Consequently, the defendants have failed to meet their burden of establishing no genuine issue of material fact on the question of whether Joyner's managerial duties were more important to the defendants than her non-managerial duties."). Thus, a jury could well determine that Target's classification was not based upon the true "managerial" work by Ms. Babbitt but rather as a means to get labor as to which it would not have to pay overtime. *See* page 15, above (quoting holding from *Smith v. Heartland* and also citing to same holding in *Deweese v. Git-N-Go Convenience Stores*).

*Second*, to all intents and purposes, given its lack of having any objective evidence as to why Ms. Babbitt's management activities were more important than her non-exempt activities, Target's argument reduces essentially to a contention that "[Plaintiff's] managerial duties were more important than [her] non-managerial duties because they are managerial in nature." *Soderberg v. Naturescape, Inc.*, 2011 U.S. Dist. LEXIS 156235, at *26 (D. Minn. Nov. 3, 2011). Not only is this not supported by the fact that the same tasks were done by hourly non-exempt employees, but, as Judge Magnuson trenchantly addressed this point, "[t]his argument is circular and does not address the question" because "Plaintiffs[, in turn,] argue that Soderberg's managerial duties were less important than his production duties because he exercised little discretion and merely acted as a conduit for decisions made by more senior management." *Id.* That is precisely Ms. Babbitt's argument (among others). Summary judgment is inappropriate where such issues (among others) are in contention. *Id.*; *see also Johnson*, 2014 U.S. Dist. LEXIS 158845, at *41 ("Based on the

25

record currently before the Court, the Court finds that a genuine issue of fact remains as to whether Johnson qualifies for the executive exemption. As in *Smith* [*v. Heartland Auto. Servs., supra*], the parties disagree about which of Johnson's duties were of primary importance for Defendants.").

*Third*, the executive exemption rises or falls on "what [the defendant] did rather than what it said." *Donovan v. Burger King*, 675 F.2d 516, 519 (1982); *see also Ale v. TVA*, 269 F.3d 680, 691 (6th Cir. 2001) ("[T]he words 'in charge' are not a magical incantation that renderan employee a bona fide executive regardless of his actual duties."); *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1272, n. 60 (11th Cir. 2008) ("Courts cannot rely solely on whether an employee was 'in charge' of the store. Rather, they must evaluate the employee's actual job duties."); *Martinez v. Hilton Hotels Corp.*, 930 F. Supp. 2d 508, 525 n.16 (S.D.N.Y. 2013) ("[T]he determination of whether or not an employee qualifies as [exempt] under the regulations . . . focus[es] on evidence regarding the actual day-to-day activities of the employee rather than more general job descriptions contained in resumes, position descriptions, and performance evaluations.") (citations omitted). Yet, Target's argumentation here is effectively nothing more than position descriptions and performance evaluations (and lawyer *ipse dixit*). That does not suffice for summary judgment. *See also, e.g., Kanatzer v. Dolgencorp, Inc.*, 2010 U.S. Dist. LEXIS 67798, at *7 (E.D. Mo. July 8, 2010) ("An employee is not automatically an exempt executive merely because she is labeled a 'manager' or because she is 'in charge' of a particular store.") (citation omitted).

3.   The Frequency With Which Babbitt Exercised Discretionary
Responsibility and the Manner In Which She was Not Free From
Direct Supervision

The next two factors in the primary duty analysis are the frequency with which the

employee exercises discretionary powers and "the employee's relative freedom from direct

supervision." 29 C.F.R. § 541.100.  These are often analyzed together inasmuch as they

overlap. *See Morgan,* 551 F.3d at 1270 n.57 (under the executive exemption, "Having

discretionary power is one aspect of freedom from supervision."); *see also Soderberg*, 2011

U.S. Dist. LEXIS 156235 at *25-26 (treating these two factors together).

As to discretionary authority, Target essentially concedes the issue. It makes *no*

attempt to argue that Ms. Babbitt exercised discretionary responsibility. Indeed, the *only*

time it refers to "discretion" in its brief is to contend that limitations on discretion may not

be dispositive but its discussion is limited to citing caselaw and it presents essentially

nothing at all from the record. Def. Mem. 2-22. It certainly presents no evidence that Ms.

