## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| TAMMY BABBITT and WILLIAM CARTER, individually and on behalf of other similarly situated individuals, | Case No. 20-cv-490 (DWF/ECW) |
| Plaintiffs, | **ORDER** |
| v. | |
| TARGET CORPORATION, | |
| Defendant. | |

This matter is before the Court on Plaintiffs' Motion for Notice and Conditional Certification (Dkt. 83) ("Motion"). For the reasons stated forth below, the Court grants the Motion for conditional certification and orders the parties to meet and confer regarding a proposed notice.[1]

## I.      FACTUAL BACKGROUND

### A.      General Background

On February 11, 2020, Plaintiffs initiated this putative collective on behalf of themselves and other similarly situated individuals who have worked for Defendant Target Corporation ("Target" or "Defendant") as exempt Executive Team Leaders

---

[1]      Plaintiffs also filed an opposed Motion for Leave to Submit Supplemental Authorities ("Motion for Leave") seeking leave to submit two cases granting conditional certification that were decided after oral argument in this case. (*See* Dkts. 150-154.) The Court sees no reason why it should not consider these cases, and therefore grants the Motion for Leave. The Court has considered the parties' arguments regarding conditional certification that were made in connection with the Motion for Leave when deciding this Motion.

("ETLs").  (Dkt. 1 ¶¶ 2-3.)  Plaintiffs Tammy Babbitt ("Babbitt") and William Carter

("Carter") (collectively, "Plaintiffs") are the named Plaintiffs.[2]  Plaintiffs and the putative

collective members assert that "Target has misclassified Plaintiff, and other ETLs in

these positions, as exempt under federal and state overtime laws and has failed to pay

them overtime pay for hours worked beyond forty (40) in a workweek" in violation of the

Fair Labor Standards Act, 29 U.S.C. §§ 201, et seq. ("FLSA").  (*Id.* ¶¶ 4-5.)

## B.    Factual Background Related to the Proposed Collective

In support of the Motion, Plaintiffs provide the deposition testimony or

declarations of the following 25 Target ETLs who come from Target stores in 13 states:

- Tammy Babbitt, Minnesota
- William Carter New Jersey, Pennsylvania
- Shantale Higginson, California
- Matthew Paredes, New York
- Jennifer Gerard, Minnesota
- Tyler Young, Arkansas
- Tana Duong, California
- Kris Gresswell, California
- Sarah Cobb, Oregon
- Paul Schulze Kentucky, Ohio
- John Alba, California
- Shawn Zenszer, New Jersey
- Heather Ryan, Nevada and California
- Tulley Bowman, Oklahoma
- Steven Gonzales, California
- Steven McBrayer, Texas
- Steven Plummer, Texas
- Monique Abrams, New York
- Pricilla Jibowu, Illinois, New York
- Ashley Bleem, Oklahoma
- Isaura Isais, California
- Philip Spagnolo, Ohio

---

[2]    Babbitt and Carter were substituted as Plaintiffs on April 12, 2021.  (Dkt. 48.)

- Kimberly Steckler, Pennsylvania, Ohio
- Nickolas Wolfe, Texas
- Nathan Wood, Texas.[3]

Target admits in its Answer that it pays ETLs on a salary basis, that no overtime is paid to ETLs, and that "the members of the proposed collective sometimes worked more than forty (40) hours in a week without receiving payments for overtime." (Dkt. 9 ¶¶ 15-41.) According to Target, there are a number of common "core roles" of the ETL position that pertain to leading and managing their respective team members. (Dkt. 89 at 2-3.)[4] The ETLs are divided into subsets, including, but not limited to, ETL-Food, ETL-Guest Experience, ETL-Operations, and ETL-Sales Floor, which have their own additional respective duties. (*Id.* at 3-6.) The minimum requirement for the ETL positions is a four-year degree or equivalent experience. (Dkt 89 at 7.) In addition, Target sets forth the following physical requirements for the ETL positions:

- Able to move merchandise with appropriate equipment (e.g., tubs, carts, flats, etc.) to and from stockroom and sales floor.
- Able to place and arrange items on all shelves and racks on the sales floor.
- Able to climb and descend ladders.
- Able to lift 40 lbs.
- Able to continuously move around all areas of the store on a daily basis.
- Able to read instructions, reports and information on computer screens and enter information on computers and PDA keyboards.
- Able to handle all products sold by Target.

---

[3]   The Court notes that Plaintiffs represented that Pricilla Jibowu, Ashley Bleem, Isaura Isais, Philip Spagnolo, Kimberly Steckler, and Nickolas Wolfe joined the parallel *Jibowu* case discussed *infra,* and are or have been pursuing the exact same overtime claims in that case. (Dkt. 85 at 12 n.5.)

[4]   Unless noted otherwise, page citations in this Order refer to the CM/ECF pagination.

(Dkt. 89 at 7.)

The ETLs report to the Store Director ("SD") or Store Team Leader ("STL"), and the SDs in turn report to the District Store Director ("DSD").  (Dkt. 106 ¶ 7.)

According to Target's Team Member Handbook, exempt team members were expected to focus their work on the leadership of their team and not hourly tasks:

> To run your business, you need to focus on the leadership of your team, including the following management activities:
>
> - Directing, training and coaching team members
> - Ensuring execution of job responsibilities
> - Planning the business
> - Holding team members accountable to their performance, using corrective action as necessary
> - Managing team member and guest issues
> - Interviewing and selecting potential team members
> - Recognizing great performers and rewarding excellence

The Team Member Handbook further stated:

> Hourly tasks must not be the focus of your time. Some examples include, but are not limited to:
>
> - Zoning
> - Stocking
> - Cashiering
> - Unloading trailers, moving boxes

(Dkt. 89-1 at 28-29.)  In addition, as part of the key leadership expectations, Target set forth the following expectations:

> At Target, the leadership role is a key part of our commitment to achieving excellence. As a leader, it's critical to continually spend substantially more than 50 percent of your time on leadership responsibilities rather than hourly tasks. You will need to jump in and assist with hourly tasks on occasion; however, you cannot forget to jump out at the right time to ensure you are spending the clear majority of your time on leadership.

As a leader, you are accountable for task completion, but you must accomplish this through other people. Successful leaders demonstrate the skills of owning, managing and driving their business. You are responsible for achieving your responsibilities through effective management and supervision, so you meet these expectations.

(*Id.* at 28.)

As part of their training, ETLs go to Target's Business College and are subjected to similar training materials. (Dkt. 86-3 at 7; Dkt. 86-5 ¶ 14; Dkt. 86-6 ¶ 3; Dkt. 86-8 at 4, 30; Dkt. 86-9 ¶ 3; Dkt. 86-10 ¶ 2; Dkt. 86-13 ¶ 3; Dkt. 86-14 ¶ 3; Dkt. 86-15 ¶ 12; Dkt. 86-16 ¶ 3; Dkt. 86-17 ¶ 6; Dkt. 86-18 ¶ 6; Dkt. 86-19 ¶ 3; Dkt. 86-20 ¶ 4; Dkt. 86-23 ¶ 14; Dkt. 86-25 ¶ 8.)