Babbitt routinely or materially exercised discretionary responsibility. And the evidence is

that Ms. Babbitt *did not* possess substantial discretionary responsibility. Ms. Babbitt could

not, and did not, establish store policy, practice, or protocols. Babbitt at 203:22-204:10.

She could not commit Target to matters of financial significance, set employee wages, or

determine the labor budgets. Babbitt at 204:12-205:9. She was not allowed to allocate

hours into the areas of the store she worked in or send associates home in order to manage

the labor budget. Babbitt at 205:11-19. She could not fire, promote or independently

discipline employees, and Target did not allow her to discipline, or hire or fire or promote

without the close supervision of its HR department. Babbitt at 203:7-18; *see also* Babbitt at

27

66:1-68:3, 203:17-20, 206:9-12. When she counseled employees on attendance she was following specific instructions from HR: "HR was just they were telling me what to do and I was just doing what they asked, so they let me know that I needed more documentation, and then we sat down together and did that and then emailed Marisa." Babbitt at 166:10-15. For instance, while Target claims that "Babbitt was responsible for compliance with wage-and-hour requirements, including that her team took their legally required meal and rest breaks" and "also ensured that her team did not work off the clock and were paid for all hours worked" (Def. Mem. 7 (citing Babbitt 47:3-20, Babbitt 47:21-48:9)), in actuality, all of that work was done by her under the guidance and direction of Human Resources ("HR") and she "was just the go-between passing along information from HR to them and from them to HR." Babbitt Decl. ¶ 10.

Not only was her discretion circumscribed and bounded, but the main aspects as to which she had discretionary managerial responsibility were low level and often rote management tasks. Her areas of responsibility devolved to such low-level matters (besides those mentioned already) as making sure the hourly staff took their breaks, Babbitt at 47:8-48:6, but this was done at the behest and with the guidance of Human Resources. Babbitt Decl. ¶ 10. Likewise, she conducted interviews during the process of hiring hourly workers – not for the Team Lead position, and even then she only conducted the second of three interviews, Babbitt at 57:14–59:11, and this was yet another task also done by the Team Leads. Babbitt Decl. ¶ 8. And when she did interviews for associates, they were pre-screened, and her evaluation would use a questionnaire rubric as to which she had no input, and her interview results were based on simply applying the qualifying questions on

that rubric. Babbitt at 61:19-62:5. As she explained, she would "just follow the process and the screening and give it to HR and then they would make that decision." Babbitt 61:12-18. She recalls participating in only about 20 interviews during her entire two years at Target (Babbitt, 59-20-22), which took about 15-20 minutes each. Babbitt at 195:8-15.And, of course, hourly Team Leads also did these interviews. Babbitt Decl. ¶ 8.

As to some such tasks, such as discipline, Target closely supervised and curtailed Babbitt's discretion. On examination from defense counsel, this became apparent:

> Q· · Well, were you able to write people up without specific
> directions from HR?
> A· · No.
> Q· · Okay.· So your testimony is you couldn't write someone up
> unless you had been given specific directions from HR?
> A· · Correct or the Store Leader.
> Q· · Okay.· I want to show you a document which we have previously
> reviewed, this is I believe
> Exhibit 12, which you have previously reviewed. 25· · · · · · · · · · ·
>
> MR. GERSHBAUM:· What is the bates number, please?
> MR. SCHMITT:· It's 30986, Charlie.
> BY MR. SCHMITT:
>
> Q· · You may recall, this is a conversation that you had with Mr.
> Vandal, right?
> A· · Correct.
> Q· · Okay.· Now, in this particular case you talked with him before
> you talked with HR, right?
> A· · HR is the one who told me to have the discussion in the first
> place.
> Q· · Well, you say in here it was unacceptable and you will be
> partnering with HR going forward, right?
> A· · With the CC, yes, but that didn't mean I hadn't spoken with them
> before.
> Q· · You had already spoken to HR by the time you --
> A· · HR came to me and they are the ones who let me know about it.

Babbitt at 213:15-214:19. Likewise, when she counseled employees on attendance, "HR was just they were telling me what to do and I was just doing what they asked, so they let me know that I needed more documentation, and then we sat down together and did that and then emailed Marisa." Babbitt at 166:10-15.