In the "Welcome" training materials for the Business College, Target set forth in the ETL Role Overview that ETLs were expected to engage in numerous managerial type roles, including, but not limited to: "[b]e a business owner who is curious and bold in your decision making"; "[h]elp assess, select and retain top talent at the hourly team member and team leader level and develop a talented team"; and "delivering performance feedback." (Dkt. 89-8 at 5-6.) ETLs also learned other tasks at Business College, such as how to handle customer returns, how to stock, and how to unload trucks. (Dkt. 86-8 at 4.)

The ETLs, in declarations and deposition transcripts filed by Plaintiffs, assert that they, regardless of their specialty or location, spend between 80-95% of their time[5] on

---

[5]     According to Plaintiffs, "Plaintiffs Carter, Ryan, Alba, Gresswell, Duong, Young, and Paredes all testified by deposition or declaration that they spent approximately 90%

hourly non-managerial type tasks, such as: working the cash register; unloading and stocking freight; placing newly received merchandise in its proper location; unpacking merchandise; setting up displays following detailed Target planograms; cleaning; folding clothes; assisting customers; filling Internet orders; zoning; putting up and taking down signs; using machinery to transport merchandise, such as an electronic pallet jack; returning carts; and working on assignments provided by corporate or by their SD. (*See, e.g.*, Dkt. 86-3 at 11-15; Dkt. 86-4 at 10-14; Dkt. 86-5 ¶¶ 3-4; Dkt. 86-6 ¶¶ 4-6; Dkt. 86-7 at 5, 15-16, 19; Dkt. 86-8 at 12-18; Dkt. 86-9 ¶¶ 4-5; Dkt. 86-10 ¶¶ 3-5; Dkt. 86-11 at 6-13; Dkt. 86-12 at 9-13; Dkt. 86-13 ¶¶ 4-5; Dkt. 86-14 ¶¶ 6-7; Dkt. 86-15 ¶¶ 2-3; Dkt. 86-16 ¶¶ 7, 10; Dkt. 86-17 ¶¶ 8-10; Dkt. 86-18 ¶¶ 8-10; Dkt. 86-19 ¶¶ 6-8; Dkt. 86-20 ¶¶ 6-7; Dkt. 86-22 at 7-11, 34; Dkt. 86-23 ¶ 7; Dkt. 86-24 at 13-15; Dkt. 86-25 ¶¶ 2-3; Dkt. 86-26 at 6-9; Dkt. 86-27 at 4-7.)

According to the ETLs, the understaffing of Target stores was constant, which caused them to perform the above tasks of an hourly employee. (*See, e.g.*, Dkt. 86-3 at 18; Dkt. 86-4 at 20; Dkt. 86-5 ¶ 9; Dkt. 86-6 ¶ 9; Dkt. 86-8 at 28-29; Dkt. 86-9 at ¶ 8; Dkt. 86-12 at 12; Dkt. 86-14 ¶ 9; Dkt. 86-15 ¶ 5; Dkt. 86-16 ¶¶ 14-15; Dkt. 86-17 ¶¶ 12-13; Dkt. 86-18 ¶ 13; Dkt. 86-19 ¶ 11; Dkt. 86-20 ¶ 11; Dkt. 86-22 at 15; Dkt. 86-23 ¶ 11; Dkt. 86-24 at 12.)

---

of their time performing non-managerial, hourly tasks, while Plaintiffs Carter, Gerard, Bowman, Zenszer, and Cobb spent 85%-95% of their workdays doing so, and 80-90% for Plaintiffs, Babbitt and Higginson." (Dkt. 85 at 13-14.)

In addition, the ETLs represented in many cases that they were provided specific instructions as to what needed to be done, and/or that they lacked any independent authority to: fire or discipline employees; promote employees; establish or change corporate or store policy; set employee wages; provide input into corporate policies; determine the labor budget; or commit Target to financial matters of significance (including formulate or develop new Target product and service offerings). (*See, e.g.*, Dkt. 86-3 at 8, 15-17, 19; Dkt. 86-4 at 15-17; Dkt. 86-5 ¶¶ 5-7; Dkt. 86-6 ¶¶ 7-8; Dkt. 86-7 at 5, 16-17; Dkt. 86-8 at 5-6, 12-18; Dkt. 86-9 ¶¶ 6-7; Dkt. 86-10 ¶¶ 6-7; Dkt. 86-11 at 14-17; Dkt. 86-12 at 12-14; Dkt. 86-13 ¶¶ 6-8; Dkt. 86-14 ¶¶ 9, 13, 15-17; Dkt. 86-15 ¶¶ 4, 6, 7; Dkt. 86-16 ¶¶ 9, 12, 18; Dkt. 86-17 ¶¶ 14-15, 17; Dkt. 86-18 ¶¶ 14-16, 18; Dkt. 86-19 ¶¶ 12-14, 16; Dkt. 86-20 ¶¶ 9, 12-15; Dkt. 86-21 at 4-5; Dkt. 86-22 at 5, 12-14; Dkt. 86-23 ¶ 9, 12-13; Dkt. 86-24 at 4-5, 10-12; Dkt. 86-25 ¶¶ 4-5; Dkt. 86-26 at 9-12; Dkt. 86-27 at 7-11.)

Babbitt testified at her deposition that she filled out a self-audit in July 2019 regarding the percentage of time she spent on tasks that she performed as an ETL. (Dkt. 102-1 at 186-87.)[6] Babbitt claimed that she marked the form in a manner as to what she believed she had to mark down. (*Id.* at 186.) In her self-audit, Babbitt asserted that she spent 5% of her time with merchandising handling, 10% of the time with providing guest services, 5% of her time with clerical issues, and 10% of her time with other manual labor tasks (such as setting signs and cleaning), with the rest of the time on

---

[6]     With respect to deposition testimony under Docket Entry 102, the page numbers reference the page number of the transcript.

managerial tasks.  (Dkt. 107 at 2.)  At the deposition, Babbitt testified that the document was not entirely accurate as there were some tasks missing that she performed.  (Dkt. 102-1 at 188.)  This included stocking and cashiering, which would have consisted 40% of her time.  (*Id.* at 189.)  Other ETLs also filled out their self-audits to show that the amount of time they spent on managerial tasks was in excess of 50%, however, they also testified that they were told by their managers to fill out the form to show that much more than 50% of their time was being spent on managerial tasks, with repercussions in some cases if they failed to do so.  (*See, e.g.*, Dkt. 86-11 at 13-14; Dkt. 102-3 at 182-83; Dkt 120-1 at 6; Dkt. 120-2 at 7; 120-3 at 7-8; 120-5 at 6-7; 120-6 at 6.)  Target, for its part, has submitted declarations from 19 current ETLs throughout the country in support of its opposition, who represented in in their declarations that they were expected to and do spend more than 50% of their time on management duties and that their primary duties involve managerial tasks.  (*See* Dkt. 103; Dkt. 103-1 through Dkt. 103-19.)  Those ETLs' estimates are consistent with their self-audits, which were attached as exhibits to the declarations.  (*See* Dkt. 103; Dkt. 103-1 through Dkt. 103-19.)