The foregoing also makes it clear that she was not free from supervision. "Freedom from supervision . . . contemplate[s] decisions of the kind and quality normally made by persons formulating policy within their spheres of responsibility, or who participate in this process, or who exercise authority to commit the employer in a substantial respect, financial, or otherwise." *Clougher v. Home Depot USA,* 696 F. Supp. 2d 285, 291 (E.D.N.Y. 2010). As just discussed, Ms. Babbitt did not have authority to commit Target in any respect, substantial or otherwise.[15]  And, as Judge Magnuson noted in *Soderberg,* for instance, evidence that can be considered as showing a lack of discretion or managerial independence include such items—among the others set forth immediately above— as "the independent ability to hire, fire, or discipline branch employees; to set branch goals; to set

---

[15] On a more specific level, in determining whether an employer has met its burden to prove that its purported "executives" are sufficiently free from close and direct supervision to be considered true executives, courts have sometimes considered (1) the frequency with which the employee's supervisor monitors them, (2) what the monitoring entails, (3) the level of supervision the worker was allowed to maintain over their staff, and (4) whether the supervision is related to the employee's exempt or non-exempt duties. *Jones v. Dolgencorp, Inc.,* 789 F.Supp.2d 1090, 1108-09 (N.D. Iowa 2011) (citing *Murray,* 939 F.2d 614, and *Kanatzer,* 2010 WL 2720788 at *5.)  However, Target makes no showing as to any of these points in any meaningful way and the record is bereft of support that would enable a full analysis. To the contrary, as discussed below, Plaintiff shows that she was frequently monitored, even as to small items, and there is no evidence she had real supervisory authority of her staff.

schedules; or to direct sales efforts." *Soderberg*, 2011 U.S. Dist. LEXIS 156235, at *27 (denying summary judgment).

Target hardly even tries to pretend that it has shown that Ms. Babbitt was free from direct supervision. Its discussion in this regard at Def. Mem. 21-23 is bereft of a single citation to the record and merely makes some general conclusory acervations that far exceed what the record supports. For instance, it writes, "Not surprisingly, Babbitt's STL frequently was not even in the building during Babbitt's shifts" (Def. Mem. 22), a statement without any apparent support in the record.[16] And likewise, while it points out that Babbitt acted as an "LOD" and sometimes opened the store without other supervision, it fails to support what that actually entailed, much less quantify how often that occurred or much less acknowledge (which is true) that this supposedly "managerial" task was one also done by non-exempt employees. Babbitt at 206:24-207:4. And here, again, Target ignores her testimony as to being an LOD. She was clear her management responsibilities did not increase as a LOD:

---

[16] Repeatedly, Target's memorandum contains conclusory assertions for which it has no evidentiary backing. For example, on page 22, it writes that, "Even if Babbitt sometimes jumped in to help finish hourly employee tasks, she did so as a manager, and was performing exempt and non-exempt tasks concurrently." Def. Mem. 22. Although defendants sometimes try to take testimony on concurrent activities, Target did not make any such effort and, suffice it to say, its conclusory allegation is not evidence. On summary judgment Target has the burden of introducing evidence as to whether Babbitt was capable, given the tasks at hand, of simultaneously performing managerial and non-managerial tasks. *Smalley v. Home Depot U.S.A., Inc.*, 2013 WL 1402348, at *9 (N.D. Cal. Apr. 15, 2013); *Costello v. Home Depot, USA, Inc.*, 2013 U.S. Dist. LEXIS 39006, at *59-60 (D. Conn. Mar. 5, 2013). But Target has failed to satisfy this burden because it has not offered evidence to show that Babbitt was also managing employees during the 80-90% of the time she was performing non-exempt category work.

31

"Q: When you were an LOD, did your authority increase?

MR. SCHMITT: Objection, leading.

THE WITNESS: No."

Babbitt at 207:5-8.

Thus, even Target's best effort at showing "freedom from supervision," fails to avoid materially disputed issues of fact. Similarly, while it summarily states (again, without citation), that that the Store Team Leader identified "priorities," "left it to Babbitt to determine how to execute them," or that Ms. Babbitt "delegated" responsibilities to the Food Team Leads (Def. Mem. 6, 18, 22), it ignores how closely she was supervised, even as to any such matters. In her testimony she explained that the Store Team Leader would do store walks with her and give her a list of things he wanted her to do, which she would just pass along to her team – hardly a matter of "leaving" it to her to determine how to execute them. Babbitt at 196:17-198:2.