## C.    Collective Scope and Proposed Notice

Along with seeking conditional certification of this matter as a collective action under the FLSA, Plaintiffs move for Court-authorized notice to putative class members.  (Dkt. 83.)  Plaintiffs seek to conditionally certify the following collective of individuals as follows:

> All current and former Executive Team Leader (ETLs) however variously titled, excluding the ETL Human Resources position, the ETL Asset Protection position, the ETL Remodel position, and the Logistics ETL

position in stores that have Replenishment ETLs, who worked for Defendant
in the United States at any time on or after July 20, 2021.

(Dkt. 85 at 7.)

Plaintiffs also seek an order allowing them to issue notice to the collective in the

form submitted by them, which provides that notice of this lawsuit should be posted in

Target breakrooms, sent via mail, email and text; allows for the creation of a website at

which consents can be electronically filed; and provides for issuance of a reminder

notice. (*Id.* at 34.) The notice period Plaintiffs propose is "a date 90 days from mailing

of the notice; if a notice is returned undeliverable and a new address is located, the

notice period for that putative class member will close no later than 120 days after the

date of the first mailing of the original notice to the putative class member." (Dkt. 86-2

at 4.) Plaintiffs also seek a number of ways for potential plaintiffs to fill out and return

the Consent to Join form: "electronically by clicking" an identified link in an electronic

notice; signed electronically via a website; and by returning the form by mail, email, or

fax. (*Id.* at 7.)

## II.    ANALYSIS

### A.    Legal Standard

Under the FLSA, "any one or more employees" may bring a collective action

against an employer for unpaid overtime. 29 U.S.C. § 216(b). Unlike a class action

under Federal Rule of Civil Procedure 23, no person becomes a party to a collective

action unless "he gives his consent in writing to become such a party and such consent is

filed in the court in which [the] action is brought." *Smith v. Heartland Auto. Servs., Inc.,*

404 F. Supp. 2d 1144, 1149 (D. Minn. 2005) (quoting § 216(b)). "Courts have discretion,

in appropriate cases, to facilitate the opt-in process by conditionally certifying a class and

authorizing court-supervised notice to potential opt-in plaintiffs." *Chin v. Tile Shop,*

*LLC*, 57 F. Supp. 3d 1075, 1082 (D. Minn. 2014) (cleaned up).

To proceed with a collective action, plaintiffs must demonstrate that they are

similarly situated to the proposed FLSA class in a two-step inquiry. *Id.* (citing *Brennan*

*v. Qwest Commc'ns Int'l, Inc.*, No. 07-cv-2024 (ADM/JSM), 2008 WL 819773, at *3 (D.

Minn. Mar. 25, 2008); *Burch v. Qwest Commc'ns Int'l, Inc.*, 500 F. Supp. 2d 1181, 1186

(D. Minn. 2007)). "First, the court determines whether the class should be conditionally

certified for notification and discovery purposes." *Id.* (citing *Burch*, 500 F. Supp. 2d at

1186). "Determination of class status at the notice stage is granted liberally because the

court has minimal evidence for analyzing the class." *Id.* (citing *Ray v. Motel 6*

*Operating, Ltd. P'ship*, No. 3-95-828(RHK), 1996 WL 938231, at *2 (D. Minn. Mar. 18,

1996)). "The plaintiffs need only establish at that time a colorable basis for their claim

that the putative class members were the victims of a single decision, policy, or plan." *Id.*

(citing *Burch*, 500 F. Supp. 2d at 1186). If there is contrary evidence presented by the

parties, the Court does not make credibility determinations or find facts at this stage. *Id.*

at 1083 (citing *Brennan*, 2008 WL 819773, at *3). "[C]ourts usually rely on the

pleadings and any affidavits submitted by the plaintiff to determine whether to grant

conditional certification." *Id.* at 1082-83 (citing *Parker v. Rowland Express, Inc.*, 492 F.

Supp. 2d 1159, 1164 (D. Minn. 2007)). Plaintiffs bear the burden of showing class

members are similarly situated, but the "burden at the first stage is a light one." *Vallone*

*v. CJS Sols. Grp., LLC*, 437 F. Supp. 3d 687, 689 (D. Minn. 2020) (citing *Smith*, 404 F. Supp. 2d at 1149). That said, as noted by Target, assertions not based on personal knowledge will not show that employees are similarly situated. *See Brooks v. C.H. Robinson Int'l, Inc.*, No. 16-CV-0939-CV-W-BP, 2018 WL 5818377, at *3 (W.D. Mo. July 6, 2018); *see also Jones v. Corporate Bank Transit of Kentucky, Inc.*, No. 13-0484-CV-W-BP, Doc. 69 at 2-3 (W.D. Mo. June 18, 2014); *Simmons v. Valspar Corp.*, 2011 WL 1363988, at *3 (D. Minn. 2011); *Wacker v. Personal Touch Home Care, Inc.*, 2008 WL 4838146, at *1 (E.D. Mo. Nov. 6, 2008) (plaintiffs made no showing of a national policy, and "the former employee who signed plaintiffs' affidavit has no personal knowledge of what goes on at other offices around the country"); *Freeman v. Wal-Mart Stores, Inc.*, 256 F. Supp. 2d 941, 945 (W.D. Ark. 2003).

In addition to showing class members are similarly situated, "this Court has consistently held that a plaintiff must demonstrate some interest from others who are similarly situated." *Chin*, 57 F. Supp. 3d at 1090. "[I]n order for a case to be appropriate for collective-action status under the FLSA, the Court must be satisfied that there are other employees who desire to opt in." *Id.* (quoting *Lyons v. Ameriprise Fin., Inc.*, No. 10-cv-503 (RHK/JJK), 2010 WL 3733565, at *4 (D. Minn. Sept. 20, 2010)). "[A]n FLSA plaintiff is not entitled to conditional certification simply to seek out others who might wish to join the action." *Parker*, 492 F. Supp. 2d at 1166. Still, a "plaintiff's burden to demonstrate interest is not particularly onerous." *Chin*, 57 F. Supp. 3d at 1091.