What Target further disregards, and which also creates disputed issues of fact, is that Target, both directly and indirectly controlled, Ms. Babbitt's workday. Directly, she was supervised by her Store Team Leader, Mr. Rehnelt, who "monitor[ed] my work. Day in, day out, he closely and directly supervised me. He worked in my store and managed every aspect of it." Babbitt Decl. ¶¶ 3-4. While Target did not ask about these matters at her deposition, she has explained:

> Mr. Rehnelt would walk around the store and observe the work that I had done and give me instructions on tasks to be completed throughout the day. When he informed me of a task to be done – such as customer service or cleaning – I almost invariably understood that it had to take precedence and to be done immediately, and usually that means it would be done by me. Whenever a matter arose about

32

> which I might have had a different idea I had to follow his directions. The kinds of things in which I was directed included, for example, stocking an end cap, or the savers (this is the seasonal front set on the grocery side), stock produce, unload the truck, stock meat, and stocking the milk.

Babbitt Decl. ¶ 3. In fact, even when not walking the store, her Store Team Leader gave her instructions over a walkie talkie. Altogether she explains that, "Basically, I felt that my everyday working life was directed and constrained by my Store Leader." *Id.* at ¶ 4. The difference in the parties' respective positions as to how the record is to be interpreted in terms of whether she was free from supervision dooms Target's motion. *See, e.g., Johnson*, 2014 U.S. Dist. LEXIS 158845, at *41; *Soderberg v. Naturescape, Inc.*, 2011 U.S. Dist. LEXIS 156235, at *26; *see also Jones*, 789 F. Supp. 2d at 1109 ("[T]he extent of [the defendants'] direct supervision of [the plaintiff] remains in dispute and [the] defendants are, therefore, not entitled to judgment as a matter of law."); *accord Deweese*, 2013 U.S. Dist. LEXIS 189719, at *29.

Indirectly, Ms. Babbitt was supervised (and lacked discretion) because she had to follow Target's lengthy and complex corporate directives, set forth in such documents as its corporate manual, guidelines, planograms, checklists and the like, as to which she had to do the work as "strictly dictated" and as to which she "could not deviate from these procedures, even when my experience and judgment suggested a different process or procedure." Babbitt Decl. at ¶ 5. Even the smallest of merchandizing tasks, for instance – how to lay out displays – was dictated by Target through its planograms: "A planogram in all Target stores they have the sales plans that go, like every end cap is set to be the same, every section like of savers up front where you see Bullseye and things like that, they are all

33

set by a sales plan and they have to be done weekly." Babbitt at 168:4-11. *See, e.g.,* *Morgan,* 551 F.3d at 1250 (evidence supporting jury verdict in favor of store managers included, the facts that (as here) "Store managers lack discretion over the store's merchandise selection, prices, sales promotions, and layouts [which] all are set by the home office and district managers" and that stores were given monthly planograms (called "schematic layout and diagram of the store" in the decision) and other sales materials that had to be followed). A comprehensive set of corporate policies and instructions can be an element of proof for finding in favor of liability by an allegedly misclassified manager. *Id.*

Target writes that "the law does not demand <u>complete</u> freedom from supervision." Def. Mem. 23 (emphasis in the original). That is true, but simply saying it does not absolve Target from its burden of showing undisputed evidence that she was materially free from supervision. Target has not done so. And the three cases that Target cites in this regard, if anything, emphasize Target's shortcoming because, in each, the record shows what sufficient discretion and/or freedom for supervision for summary adjudication can look like.