Target takes the position that because discovery has taken place in the present matter and in other cases involving Plaintiff's counsel, including in *Jibowu v. Target*

*Corp.*, 492 F. Supp. 3d 87 (E.D.N.Y. 2020), and its predecessor *Locicero v. Target Corp.*, No. 3:16-cv-05592 (D.N.J. July 27, 2017), the Court must apply a heightened standard that allows the Court to consider the evidence submitted by Target.  (Dkt. 101 at 34-35.) Target's argument runs contrary to the fact that "[a]fter discovery is completed, the court conducts an inquiry into several factors if there is a motion to decertify the class."  *Chin*, 57 F. Supp. 3d at 1082 (citing *Burch*, 500 F. Supp. 2d at 1186).  Moreover, "[e]ven in cases where the parties have engaged in some discovery, plaintiffs must show only a colorable basis to achieve conditional certification under the first stage of review." *Lyons*, 2010 WL 3733565, at *3 (citations and quotation omitted).  Indeed, the purpose of this Motion is to determine "'whether the class should be conditionally certified for notification **and discovery purposes**.'"  *Harris v. Chipotle Mexican Grill, Inc.*, 49 F. Supp. 3d 564, 577 (D. Minn. 2014) (emphasis added) (quoting *Burch*, 500 F. Supp. 2d at 1186).  Target's position circumvents this process by avoiding fulsome discovery as to a national collective by requiring this Court to weigh the evidence from it at the conditional certification stage, regardless of whether Plaintiffs have the opportunity to challenge the evidence during depositions or other discovery.  The Court appreciates that discovery has taken place in *Jibowu* and *Locicero*, however, there is no dispute that in *Jibowu* the court ultimately limited the class to stores at issue, as opposed to a national collective that is at issue in the present Motion.  Moreover, as conceded by Target's counsel at the hearing, discovery has in many instances been marked as confidential in *Jibowu,* and there has been no agreement as far at this Court can determine that Target has agreed that all information be used in the present case.  Target cannot have it both ways—claim fulsome

12

discovery and assert confidentiality that precludes a fulsome record for this Court.  As such, since the parties here have not completed discovery, this case is at the first step of the two-step inquiry.  *See Brennan*, 2008 WL 819773, at *3.  That said, while the Court "does not make any credibility determinations or findings of fact with respect to contrary evidence presented by the parties at this initial stage . . . neither the remedial purposes of the FLSA, nor the interests of judicial economy, would be advanced if we were to overlook facts which generally suggest that a collective action is improper." *Saleen v. Waste Mgmt., Inc.*, No. CIV 08-4959(PJS/JJK), 2009 WL 1664451, at *4 (D. Minn. June 15, 2009), *aff'd*, 649 F. Supp. 2d 937 (D. Minn. 2009) (marks and citation omitted).  In other words, the Court will not ignore evidence in the record submitted by Plaintiffs or Target, such as excerpts from Plaintiffs' deposition testimony relied upon by Target, but the Court will not expand *Saleen* as suggested by Target to encompass evidence propounded by Target that has not been fully vetted by discovery in the present action.

**B.  Similarly Situated Putative Class Members**

"The term 'similarly situated' is not defined by the FLSA, but it typically requires a showing that an employer's commonly applied decision, policy, or plan similarly affects the potential class members, and inflicts a common injury on plaintiffs and the putative class." *Chin*, 57 F. Supp. 3d at 1083 (cleaned up).  "[P]laintiffs need only establish . . . a colorable basis for their claim that the putative class members were the victims of a single decision, policy, or plan." *Id.* at 1082 (citing *Burch*, 500 F. Supp. 2d at 1186).  "A colorable basis means that plaintiffs must come forward with something more than the mere averments in their complaint in support of [their] claim." *Lyons*,

13

2010 WL 3733565, at *3 (cleaned up). "Determining whether Plaintiff's showing meets this standard lies within the Court's sound discretion." *Chin*, 57 F. Supp. 3d at 1083 (cleaned up).

Plaintiffs argue that under the fairly lenient standard applicable at the notice stage, the pleadings and declarations submitted in support of this Motion sufficiently establish a colorable basis that Target has a nationwide, uniform practice of classifying ETLs in similar situations as exempt, especially in light of caselaw from within this District certifying nationwide collective based on lesser evidence. (Dkt. 85 at 22-29.)

Target counters, in part, that Plaintiffs must not just show that all ETLs were subject to a common policy, but also demonstrate that the common policy or plan violated the law—"to win conditional certification, plaintiffs must 'demonstrate a nationwide policy pursuant to which [ETL]s are assigned duties that render [Target's] exempt classification inappropriate.'" (Dkt. 101 at 38-39 (quoting *Jibowu*, 492 F. Supp. 3d at 121) (alterations in original).) In this regard, Target asserts that Plaintiffs' Motion fails because its written policies and training documents all demonstrate that ETLs are expected to spend a majority of their time on managerial tasks, thereby establishing that Target properly characterized the ETLs as bona fide executives.[7] (*Id.* at 39-41.) To the

---

[7]   The FLSA excludes employees who are classified as bona fide executives from overtime pay. *See* 29 U.S.C. § 213(a)(1). Under the FLSA, the term "employee employed in a bona fide executive capacity" means any employee:

>   (1) Compensated on a salary basis pursuant to § 541.600 at a rate of not less than $684 per week (or $455 per week if employed in the Commonwealth of the Northern Mariana Islands, Guam, Puerto Rico, or the U.S. Virgin Islands

extent that Target is relying on the *Jibowu* decision for the proposition that the Court

must make a merits determination based on evidence proffered by Plaintiffs or *Jibowu*'s

requirement that the plaintiffs in that case prove that Target had a "*de facto* unlawful

policy," *Jibowu*, 492 F. Supp. 3d at 123, the Court finds that this is an issue for the

decertification stage of a FLSA action, especially where most of the information is in

Target's control, *see Chin* 57 F. Supp. 3d at 1085 (explaining that "**courts in the Eighth**

**Circuit have consistently** held that merits based inquiries, including whether an FLSA

exemption applies, are appropriate for the second, decertification stage of FLSA

actions.") (citations omitted) (emphasis added).  Moreover, courts within the Eighth

Circuit have rejected the assertion that mere existence of a lawful policy closes the door

to certification.  *See Walkinshaw v. Saint Elizabeth Reg'l Med. Ctr.*, 507 F. Supp. 3d

1106, 1122 (D. Neb. 2020) ("First, as to the argument that there can be no collective

---

by employers other than the Federal government, or $380 per week if
employed in American Samoa by employers other than the Federal
government), exclusive of board, lodging or other facilities;

(2) Whose primary duty is management of the enterprise in which the
employee is employed or of a customarily recognized department or
subdivision thereof;

(3) Who customarily and regularly directs the work of two or more other
employees; and

(4) Who has the authority to hire or fire other employees or whose
suggestions and recommendations as to the hiring, firing, advancement,
promotion or any other change of status of other employees are given
particular weight.