First is *Scott v. SSP*, 2011 U.S. Dist. LEXIS 32819 (E.D.N.Y. Mar. 29, 2011) (which was a case brought by Mr. Lesser and his firm). *Scott* was a far cry from this one. There, the plaintiff was the individually "solely responsible for deciding how to allocate her time between supervising each unit" in a situation where she physically was in charge of various restaurants at differing locations and there was not, as in Ms. Babbitt's Target store, an unitary physical store with a Store Leader on the premises who watched over her,

34

walked with her, and directed her using a walkie talkie when not with her. Rather, the

"undisputed evidence in the record":

> demonstrates that Plaintiff exercised extensive discretionary authority on a regular
> basis. Plaintiff was the lone Unit Manager for as many as four different Units at one
> time, and was solely responsible for deciding how to allocate her time between
> supervising each Unit. Plaintiff used her knowledge of Defendant's business to
> decide whether to depart from historical averages when ordering food and drink for
> her Units. She also chose when and how to assist hourly employees with nonexempt
> work. Indeed, Plaintiff had to use good judgment regularly, including when deciding
> how much work to delegate to her Assistant Managers; disciplining hourly
> employees; enforcing company standards and administrative regulations; choosing
> not to socialize with hourly employees to prevent conflicts in the disciplinary
> process; making "judgment call[s]" to suspend employees without prior approval in
> extenuating circumstances (Scott Dep. at 208, 219); recommending suspensions of
> employees to her supervisors; interviewing at least one person; asking the human
> resources department for additional employees; recommending individuals for
> promotion; finding ways to meet her budget or surpass it; handling customer
> complaints; providing disgruntled customers with complimentary food and drink;
> coming up with an action plan to deal with a failed Unit inspection; counting cash
> and transporting it to and from the Units to the safe (Scott Dep. at 138); choosing
> each day's product sample (Scott Dep. at 122); determining staffing needs based on
> flight levels; and striking agreements with other Unit Managers to move employees
> between their respective Units (Scott Dep. at 233). In fact, Plaintiff instructed an
> Assistant Manager, one of her subordinates, to use more of *her* own judgment when
> ordering food and drink for the Units. (Scott Dep. at 156-57.)

*Scott*, 2011 U.S. Dist. LEXIS 32819, at *38-39. Simply stated, the record in this case in no

manner compares to Scott: Scott is an example of a case where summary judgment was

appropriate (which is why Plaintiff did not appeal the ruling). This case is completely

different – just compare the preceding recitation from *Scott* with Target's argument on

"discretion" and "freedom from supervision" at pages 21-23. No more really needs to be

said.

     *Yesmin v. Rite Aid of New York, Inc.*, 2012 U.S. Dist. LEXIS 127655 (E.D.N.Y.

Sept. 6, 2012), is to the same effect. The *Yesmin* plaintiff was a store *co-manager*, not an

assistant. She admitted at testimony that she "that she had tremendous amount of discretion in performing many of her tasks and that she managed the store while concurrently undertaking her non-exempt tasks" (and most certainly no such admission exists here) and the Court's summary list of matters as to which she had direct supervisory authority and discretion is over 1,100 words long, and includes item after item that has no possible equivalent to this case – including, for instance, the unilateral authority to issue disciplinary warnings, handling customer complaints, put in replacement orders, being in charge of counting receipts and resolving discrepancies, having responsibility for the store safe, checking employees bags when they left the store, having approval to void transactions (which she did for 30 minutes a day), possessing discretion whether to take returns, being responsible for ordering the store's merchandise, placing orders directly with vendors, and handling bank deposits, among others things. *See Yesmin*, 2012 U.S. Dist. LEXIS 127655 at \*5-\*10. Thus, despite Target's attempt to make high-level generalized statements about *Yesmin* shows, its actual facts show a materially different set of facts of an employee doing substantial and material management work in numerous respects that only underscores how weak Target's showing is in this case.

Target's third case in this regard is *Amash v. Home Depot U.S.A, Inc.*, 2014 U.S. Dist. LEXIS 79761 (N.D.N.Y. June 12, 2014), which it cites for the proposition that a manager may still be considered exempt "even where a manager's discretion is limited by upper management." Def. Mem. 23. Again, Target's conclusory recitation of a broad principle does not mean there are no genuine issues of material fact because, as noted, Plaintiff has testified as to how her discretion was constrained. But, also again, *Amash* is

36

instructive because the Court's actual conclusion was that the plaintiffs' discretion having some boundaries was overwhelmed by the "array of his management" so that a trier of fact could not rule in plaintiffs' favor. And, like *Scott* and *Yesmin*, that "array" of management duties and authorities – which were admitted and not controverted by the plaintiff-swamps the record as to the management duties and authorities accorded to Ms. Babbitt by Target:

> Pangione admits that approximately 67% of the time, at both the Latham and Schenectady stores, he was responsible for the store when the manager was not there. A major task of Pangione as a MASM included "coaching, training and developing Associates by providing both informal (e.g. on- floor coaching) and formal (e.g. written evaluation) job performance-based feedback." Pangione also testified, inter alia, that he: recommended changes to employee status which includes hiring, firing, and wage increases; scheduled and directed the work of other employees; disciplined employees; conducted safety assessments; managed the inventory; placed orders for certain products; and handled employee grievances. Further, he testified, *inter alia*, that he was "always observing" the associates and department supervisors to ensure they were working properly. Pangione was also responsible for training department supervisors to ensure that the departments he supervised were as profitable as possible.

> As a MASM, Pangione confirmed that he was responsible for preparing performance reviews of his department supervisors, and approving the reviews drafted by his department supervisors regarding the associates in Pangione's departments. When Pangione reviewed a performance report prepared by one of his department supervisors regarding an associate, he would alter the report when he disagreed with the department supervisor's findings. Additionally, Pangione participated in setting wage increases for the department supervisors and associates who reported to him as well as providing input on the annual raises his department supervisors received....

> Plaintiff further admits spending the remainder of his time providing training to the department supervisors and associates on the sales floor relating to issues such as product knowledge, aisle maintenance, aisle safety, and customer service. He also spent time writing and adjusting work schedules; delegating assignments; holding department supervisors and associates accountable for their performance; making item price changes and shrink plans; disciplining department supervisors and sales associates; resolving employee grievances and customer complaints; enforcing legal and safety compliance; and working alongside sales associates teaching them how to merchandise products.

*Id.* at *10-12, *13-14. Indeed, in complete counterdistinction to the present case, the Court

lastly pointed out that, "Moreover, Pangione has not identified any nonexempt duties he

performed which would require a fact finder to allocate time spent between exempt and

non-exempt activities." *Id.* at *14.

   Here, given the contrasting positions of the party, and in stark contrast to such

cases as *Scott*, *Yesmin*, and *Amash*, only a factfinder can decide whether Babbitt satisfies

the "direct supervision" prong of the primary duty test. *See also, e.g., Carhuapoma v.*

*New York-Presbyterian Healthcare Sys.*, 2013 U.S. Dist. LEXIS 45886, at **33-34

(S.D.N.Y. Mar. 29, 2013) ("Despite the fact that Plaintiff had some level of discretion in

certain discrete areas, however, genuine disputes of material fact exist as to whether

overall Plaintiff had a level of discretion consonant with an employee whose duties are

primarily managerial.").

### 4.   Target paid Babbitt barely more than the hourly positions beneath her.

   The last of the factors for the primary duty analysis is "the relationship between the

employee's salary and the wages paid to other employees for the kind of nonexempt work

performed by the employee." 29 C.F.R. § 541.700(a). Target summarily presents this as a

matter of comparing Babbitt's salary with the salaries of positions under her. But most

assuredly Target's attorneys know that is not the test. Rather, the test is the comparative

hourly amount earned by the supposedly exempt employee and those she supervises, as

has been held by all three Courts of Appeals to address the matter. See *Jones v. Virginia*

*Oil Co.*, 69 Fed. Appx. 633, 638-9 (4th Cir. 2003); *Morgan*, 551 F.3d at 1271; *Thomas v.*

*Speedway SuperAmerica, LLC*, 506 F.3d 496, 508-09 (6th Cir. 2007); *see also, e.g., Jones,*

789 F. Supp. 2d at 1109 (court in this Circuit following *Morgan* and *Thomas* and utilizing the comparative hourly wage); *Deweese,* 2013 U.S. Dist. LEXIS 189719, at *30 n.28 (another court in this Circuit addressing issue and finding the *Morgan* and *Thomas* analysis "to be a sound approach").[17] Target admits that it paid its Team Leads – the position subordinate to Ms. Babbitt – an average of $19 per hour during Babbitt's employment. Def. Mem. 11; Brewer Dec. ¶ 9 (Ex. A). Since Ms. Babbitt testified that she worked 60-70 hours a week, Babbitt at. 35:1-10, her effective hourly rate of pay would have been $21.89 (using the average of 65 hours a week).[18] The differential of 3 dollars an hour (or just 14%) would not be sufficient to support Target's burden, and at a minimum presents a material issue so that summary judgment cannot be granted. In *Morgan v Family Dollar,* the Eleventh Circuit determined that a two- or three-dollar-per-hour difference is "relatively small" and that, accordingly, "it was within the jury's province to conclude that this factor either did not weigh in [the employer]'s favor or at least did not outweigh the other factors