29 C.F.R. § 541.100(a).

action because CHI had a lawful policy in place to pay all employees for remote on-call work, the mere existence of a policy is not proof that it was followed in practice."); *Oliphant v. Sprint Corp.*, No. 8:18CV353, 2019 WL 2088052, at *3 (D. Neb. Apr. 26, 2019), *R. & R. adopted*, 2019 WL 2086003 (D. Neb. May 13, 2019) ("Oliphant and Gulizia's affidavits tend to corroborate the allegations in the Complaint that Sprint's wage payment practices caused them to perform unpaid regular and overtime work, despite Sprint's written policies and procedures prohibiting such conduct.") (citation omitted); *see also Shockey v. Huhtamaki, Inc.*, 730 F. Supp. 2d 1298, 1304 (D. Kan. 2010) ("[T]he presence of a written policy is not evidence that the policy was enforced, and certainly does not negate the possibility of an unwritten policy or general practice to the contrary.")  To the contrary, some courts have suggested that a common policy of payment for that class of employees which results in the putative collective in not being paid overtime can be evidence that the employees are similarly situated.  *See Chin*, 57 F. Supp. 3d at 1087 ("Furthermore, Chin clearly demonstrates that a common policy or practice exists by alleging that the uniform, national compensation structure for all Sales Associates and Assistant Store Managers is responsible for putative class members not being paid minimum wage or overtime.  In fact, as Plaintiff correctly notes, one court recently found that the fact that the defendant claimed the employees at issue were covered by the retail sales exemption favored conditional certification because it showed a common policy to deny the employees overtime when they worked more than 40 hours per week.") (marks omitted) (citing *Long v. CPI Sec. Systems, Inc.*, 292 F.R.D. 296, 304 (W.D.N.C. 2013)).  Here, Target concedes a national policy to avoid paying overtime

16

applicable to all of its purportedly "11,000+" ETLs, regardless of the subclass or location: "all of these documents require ETLs primarily to perform exempt work: ETLs are expected to act as leaders and accomplish goals through their teams." (Dkt. 101 at 39.)

Given this common thread, the Court must still examine "how much evidence must a plaintiff submit in order to establish a 'colorable basis' that all members of the putative class were harmed by the same unlawful policy." *Saleen*, 649 F. Supp. 2d at 940. Indeed, the mere fact that some employees of a large corporation were not properly compensated under the FLSA does not provide a "colorable basis" to infer the existence of an unlawful companywide policy. *Id*. at 941. In *Saleen*, a case on which Target relies, the court noted that the defendant employer submitted evidence showing that on 222,000 occasions during the proposed class period, the employer paid for time worked during meals, including for a number of opt-in employees. *Id.* at 942. While the court questioned the significance of this evidence, it concluded that "evidence that [an employer] paid for time worked during meal breaks on hundreds of thousands of occasions is very difficult to reconcile with plaintiffs' claim that [an employer] maintains a companywide policy not to pay for worked meal breaks." *Id.* This evidence, along with other evidence, led the court, in a "close case" (where it could only overturn the magistrate judge's decision where it was clearly erroneous), to affirm the magistrate judge's decision to deny conditional class certification where the plaintiffs submitted declarations from employees representing less than 1% of the work force (112 declarations out of 20,0000-30,0000 employees). *Id.* at 942-43. The court in *Saleen* did

17

not set a threshold for what percentage of employees is necessary before a court can find a colorable basis for a claim that the putative class members were the victims of a single unlawful decision, policy, or plan.  While the Court views the percentage as one potentially helpful factor, "courts in this District and the Eighth Circuit have not required a threshold percentage of opt-ins for conditional certification."  *Chin*, 57 F. Supp. 3d at 1091 (citing *Bilskey v. Bluff City Ice, Inc.*, No. 1:13-cv-62 (SNLJ), 2014 WL 320568, at *3 (E.D. Mo. Jan. 29, 2014)).  In the end, "there is no numerical baseline that plaintiffs must meet," and "whether a plaintiff has shown sufficient opt-in interest is necessarily a case-specific inquiry that will turn on case-specific facts."  *Wang v. Jessy Corp.*, Civil No. 17-5069 (JRT/HB), 2019 WL 3574553, at *5 (D. Minn. Aug. 6, 2019).  While the percentage of the total potential class is not determinative, percentages well under 1% have been conditionally certified by courts within this District.  *See Chin*, 57 F. Supp. 3d at 1091 (5 interested persons, from at least 5 states, out of 2,700 putative class members, or about 0.2%); *Burch*, 500 F. Supp. 2d at 1188-89 (conditionally certified a nationwide collective of approximately 8,000 workers based on declarations from 19 plaintiffs, or about 0.24%).

Target also relies on the decision in *Jibowu*, *supra*, for the proposition that Plaintiffs' Motion fails because they have failed to put forward sufficient ETL declarations to support a nationwide collective.  (Dkt. 101 at 48.)  In *Jibowu*, the court concluded as follows:

> While relying on Defendant's lawful ETL policies as demonstrating the uniformity of its practices across the country, Plaintiffs have submitted only eight sworn statements in approximately six states as to Defendant's

> purportedly unlawful unofficial policy.  Courts in this Circuit have generally denied certification of nationwide collectives where plaintiffs proffer evidence of de facto unlawful policies in only some of a defendant employer's many locations.

*Jibowu*, 492 F. Supp. 3d at 124 (citations omitted).  Similar to *Saleen*, the *Jibowu* court does not specify how many sworn statements, locations, or states would be necessary to approve a nationwide class.  Regardless, the decision in *Jibowu* is distinguishable from this case in that the *Jibowu* court, following case law from the Second Circuit, found that the plaintiffs were required at step one to make a "modest factual showing" and ultimately applying a "modest-plus" standard based on the discovery taken, and therefore considered evidence presented by both the plaintiffs and Target.  *Id.* at 119-120.  As stated previously, here, law in the Eighth Circuit is that the "burden at the first stage is a light" and Plaintiffs need only show a "colorable basis" for their claim, as opposed to proving that Target had a *de facto* unlawful policy, that the putative class members were the victims of a single decision, policy, or plan, without making findings as to evidence presented by Target.  *See Vallone*, 437 F. Supp. 3d at 689; *Chin*, 57 F. Supp. 3d at 1082; *Saleen*, 2009 WL 1664451, at *4.

Here, the Court has before it a common policy from Target as to all stores of a class of executives in the form of ETLs to which it does not pay overtime.  While the written policies and training materials set forth that the ETLs are expected to spend more than 50% of their time on leadership responsibilities rather than "focus" on hourly tasks, there is also no dispute that ETLs are tasked with performing significant hourly tasks as part of their essential functions of their position, as evidenced by the same materials, and

that the physical requirements for ETLs include the ability to move merchandise with

appropriate equipment and to be able to place and arrange items on all shelves and racks

on the sales floor.  (Dkt. 89 at 7; Dkt. 89-1 at 28-29.)  Moreover, it is clear that Target

wanted its ETLs to perform hourly tasks:

> [I]t's critical to continually spend substantially more than 50 percent of your
> time on leadership responsibilities rather than hourly tasks. **You will need to
> jump in and assist with hourly tasks on occasion**; however, you cannot
> forget to jump out at the right time to ensure you are spending the clear
> majority of your time on leadership.