[17] There is good reason for this – it is the effective rate earned that matters because, by classifying ETLs, like Ms. Babbitt as exempt, Target is incentivized to make them work longer hours at lower and lower effectively hourly pay. *See Plaunt v. Dolgencorp, Inc.,* 2010 U.S. Dist. LEXIS 132135, at *40 (M.D. Pa. Dec. 14. 2010) ("To ignore the fact that Plaunt worked more than fortyhours per week would largely frustrate the purpose of this inquiry: to determine whether the employer sought to subvert the FLSA by attaching an overtime exemption to an employee who otherwise performs the same non-exempt tasks as hourly employees."); *Davis*, 2010 U.S. Dist. LEXIS 95172, at **21-22 (calculation of plaintiff's hourly rate when comparing salaries andwages is based on extra hours plaintiff worked); *Hale v. Dolgencorp, Inc.,* 2010 U.S. Dist. LEXIS 62584, at **17-18 (W.D. Va. June 23, 2010) (same); *Johnson v. Big Lots Stores, Inc.,* 604 F. Supp. 2d 903, 918-19 (E.D. La. 2009) ("The fair comparison is the effective hourly wage of an ASM with the hourly wage of someone doing the nonexempt work he regularly performed.").

[18] This is derived by dividing her salary of $74,000 (an average) by 52 weeks and dividing that by 65 hours.

in [the employee]'s favor." *Morgan*, 551 F.3d at 1271; *accord Jones*, 789 F. Supp. 2d at 1109-10 (same; denying summary judgment where differential was $2.20 and citing *id.* to conclude it was a matter for the jury); *Deweese*, 2013 U.S. Dist. LEXIS 189719, at *34-35 (even where differentials between plaintiff and those subordinate to her were 36% to 41%, the determination was a matter to be left to the jury); *Ely v. Dolgencorp, LLC*, 827 F. Supp. 2d 872, 892-3 (E.D. Ark. 2011) ("this factor weighs in favor of Plaintiff, and summary judgment must be denied" after reducing Plaintiff's salary to an hourly rate for comparison purposes and finding a 27% difference).

## IV.   CONCLUSION

Target has failed to meet its heavy burden to show that there are no genuine issues of material fact and that the "executive" label that it has affixed to her fits "plainly and unmistakably" in both "terms and spirit." *Spinden,* 94 F.3d at 426 (*quoting McDonnell v. City of Omaha, Neb.,* 999 F.2d 293, 296 (8th Cir.1993) (internal quotations omitted)). The record in fact shows that her work was primarily manual labor, that she was closely and directly supervised and paid barely more than her hourly staff. Finally, Target has not shown that the few low level management duties that it allowed Babbitt to perform were of such great importance that they overcame the fact that she was mostly engaged in non-management manual labor.

For the foregoing reasons, Target's Motion for Summary Judgment as to Plaintiff Tammy Babbitt should be denied.

Dated: November 5, 2021

s/ *Seth R. Lesser*
Seth R. Lesser
Christopher M. Timmel
**KLAFTER LESSER, LLP**
Two International Drive, Suite 350
Rye Brook, NY 10573
Tel: (914) 934-9200

s/ *Richard E. Hayber*
Richard E. Hayber
**HAYBER, MCKENNA & DINSMORE, LLC**
750 Main Street, Suite 904
Hartford, CT  06103
Tel: (860) 920-5362

David A. Roth
Marc S. Hepworth
Charles Gershbaum
Rebecca S. Predovan
**HEPWORTH GERSHBAUM & ROTH, PLLC**
192 Lexington Avenue, Suite 802
New York, NY 10016
Tel: (212)545-1199

Rachhana T. Srey, MN Bar # 340133
**NICHOLS KASTER, PLLP**
4600 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 256-3200

*Attorneys for Plaintiffs and Opt-Ins*

41