(Dkt. 89-1 at 28; Dkt. 102-2 at 3 (emphasis added).)

The inclusion of non-exempt tasks in the job description itself distinguishes this

case from many of those relied on by Target.  For example, in *Brown v. Barnes & Noble,

Inc.*, "Plaintiffs d[id] not argue that the [Café Manager] job description in and of itself

describes a non-exempt position."  252 F. Supp. 3d 255, 263 (S.D.N.Y. 2017).  In fact,

*Brown* distinguished another case, *Ferreira v. Modell's Sporting Goods, Inc.*, No. 11-cv-

2395 (DAB), 2012 WL 2952922 (S.D.N.Y. July 16, 2012), which certified a class based

on "a single plaintiff's sworn statement in granting conditional certification of a

collective action involving assistant store managers" because "the court in *Ferreira* in

fact reviewed and relied on defendant's written corporate policies, the relevant job

description, plaintiff's deposition testimony, the testimony of one of defendant's

corporate executives, and defendant's motion papers, **which all indicated that there

was a uniform practice of requiring Assistant Managers to perform at least some

non-exempt duties**."  252 F. Supp. 2d at 267 (emphasis added).  Similarly, in *Guillen v.

Marshalls of MA, Inc.*, the Assistant Store Manager job description did not include non-

exempt tasks, and even though the Assistant Store Managers received training for "certain apparently non-exempt tasks during the standardized management training program," they did not say "they were instructed in the training program to spend their work hours actually performing such tasks and, indeed, the voluminous management training materials they attach[ed] . . . d[id] not support such a conclusion."  750 F. Supp. 2d 469, 472, 477-478 (S.D.N.Y. 2010).

In other words, there is evidence that Target expected the ETLs to perform a meaningful number of hourly tasks.  Further, Target's admonishments that ETLs should "continually spend substantially more than 50 percent of your time on leadership responsibilities rather than hourly tasks" and "jump out at the right time to ensure you are spending the clear majority of your time on leadership" suggest Target was cognizant of the difficulty of designating such employees as exempt under the bona fide executive exemption.[8]  Moreover, the declarations and deposition transcripts from ETLs propounded by Plaintiffs are evidence that Target did not sufficiently staff its stores with hourly workers who would perform hourly tasks, resulting in ETLs being required to spend the great majority of their time on hourly non-managerial type tasks lest they go

---

[8]      Target did not provide any evidence indicating how ETLs were to determine when to "jump out" of hourly tasks or otherwise ensure they were spending more than 50% of time on leadership responsibilities, although Director of Employee Relations Michael Brewer did state "If an ETL reports spending 50% or less of their time on managerial Duties [in her self-audit], Target offers resources and training to restore the proper balance of work; the ETL is not subject to any adverse action."  (Dkt. 106 ¶ 16.)

uncompleted, regardless of the expectations set forth in Target's written materials. (*See supra*, Section I.B.)

The Court recognizes that this evidence represents less than 1% of the ETLs, but finds it significant that they are from ETLs working at stores across the country.[9] In other words, there is evidence of a pattern or practice by Target of using ETLs to shore up their hourly workers across the country that cannot be merely explained by a rogue manager or region. The Court acknowledges that 19 current ETLs throughout the country have represented in declarations and self-audits filed in support of Target's opposition that they expect to and do spend more than 50% of their time in management duties in their self-audits and have asserted that their primary duties involve managerial tasks. (*See* Dkt. 103; Dkt. 103-1 through Dkt. 103-19.) However, this evidence is quite different from the employee time records propounded by the defendant in *Saleen*, which established that on 222,000 occasions during the proposed class period, the employer paid for time worked during meals, including for a number of opt-in employees. 649 F. Supp. 2d at 942. The Court is reluctant to put much, if any, weight in declarations

---

[9]    Target's reliance on *Khan v. Airport Mgmt. Servs., LLC*, No. 10 CIV. 7735 NRB, 2011 WL 5597371, at *4 (S.D.N.Y. Nov. 16, 2011), is unpersuasive. In *Khan*, the plaintiff and three former co-workers submitted declarations stating they performed "clerk activities" rather than managerial functions. 2011 WL 5597371, at *3-4. Defendants submitted 23 declarations from individuals of various managerial titles employed at locations across the country—including three individuals who Khan identified by name as "'similar employees' who were not paid overtime"—and Defendants' declarations stated that employees holding a managerial title had "broad managerial duties" rather than "the limited responsibilities claimed by Khan." *Id.* at *4. Further, after five months of discovery, Kahn was "unable to produce a single other individual interested in participating as a plaintiff in this case, which, while "not determinative," was "telling." *Id.* at *5.

obtained by Target's counsel as part of interviews for the present litigation. The Court does not intend to suggest any wrongful conduct by Target, but such evidence should be vetted though fulsome discovery, as Plaintiffs' allegations and declarations have been vetted through depositions, especially where there are assertions made under oath that STLs have been pressuring ETLs to fill out self-audits in a manner to show that much more than 50% of their time was being spent on managerial tasks, with repercussions in some cases if they failed to do so.[10] (*See, e.g.*, Dkt. 86-11 at 13-14; Dkt. 102-3 at 182-83; Dkt 120-1 at 6; Dkt. 120-2 at 7; Dkt. 120-3 at 7-8; Dkt. 120-5 at 6-7; Dkt. 120-6 at 6.)

Target also argues that conditional certification is inappropriate because the proof submitted is specific to the individual. (Dkt. 101 at 44.) In particular, Target argues that the self-audits and the ETLs' deposition testimony demonstrate that there is wide variation in how ETLs performed their duties, the ETL position includes a broad category of distinct roles that have very different responsibilities, and there is substantial variation in the amount of time putative class members allegedly spent performing managerial versus non-managerial tasks. (Dkt. 101 at 29, 44-45, 51.) In this regard, Target first relies on the *Jibowu* decision, where it appears the court took into account Target's assertion that certification was not appropriate given that any unlawful activity may be

---

[10]     While there was an assertion that the STLs would not be shown the 19 employees' declarations (*see e.g.,* Dkt. 103-1 through Dkt. 103-19), there is no assertion that STLs did not talk to the 19 employees about giving a declaration or any explanation of how these employees were chosen by Target to supply a declaration.

due to a specific management team in each store and not an unlawful Target policy or practice. *See Jibowu*, 492 F. Supp. 3d at 125 ("Defendant attributes Plaintiffs' performance of primarily nonexempt work to Plaintiffs' personal decisions or alleged practices of local management teams, explanations that cannot possibly be representative of thousands of other ETLs. The Court agrees that misclassification due to variation in unofficial, de facto policies implemented at individual stores generally weighs against conditional certification of a nationwide collective.") (cleaned up). However, for the Court to make such a finding at this stage in the litigation presupposes that a rogue manager or an employee's decision at a particular store caused the unlawful conduct simply because Target's national written policy requires ETLs to spend more than 50% of their time on leadership tasks. In other words, an employee would have to prove that a national unlawful practice caused their injuries at the first stage of review, which goes far beyond the pleadings and affidavits required in this District and would amount to a determination on the merits that is more appropriate on motion for decertification. *See Chin*, 57 F. Supp. 3d at 1082-83; *see also Simmons*, 2011 WL 1363988, at *5 ("And although Plaintiffs worked in different regions across the country and under different managers, they all make the same allegations about the nature of their job responsibilities, the fact they regularly worked more than 40-hour weeks, their classification as exempt, and the policies they were required to follow in reporting their work hours. The salient factual allegations among the Plaintiffs are sufficiently similar for collective treatment at this stage."); *Burch*, 500 F. Supp. 2d at 1187 (citing *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1217 (11th Cir. 2001)) (finding at the

conditional certification stage, "Plaintiffs are not required to provide evidence showing [the employer]'s illegal practice at every location or that Plaintiffs are identically situated to putative class members in all respects.").

It is a closer call with respect to Target's argument regarding the variation in time spent on tasks by each ETL and the need by the Court to make an individualized assessment for the 11,000+ ETLs for the purposes of the bona fide executive exemption. There is no dispute that "[d]etermining whether an employee is exempt is extremely individual and fact-intensive." *Pressler v. FTS USA, LLC,* No. 409CV00676JLH, 2010 WL 1904974, at *4 (E.D. Ark. May 12, 2010) (citation omitted).  Indeed, the Secretary of Labor's regulations provide that the determination of whether Plaintiffs spent the majority of their time on management or hourly tasks, or what their primary duty is, comprises a fact-intensive inquiry: "Determination of an employee's primary duty must **be based on all the facts in a particular case**, with the major emphasis on the character of the employee's job as a whole."  29 C.F.R. § 541.700(a) (emphasis added); *see also Fife v. Harmon*, 171 F.3d 1173, 1175-76 (8th Cir. 1999) (noting that when determining whether the "bona fide" exemption applies to a particular employee, the Court inquires into the employee's day-to-day activities and responsibilities, as contemplated in regulations set forth by the Secretary of Labor).  "Courts have held that where individualized determinations are required, 'certification of a FLSA collective action is inappropriate.'"  *Keef v. M.A. Mortenson Co.*, No. 07-CV-3915JMRFLN, 2009 WL 465030, at *3 (D. Minn. Feb. 24, 2009) (citation omitted) (granting decertification motion).  If this Court would be required to hold mini-trials as to each of the 11,000+

ETLs in order to determine if they were properly designated as exempt, that would run contrary to the purpose of a collective action: to facilitate the "efficient resolution in one proceeding of common issues of law and fact." *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989).

That said, the Court starts with the premise that "there is no general rule that classification cases are not suitable for conditional certification." *Cruz v. Lawson Software, Inc.*, No. CV 08-5900 (MJD/JSM), 2009 WL 10711635, at *8 (D. Minn. Mar. 31, 2009) (citation omitted). Courts have found that concern of whether individualized evidence will be necessary is better assessed at the decertification stage. By way of example, in *Simmons, supra,* the defendant opposed conditional certification of the class and argued that the plaintiffs were exempt and their exemption status "depend[ed] on an individual, fact-specific analysis of each employee's job responsibilities under the relevant statutory exemption criteria." 2011 WL 1363988, at *4. The court went on to find that conditional certification was warranted because whether or not plaintiffs were exempt pursuant to the statutory exemption was an inquiry appropriate for a decertification motion, "which [is] judged by a very different standard than the one applicable [for a motion to conditionally certify the case as a collective action]." *Id.*; *see also Pressler*, 2010 WL 1904974, at *4 ("Typically, the defendant's concern that individualized evidence is necessary to determine whether potential plaintiffs have been considered exempt from the requirements of the FLSA is better addressed at the second stage of the certification process.").

Here, there is no dispute that there are subsets of the ETL role, there is variation in how ETLs performed their roles, and there is variation in time spent on hourly tasks by each ETL.  The Court is not persuaded at this stage of the litigation, however, that these differences render the case unmanageable or suggest that "neither the remedial purposes of the FLSA, nor the interests of judicial economy, would be advanced if we were to overlook facts which generally suggest that a collective action is improper."  *West v. Border Foods, Inc.*, No. 05-2525 (DWF/RLE), 2006 WL 1892527, at *7 (D. Minn. July 10, 2006) (citation omitted).  The range of time spent on non-exempt hourly tasks by ETLs based on the evidence propounded by Plaintiffs is between 80 and 95%.  (Dkt. 85 at 13-14.)  Given that whether 50% of an employee's time is spent on exempt work is "a useful guide in determining whether exempt work is the primary duty of an employee," 29 C.F.R. § 541.700(b), the fact that the ETLs relied upon by Plaintiffs assert they spent between 5% and 20% of their time on exempt work—much less than 50%—does not present an insurmountable obstacle to conditional certification.

More importantly, Target also asserts that "wide variation" in how Plaintiffs and opt-ins perform their roles renders this case unmanageable as a collective action.  (Dkt. 101 at 45.)  The variation described by Target focuses on managerial/leadership responsibilities, not the hourly non-exempt tasks that ETLs are also expected to perform. (*See, e.g.*, *id.* at 12-15 (describing ETL positions), *id.* at 22-27 (describing differences in training, participation in personnel decisions, interviewing and hiring, discipline, supervision and delegation)).  However, Target argues that the focus here is on whether a common policy or plan violated the law.  (*See* Dkt. 101 at 38 ("Plaintiffs must show not

just that all ETLs were subject to a common policy, but that the "common policy or plan

. . . **violated the law**.") (citing *Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2nd Cir. 2010)).)

Plaintiffs' theory is that ETLs perform hourly non-exempt work because "Target

promulgates comprehensive formal corporate procedures and policies with which all

ETLs must comply" and those "policies mandated, in practice, that ETLs throughout the

company perform primarily hourly work to meet [Target's] standards."  (Dkt. 85 at 18-

19.)  Plaintiffs further allege "a store's labor budget (set a far higher management level

than ETLs), combined with Target's other scripted policies, require stores to maintain

lean labor budgets for profitability which results in making the performance of non-

managerial tasks the primary duty of ETLs."  (*Id.* at 19.)  In view of these allegations,

which are supported by deposition testimony, the common issues of fact and law as

alleged by Plaintiffs relate more to the effect of Target's procedures, policies, and

financial goals on an ETL's ability to spend at least 50% of her time on managerial or

leadership tasks and less on the specific hourly tasks performed by each ETL.  The Court

also is not persuaded that, when the hourly non-exempt tasks that are the focus of the

alleged violation constitute tasks such as zoning, stocking, cashiering, unloading trailers,

moving boxes, and moving, unpacking, and setting up merchandise (*see, e.g.*, Dkt. 102-

2), the type of merchandise (e.g., clothing, groceries, or electronics) is a difference that is

meaningful at the conditional certification stage.

Further, while there is evidence of differences in the ETLs' roles and experiences,

there is also evidence of significant overlap in the various subsets of ETLs

managerial/leadership "core roles," including requirements to manage inventory, "[d]rive

timely execution of all store operational processes to ensure the store is in stock and impactful," prioritize guest services, "[m]anage the team to ensure food safety standards are maintained and temperature standards adhered to for sales floor, production, and backroom locations, ensure quality" "[m]onitor team zones," and "[e]nsure cart attendants are following proper cart return procedures and keeping spill stations fully stocked," among other things.  (Dkt. 89 at 3-6.)  The Court also notes that Target's allegations that these "wide variations" make the case unmanageable are fairly generic (*see id.* at 44-45), and that those variations did not prevent the *Jibowu* court from conditionally certifying a class of several different subsets of ETLs, namely:

> current and former Food ETLs, Sales Floor ETLs, Softlines ETLs, Hardlines ETLs, Guest Experience ETLs, Replenishment ETLs, and Logistics ETLs in stores that do not have Replenishment ETLS, employed by Defendants at the Target store locations within California, Illinois, New York, Ohio, Oklahoma, Pennsylvania, and Texas, at which Plaintiff Jibowu or the opt-in Plaintiffs worked, at any time from June 28, 2014 to the present.

492 F. Supp. 2d at 129.  In other words, while the *Jibowu* court had concerns about a nationwide class (when applying a different legal standard), it did not find that the subsets of the ETL position or variation between the ETLs' roles in stores in the six states in which it did certify rendered the case unmanageable.

The Court has carefully considered *Stroud v. Target Corp.*, No. 10-cv-01583 (D. Minn. Sept. 1, 2011), a case cited by Target on this point.  In *Stroud*, the Court cited *Morisky v. Public Serv. Elec. & Gas Co.*, 111 F. Supp. 2d 493 (D.N.J. 2000), when finding the case unmanageable and that there were no procedural advantages to certification "[b]ecause this is a case where the "exempt or non-exempt status of

potentially hundreds of employees would need to be determined on a job-by-job, or more likely, an employee-by-employee basis." *Stroud*, No. 10-cv-01583, Dkt. 71 at 13. But *Morisky*, the case Stroud relied on, differs significantly from this case. First, the proposed collective constituted "management, administrative, supervisory and technical employees" in the same salary grade at a nuclear power plant and the plaintiffs included technical analysts, a CAD drafter, a designer, and engineers—plainly very different roles. *Morisky*, 111 F. Supp. 2d at 494-496. Second, the case was "clearly beyond the first tier of the above analysis, as over 100 potential plaintiffs ha[d] already opted into this lawsuit" and "discovery was to have been completed" before the motion was filed, resulting in application of "a stricter standard." *Id.* at 497-98. This is very different from the situation and legal standard applicable here, where the proposed collective are all ETLs of one type or another and discovery is not complete.

As for *Stroud*, that case observes that "[l]ess evidence is also needed where the uniform description or training manuals for an exempt job expressly include non-exempt tasks." *Stroud*, No. 10-cv-01583, Dkt. 71 at 11 (discussing similarly situated factor). The *Stroud* plaintiffs offered no such description or training manuals, and in fact relied only on four declarations. *See id.* at 12. Here, however, it is undisputed that the job description for all ETLs expressly includes non-exempt tasks, rendering this case distinguishable from *Stroud* for purposes of analyzing the similarly situated and manageability factors.

For all these reasons, the Court is not persuaded at this stage that this case is unmanageable. Other courts have conditionally certified nationwide classes

30

notwithstanding factual differences of the type argued by Target.  *See, e.g.*, *O'Quinn v. TransCanada USA Servs., Inc.*, 469 F. Supp. 3d 591, 604-05 (S.D. W. Va. 2020) ("At this stage in the proceedings, factual distinctions between putative class members, such as, (1) having different supervisors, (2) having different job duties, (3) working in facilities [at] distinct locations, and (4) difference is amount paid, are not fatal to a motion for conditional class certification in an FLSA action."); *Meyer v. Panera Bread Co.*, 344 F. Supp. 3d 193, 207-08 (D.D.C. 2018) ("In short, '[a]lthough defendants often argue that the necessity of fact-intensive individualized inquiries will render a collective action unmanageable,' courts tend 'not to consider such arguments at the conditional certification stage, and, instead, put these issues off until the decertification stage, when discovery is complete.'") (quoting *Barry v. S.E.B. Serv. Of New York, Inc.*, No. 11-CV-5089, 2013 WL 6150718, at *6 (E.D.N.Y. Nov. 22, 2013)); *Indergit v. Rite Aid Corp.*, No. 08 CIV. 11364 (PGG), 2010 WL 2465488, at *9 (S.D.N.Y. June 16, 2010) (rejecting argument that collective adjudication would be unmanageable because "determining an employee's exempt status under the executive exemption 'requires an analysis of each individual's daily job duties,' and that because this is a fact-intensive inquiry, this type of FLSA claim cannot be the subject of an FLSA collective action" as "ignor[ing] the purposes of the FLSA").  As the *Indergit* court observed, "[i]f this Court were to credit Rite Aid's argument, no FLSA action that is premised upon an alleged misclassification under the executive exemption could be resolved through the collective action process, thereby defeating the stated purpose of the FLSA and wasting judicial resources by requiring courts to consider each individual plaintiff's claims in a separate lawsuit").

Here, the Court concludes that the differences identified by Target do not require denial of conditional certification.

**C.    Notice**

Target identifies a number of concerns with Plaintiffs' proposed notice and requests that if the Court grants conditional certification, that it require the parties meet and confer about the notice.  The Court agrees that the parties should meet and confer regarding the notice and directs the parties to do so and file a proposed notice, identifying any points of disagreement, on or before April 11, 2022, unless this Order is appealed.  If the parties cannot reach agreement, each side may file a brief of no more than 3,000 words setting forth the basis for their position on the same date.

## IV.    ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that:

1.    Plaintiffs' Motion for Notice and Conditional Certification (Dkt. 83) is **GRANTED**.

2.    The parties must meet and confer regarding a proposed notice and file a proposed notice identifying any points of disagreement, on or before **April 11, 2022**, unless this Order is appealed.  If the parties cannot reach agreement, each side may file a brief of no more than 3,000 words setting forth the basis for their position on the same date.

DATED: March 28, 2022                    *s/Elizabeth Cowan Wright*
                                         ELIZABETH COWAN WRIGHT
                                         United States Magistrate Judge